UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRUCE KIRBY, INC., *et al.*,
    *Plaintiffs*,

    v.

LASERPERFORMANCE (EUROPE)
LIMITED, *et al.*,
    *Defendants*.

No. 3:13-cv-00297 (JAM)

## ORDER REGARDING CROSS-MOTIONS
## FOR SUMMARY JUDGMENT ON CLAIMS AND COUNTERCLAIMS

This case principally concerns a contract dispute between Bruce Kirby, the designer of

the renowned Kirby Sailboat, and certain companies that build and sell those sailboats under the

"Laser" brand name. Both Kirby and his company, Bruce Kirby, Inc., claim that the builders

breached their contracts with them and have also infringed their intellectual property rights.

Amidst a sea of claims, counterclaims, and competing motions for summary judgment, the

builders assert that neither Kirby nor his corporate namesake have standing to sue them, because

Kirby and Bruce Kirby, Inc. sold their contractual and intellectual property rights to another

company who has not been joined as a plaintiff in this action. I agree, and therefore will grant

defendants' motions for summary judgment on plaintiffs' claims. I will otherwise grant in part

and deny in part the remaining motions for summary judgment in this case.

### BACKGROUND

In 1969, Bruce Kirby designed a small sailboat that could be carried on the top of a car,

and he thereby revolutionized the sport of sailboat racing. During the early 1970s, plaintiffs

entered into an agreement, called the Head Agreement, with two international sailing bodies—

the International Sailing Federation (ISAF, formerly known as the International Yacht Racing Union) and the International Laser Class Association (ILCA)—to regulate the manufacture, sale, and registration of these sailboats that use the Kirby Sailboat design and are sold under the brand name "Laser." Plaintiffs also entered contracts ("Builder Agreements") with sailboat builders—including predecessors to defendants LaserPerformance (Europe) Limited (LPE) and Quarter Moon, Inc. (QMI)—to build the sailboats in conformity with the Head Agreement. The Builder Agreements granted LPE and QMI (as successors to the original parties to the Builder Agreement) a license to manufacture, sell, and market the Laser sailboat. Docs. #228-11 at 5 (1983 Agreement); #228-12 (1989 Agreement). In exchange for the license, LPE and QMI owed plaintiffs royalties in an amount of 2% of the dealer wholesale price. The dealer wholesale price was defined in the Builder Agreements and excluded, among other things, packaging costs. If the royalty payment was overdue, the Builder Agreements established a 12% interest rate on the amount overdue.

In 2008, Kirby decided to sell his rights in the Laser boat. He and his company entered into a sales contract with a New Zealand company called Global Sailing Limited (GSL) to receive $2.6 million for all of his interest in the Kirby Sailboat design, including all intellectual property rights and all rights under agreements entered into between plaintiffs and third parties relating to the Kirby Sailboat. In January 2009, GSL informed LPE and QMI that the rights had been assigned and to send all royalty payments to GSL. *See* Doc. #228-15. But, citing the lack of documentation to show that plaintiffs had assigned rights to GSL, LPE and QMI continued to send royalties to plaintiffs; when plaintiffs refused to accept the payments, defendants made the payments in escrow. *See* Docs. #228-16 (confirming LPE's and QMI's payment for September 2009 through January 2010 royalties sent to plaintiffs), #228-20 (returning check to plaintiffs

that they had sent to QMI), #228-22 (noting that February 2011 payment from QMI was in escrow).

In May 2010, GSL attempted to terminate the Builder Agreement with LPE. *See* Doc. #219-5. QMI remained an authorized builder. In 2011, plaintiffs and GSL entered another agreement that purported to revise the parties' relationship in light of the lack of consent by the builders to the plaintiffs' transfer of their rights to GSL. Following entry into that agreement, plaintiffs then purported to terminate the Builder Agreements with QMI and LPE in 2012 on the basis of their non-payment of royalties that plaintiffs claimed were owed under the Builder Agreements. *See* Docs. #228-24, #228-25, #228-26, #228-27.

In this lawsuit, plaintiffs claim that certain builders—including defendants LPE and QMI—breached the Builder Agreements. LPE and QMI allegedly breached their Agreements by not paying the proper royalties, and allegedly infringing on plaintiff's intellectual property rights by continuing to build sailboats and to place racing hull numbers on them after the Builder Agreements had been terminated due to their breach.

Plaintiffs initially pressed seven claims against seven defendants. By the time of the pending motions for summary judgment, there were three remaining defendants to the original suit: LPE, QMI, and ILCA. Defendants LPE and QMI have moved for summary judgment on all remaining claims (Doc. #186). Defendant ILCA has moved to dismiss for lack of personal jurisdiction and also for summary judgment (Docs. #174, 183). In addition, LPE and QMI have brought various breach of contract and tortious interference counterclaims against plaintiffs and GSL, and these counterclaim defendants have likewise moved for summary judgment on the counterclaims (Docs. #180, 184). I will address each of the pending motions for summary judgment in turn below.

**DISCUSSION**

***1. LPE and QMI's Motion for Summary Judgment***

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. To bring a case or controversy within the meaning of the Constitution "a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In contract disputes, "absent a contractual relationship there can be no contractual remedy." *Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011) (quoting *Suffolk Cnty. v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir. 1984)). This underlying rule of contract law runs parallel to the requirements for constitutional standing of any litigant to maintain a claim for breach of contract, because "strangers may not assert the rights of those who do not wish to assert them," and "the terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract." *Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014). Similarly, in copyright or other intellectual property actions, only the owner—or his assigned designee—of the intellectual property rights may sue for infringement of those rights. *See Davis v. Blige*, 505 F.3d 90, 98-99 (2d Cir. 2007).

Here, defendants argue that plaintiffs do not have standing to bring any of the claims because they are no longer parties to any of the Head or Builder Agreements. Plaintiffs counter that the 2008 sale was never valid due to the lack of satisfaction of conditions precedent, and even if it were valid, the 2008 sale was negated by the later agreement that plaintiffs and GSL

4

entered into in 2011. As plaintiffs would have it, when they entered into the 2011 Agreement, the 2008 sale to GSL was effectively undone, plaintiffs' rights were restored as parties to the Head and Builder Agreements, and they regained or retained their intellectual property rights.

This Court must interpret the various agreements as they are written. "[W]ords and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012). Therefore, I must look to the terms of the Head Agreement, Builder Agreements, the 2008 Agreement, and the 2011 Agreement to determine if plaintiffs effectively transferred their rights to GSL, and if so, what rights were transferred.

*The Head and Builder Agreements*

In 1983, Bruce Kirby, Bruce Kirby Inc., and the Trademark Owner (a third party who owned the trade mark brand name "Laser") entered into a "Head Agreement" that tightly restricted who could build boats to be raced in the Laser class. If any party to the Head Agreement wanted to assign its rights under that agreement, the assigning party was supposed to get written permission from the other parties, who were not supposed to unreasonably withhold such permission. *See* Doc. #228-32 at 16 (§ 10.1).

The Head Agreement authorized plaintiffs to enter into Builder Agreements, and plaintiffs entered into at least two such agreements with different builders in 1983 and 1989. The 1983 Builder Agreement between plaintiffs and Brook Shaw Motor Services Ltd. (Brook Shaw) granted Brook Shaw "the sole and exclusive license of the Copyright to manufacture, sell and market Kirby Sailboats" in the defined market given to Brook Shaw. Doc. #228-11 at 5 (§ 2.3). "Copyright" was defined to include "all right title and interest in and to copyright and industrial design rights in the Licensed Design" of the Kirby Sailboat. *Id.* at 4 (§ 2.1). The Builder

Agreement defines a Kirby Sailboat as "a sailboat or sailboat hull manufactured in accordance with the Licensed Design which has been commonly sold in association with the trademark 'LASER.'" Doc. #228-11 at 3. In exchange for Brook Shaw's right to use the design, Brook Shaw was required to pay to Kirby "two (2%) percent of Licensee's Dealer Wholesale price for each Kirby Sailboat manufactured and sold." *Id*. at 12 (§8.1(a)).

The 1989 Builder Agreement between plaintiffs and PY Small Boats, Inc. was essentially identical to the 1983 Builder Agreement. *See* Doc. #228-12. Most importantly for present purposes, both Builder Agreements provided that "[n]either Bruce Kirby nor Bruce Kirby Inc. shall assign any rights in the Licensed Design save to an assignee who shall enter into an agreement with Licensee on terms and conditions identical with the terms and conditions of this Agreement." Docs. #228-11 at 21 (§ 11.4), #228-12 at 15 (§ 11.4). Plaintiffs claim that defendants LPE and QMI are successors-in-interest to these Builder Agreements with Brook Shaw and PY Small Boats, Inc. *See* Doc. #23 at 7; *see also* Docs. #23-5, #23-6, #23-9.

### 2008 Intellectual Property Purchase Agreement

On June 1, 2008, plaintiffs and GSL entered into an "Intellectual Property Purchase and License Agreement" ("2008 Agreement"). The 2008 Agreement noted that "Sellers [plaintiffs] desire to sell, and Buyer [GSL] desires to purchase, all of the intellectual property rights owned by Sellers in and relating to the design of the sailboat known as the 'Kirby Sailboat'. . . ." Doc. #228-33 at 2. The purchase price for these rights was $2.6 million. *Id.* at 3. The 2008 Agreement defined "Intellectual Property Assets" as:

> all intellectual property rights owned by the Sellers, in whole or in part, or
> licensed to the Sellers relating to the Kirby Sailboat . . . (I) patents; (II)
> trademarks, service marks, trade names, service names, brand names, trade dress
> rights, logos, Internet domain names and corporate names . . . ; (III) copyrights
> and registrations and applications therefor[] . . . including but not limited to the
> construction manual; (IV) vessel hull designs for the Kirby Sailboat; (V) rights in

confidential information used by the Sellers; and (VI) rights under agreements entered into between the Sellers and third parties relating to the Kirby Sailboat.

*Id.* at 2 (§ 1.1).

Plaintiff Bruce Kirby intended to "get out of the Laser biz" with this sale. Doc. #219-4 at 53. GSL intended to step into plaintiffs' shoes regarding the Builder Agreements, sending letters to the builders instructing them to send royalty payments to GSL rather than to plaintiffs. Doc. #228-14. In 2010, GSL also attempted to terminate the Builder Agreement with defendant LPE, presumably under the authority that it purchased in the 2008 Agreement. Doc. #219-5.

The 2008 Agreement has a choice-of-law provision specifying New York law. Under New York law, "when interpreting a contract . . . the intention of the parties should control, and the best evidence of intent is the contract itself." *Gary Friedrich Enter., LLC v. Marvel Characters, Inc*., 716 F.3d 302, 313 (2d Cir. 2013). Here, there is no doubt that the express intention of the parties to the 2008 Agreement was to transfer the intellectual property rights from plaintiffs to GSL in exchange for payment. Not only do the four corners of the contract express as much, but the parties' actions after the transfer by informing third parties of the transfer of rights suggested that plaintiffs and GSL had a binding contract. GSL also attempted to terminate its Builder Agreement with defendant LPE in 2010, showing that it regarded the transfer of rights complete, including the rights under contract with the builders.

Plaintiffs argue that the 2008 Agreement was invalid because there were failures of conditions precedent—namely, that plaintiffs failed to get permission as required from the other party to the Head Agreement before transferring their rights to GSL. I am not convinced. A condition precedent to a contract must clearly appear in the parties' contract itself, rather than in some writing between one of the parties and a third party. *See Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 646 (S.D.N.Y. 2012); *Kass v.*

*Kass*, 235 A.D.2d 150, 159 (1997), *aff'\'d*, 696 N.E.2d 174 (1998). Regardless of any obligations undertaken by plaintiffs to the trademark owner in the separate Head Agreement, the 2008 Agreement between plaintiffs and GSL does not contain a condition precedent for plaintiffs to obtain consent from any other parties before they transferred their rights to GSL.

Moreover, even assuming that any such condition precedent was an implied part of the 2008 Agreement, it is the "well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 348 (S.D.N.Y. 2013); *see also In re Bankers Trust Co*., 450 F.3d 121, 127 (2d Cir. 2006). Here, plaintiffs insist upon enforcement of a condition precedent that plaintiffs themselves decided to disregard.

Plaintiffs further contend that defendants refused to acknowledge the transfer of rights under the 2008 Agreement, and therefore should be estopped from enforcing the 2008 Agreement now. But there is no reason why I need to look to defendants' actions to determine the validity of plaintiffs' contracts with GSL. Defendants' acknowledgement or ignorance of the 2008 Agreement has no bearing on whether the 2008 Agreement effectively transferred rights from plaintiffs to GSL as a matter of law. Moreover, defendants understandably cited their failure to receive documentation establishing the legitimacy of GSL's interest. Based on these reasons, I find that the 2008 Agreement was a valid contract that transferred all of plaintiffs' rights to GSL, including plaintiffs' rights under the terms of the Head and Builder Agreements.

*2011 Agreement Relating to Kirby Sailboat*

Plaintiffs next argue that, even assuming the 2008 Agreement to have been valid, the 2008 Agreement was effectively undone by the later Agreement Regarding Kirby Sailboat Rights that plaintiffs and GSL entered into in 2011 ( "2011 Agreement"). *See* Doc. #228-23. This

agreement was evidently prompted by the failure of plaintiffs to have obtained prior consent to the transfer of plaintiffs' contracts and rights to GSL, and the subsequent unwillingness of defendants to pay royalties to GSL rather than to plaintiffs. In light of these events, plaintiffs and GSL stated in the preambular "Background" section to the 2011 Agreement that the "IP agreement [2008 Agreement] has entirely failed to accomplish the intent of the parties," because "the failure to obtain all the required consents and approvals to transfer the Contracts and certain of the Kirby Sailboat rights" meant that "certain of the Kirby Sailboat rights . . . remained and still remain in the possession of Kirby." Doc. # 228-23 at 2. The parties thereupon recited their "wish to implement the arrangements contemplated in this agreement, in lieu of Kirby [plaintiffs] immediately repaying the Purchase Price [of $2.6 million from the 2008 Agreement] in full, and in return for which Global Sailing agrees not to pursue Kirby for specific performance of Kirby's obligation to transfer all of the Contracts and the remaining Kirby Sailboat Rights to Global Sailing." *Ibid.*

The 2011 Agreement then went on to provide for plaintiffs to pay $1 million to GSL and also to pay to GSL all or a portion of ongoing license fee payments that plaintiffs might receive. *Id.* at 3-4. In return for these payments, GSL "grants to Kirby [plaintiffs] an exclusive, non-assignable, non-transferrable, royalty free license to use and sub-license the Kirby Sailboat Rights *owned by Global Sailing*, solely to the extent necessary or desirable for Kirby to fulfill its obligations under the Contracts." *Id.* at 5 (emphasis added). The Kirby Sailboat Rights are described in the 2011 Agreement and consist of intellectual property rights,[1] while the rights

---

[1] "[V]essel hull designs for the Kirby Sailboat; copyrights therefor[], creative works and works of authorship, including but not limited to the Class Agreement dated 11 November 2005; patents; trade marks, brand names, trade dress rights, logos, internet domain names and corporate names, together with the goodwill associated with the foregoing, and applications registrations and renewals thereof; and rights in confidential information used by Kirby (together, *Kirby Sailboat Rights*)." Doc. # 228-23 at 2.

under the contracts with third parties are distinguished in the 2011 Agreement as "Contracts rights."[2] This is the sole transfer of rights mentioned in the 2011 Agreement from GSL to Kirby.

It is clear to me that the 2011 Agreement did not rescind or undo the 2008 Agreement. Plaintiffs had received $2.6 million for their sale of interests under the 2008 Agreement, and the 2011 Agreement required plaintiffs to pay back less than half that amount ($1 million). The ownership of rights and interests transferred by the 2008 Agreement remained with GSL, and plaintiffs received no more than a license to a subset of those rights for the purpose of servicing existing contracts. Although this license is described in the 2011 Agreement as "exclusive," and the general rule is that "an exclusive licensee may sue others for infringement," *Davis*, 505 F.3d at 100, the 2011 Agreement makes clear that the license is for the "Kirby Sailboat Rights" and is further limited "solely to the extent necessary or desirable for Kirby to fulfill its obligations under the Contracts." Doc. #228-23 at 5.  *See also* 17 U.S.C. § 201(d)(2) (providing in part that "[t]he owner of any particular exclusive right is entitled, *to the extent of that right*, to all of the protection and remedies accorded to the copyright owner by this title") (emphasis added).

The 2011 Agreement does not assign GSL's rights under any contracts to plaintiffs (including the rights assigned to GSL by plaintiffs by means of the 2008 Agreement). Although the 2011 Agreement grants a license to plaintiffs, it stops well short of authorizing plaintiffs as licensees to sue third parties for the infringement of intellectual property rights now owned by GSL. In the absence of a contractual re-assignment and in light of the express limitation on plaintiffs' license ("to use and sublicense the Kirby Sailboat Rights owned by Global Sailing, *solely to the extent necessary or desirable for Kirby to fulfill its obligations under the*

---

[2] "[R]ights under agreements entered into between Kirby and third parties relating to the Kirby Sailboat (*Contracts*)." Doc. #228-23 at 2.

*Contracts*"), I conclude that the 2011 Agreement did not confer on plaintiffs the right to sue to enforce the contractual and intellectual property rights now owned by GSL.

Accordingly, because all of plaintiffs' claims against defendants rely on a common legal predicate—the right of plaintiffs to assert contract and intellectual property rights that belong to GSL—I conclude that plaintiffs have no standing or right of action as to any of their claims against LPE and QMI. Therefore, I will grant LPE's and QMI's motion for summary judgment to dismiss plaintiffs' claims.

### 2. ILCA's Motion to Dismiss and Motion for Summary Judgment

Defendant ILCA brings both a motion to dismiss and a motion for summary judgment against plaintiffs. As noted above, I find that plaintiffs do not have standing to assert any rights under the Builder Agreements, or to assert any claims that rely on intellectual property rights sold to GSL. Accordingly, there is no need for the Court to consider ILCA's alternative arguments for dismissal, and ILCA's motion for summary judgment of plaintiffs' claims will be granted and its corresponding motion to dismiss denied as moot.

### 3. Kirby's Motion for Summary Judgment on the Counterclaims by LPE and QMI

Kirby and his company move for summary judgment on Counterclaims III-IX brought by LPE and QMI.  I grant this motion as to Counterclaims III and IV by consent. *See* Doc. #231 at 4 n.1. Plaintiffs otherwise contend that summary judgment should be granted for Counterclaims V-IX on the ground that LPE and QMI have not provided a timely damages analysis, and that such damages analysis is a necessary element of the claims brought. I will deny this motion on the ground that the necessary damages calculations were produced only a few days late after the close of discovery, *see* Doc. #180-1 at 16-17, and that there has been no showing of willfulness

or prejudice that would warrant the extreme sanction of dismissal. Plaintiffs have not otherwise

sought summary judgment against the counterclaims.

### 4. GSL's Motion for Summary Judgment on the Counterclaims

Counterclaim defendant GSL moves for summary judgment on the remaining claims

against it for breach of contract (Counterclaim VI and VII) and for unjust enrichment

(Counterclaim IX) that have been asserted by LPE and QMI.[3] These claims are based on LPE's

and QMI's alleged overpayment of royalty fees when they paid royalties on two different models

of sailboats (the Laser Radial and Laser 4.7) that were allegedly not covered by the Builder

Agreement. LPE and QMI also contend that they paid the 2% royalty on the price the wholesale

dealer paid for packaging, which amounts to an overpayment as the royalty should only have

been paid on the actual sailboats and hulls.

Whether the Laser Radial and Laser 4.7 are covered by the royalty provision in the

Builder Agreements is a matter of contract interpretation, and "words and phrases [in a contract]

should be given their plain meaning." *Olin Corp*, 704 F.3d at 99. The Builder Agreements define

a Kirby Sailboat as "a sailboat *or sailboat hull* . . . which has been commonly sold in association

with the trademark 'LASER.'" Doc. #228-11 at 3 (emphasis added). It is undisputed that the

same LASER hull is used for all Kirby sailboats, including the Laser Radial and Laser 4.7. The

Laser Radial and Laser 4.7—as evidenced by their names—are "sold in association with the

trademark 'LASER.'" *Ibid.* It follows that LPE and QMI owe royalties on the wholesale price of

the Laser Radial and the Laser 4.7 pursuant to any valid Builder Agreements, and therefore GSL

---

[3] In November 2014, LPE and QMI stipulated to the dismissal of all other counterclaims against GSL and filed an amended answer and counterclaim. *See* Docs. #172, # 173-1. GSL notes that LPE and QMI also agreed at that time that "the two counterclaims for breach of the 1983 and 1989 Builder Agreements are based on the same facts underlying the unjust enrichment claim, *i.e.*, the overpayment of royalties." Doc. #184-1 at 8. Based on the lack of objection to this statement, I will consider aspects of Counterclaims VI and VII (claiming damages for unauthorized licensing in breach of the Builder Agreements) also to be abandoned. *See* Doc. #233.

is entitled to a grant of summary judgment as to any counterclaims based on the claims by LPE

and QMI of alleged overpayment of royalties as to the hulls used in the Laser Radial and Laser

4.7.

I will otherwise deny GSL's motion for summary judgment as to the counterclaim of

overpayment of royalties based on LPE's and QMI's inclusion of packaging costs in their

original royalty payment calculation. Per the Builder Agreements, packaging costs were not to be

included when LPE and QMI calculated royalties owed to plaintiffs or GSL. *See* Doc. #228-11 at

4. While neither party here has adduced much evidence or put forth much argument regarding

the inclusion of packaging costs in LPE's and QMI's prior royalty payments, there are two

exhibits that together establish enough of a genuine issue of material fact in my mind as to

whether LPE and QMI overpaid royalties that I will deny summary judgment. First, a LPE

executive said at his deposition that LPE and QMI had included the cost of packaging (which

was over $100 per sailboat box) and shipping costs, without deductions for other royalties, when

they calculated the royalty payment. *See* Doc. #194-4 at 17-18, 24. Second, LPE and QMI

supplied a chart listing the amounts that they overpaid based on packaging, shipping, and royalty

costs. *See* Doc. #263-2. GSL has not supplied counter-evidence to suggest that LPE and QMI did

not include these costs in calculating royalty payments prior to the termination of the Builder

Agreements. Therefore, GSL has not established the lack of a genuine issue of fact, and I will not

grant summary judgment as to the claim of overpayment of royalties on packaging and other

costs excluded by the Builder Agreements.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment by LPE and QMI (Doc.

#186) and the motion for summary judgment by ILCA (Doc. #183) are GRANTED in light of

my conclusion that plaintiffs Bruce Kirby and Bruce Kirby, Inc., have no standing to maintain

their claims. The motion to dismiss by ILCA (Doc. #174) is DENIED as moot in light of the granting of its motion for summary judgment. The motion for summary judgment by counterclaim defendants Bruce Kirby and Bruce Kirby, Inc. (Doc. #180) as to several of the counterclaims asserted by counterclaim plaintiffs LPE and QMI is GRANTED in part (as to Counterclaims III and IV) and DENIED in part (as to Counterclaims V through IX). The motion for summary judgment by counterclaim defendant GSL (Doc. #184) against LPE and QMI is GRANTED in part (as to the claim of overpaid royalties for the Laser Radial and Laser 4.7) and DENIED in part (as to the claim of overpaid royalties for packaging).

It is so ordered.

Dated at New Haven this 12th day of August 2016.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge