UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRUCE KIRBY, INC. *et al.*,
    *Plaintiffs*,

v.

LASERPERFORMANCE (EUROPE)
LIMITED *et al.*,
    *Defendants*.

No. 3:13-cv-00297 (JAM)
No. 3:17-cv-01158 (JAM) (consol.)

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Global Sailing Ltd. has moved for partial summary judgment on the narrow question of whether defendants LaserPerformance (Europe) Ltd. and Quarter Moon, Inc. breached licensing agreements in the 2010s that their predecessors established in the 1980s. I agree with Global Sailing that defendants breached some aspects of those agreements, but I do not agree that the evidence supports summary judgment on each alleged breach that Global Sailing claims. So I will grant in part and deny in part Global Sailing's motion for summary judgment.

**BACKGROUND**

This motion is the latest stage of a long-running dispute between the parties. Because I discuss this case's history at *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2018 WL 3614117, at *1-*3 (D. Conn. 2018), and *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2016 WL 4275576, at *1-*2 (D. Conn. 2016), I will address here only the facts pertinent to Global Sailing's motion, largely as laid out in the parties' Local Rule 56(a) statements.

In 1969, Bruce Kirby designed the 13' 10½" Laser sailboat, a high-performance racing vessel. *See* Doc. #470-2 at 1 (¶ 1); *Kirby*, 2016 WL 4275576, at *1. Kirby does business through

his Connecticut-based company, Bruce Kirby, Inc, and I refer to them together as the "Kirby Plaintiffs." *See* Doc. #470-2 at 1-2 (¶ 2).

To regulate Laser production, the Kirby Plaintiffs entered into a "Head Agreement" with various organizations that governed sailing. *See Kirby*, 2016 WL 4725576, at *1; Doc. #472 at 1 (¶ 1); *see also* Doc. #470-2 at 2-3 (¶ 6). The Head Agreement required any party to that agreement to obtain written permission from all other parties to the agreement before assigning any rights under the agreement. Doc. #472 at 1 (¶ 1). To actually produce Lasers, the Kirby Plaintiffs also entered into "Builder Agreements" with individual sailboat manufacturers. *See Kirby*, 2016 WL 4725576, at *1; *see also* Doc. #470-2 at 2-3 (¶ 6).

This case is about two of those Builder Agreements. The Kirby Plaintiffs entered into the first agreement with Brook Shaw Motor Services in 1983. Doc. #470-2 at 3 (¶ 7). They entered into the second agreement with PY Small Boats, Inc. in 1989. *Ibid.* (¶ 9). United Kingdom-based defendant LaserPerformance has succeeded Brook Shaw's rights and obligations under the 1983 Agreement, and Rhode Island-based defendant Quarter Moon has done the same for PY under the 1989 Agreement. *Id.* at 2, 4 (¶¶ 4-5, 11-12). Ontario law governs the 1983 Agreement, and Connecticut law governs the 1989 Agreement. *See id.* at 3-4 (¶¶ 8, 10).

Both Builder Agreements had several common obligations. They required the builder licensees to pay royalties for the right to manufacture and market Lasers, to pay interest on overdue royalty payments, to maintain sales records of Lasers, and to make those records available for inspection. *Id.* at 6 (¶ 17). Both agreements provided that a failure to pay royalties on time would be a condition of default. *Id.* at 7 (¶ 20). Both agreements provided that the defaulting party could receive written notice of the defaulting event at the Kirby Plaintiffs'

option. *Id.* at 8 (¶ 23).[1] And both agreements required that the Kirby Plaintiffs could only assign their rights in the Laser design to an assignee who would enter into an agreement with the builder licensees with identical terms and conditions to the preexisting Builder Agreements. Doc. #472 at 1 (¶ 2).

The agreements also had several notable distinctions. Each agreement had a different "no contest" clause preventing a licensee from challenging various intellectual property rights the Kirby Plaintiffs held. The 1989 Agreement provided that a builder defaults if "the Licensee contests in any manner whatsoever the right and interest of [the Kirby Plaintiffs] in and to the Licensed Design." Doc. #470-2 at 9 (¶ 28). The 1983 Agreement, by contrast, provided that a builder defaults if it "contests in any manner whatsoever the validity of [the Kirby Plaintiffs'] exclusive and complete Copyright." *Id.* at 10 (¶ 31). The 1983 Agreement stated that "Copyright" referred to "copyright and industrial design rights in" the Laser. *See* Doc. #228-11 at 4 (¶ 2.1).

Aside from the "no contest" clauses, the 1983 Agreement also sought to protect the Kirby Plaintiffs' intellectual property by requiring that, after a termination of the agreement, a builder licensee must stop manufacturing Lasers and stop using the production tooling, moulds, and plugs associated with manufacturing Lasers. Doc. #470-2 at 12 (¶ 38). The 1983 Agreement also provided that, in the event the agreement was terminated, the licensee would "attempt in good faith to negotiate a sale to [the licensor], or to negotiate a sale to another [Laser licensee] all

---

[1] The Builder Agreements stated that upon a default, "Kirby Inc. may at its option give written notice to the Licensee of such event of default, and if the Licensee does not cure such default within 30 days of the giving of said notice," the agreement would "terminate upon Kirby Inc. giving to Licensee written notice of termination on the expiry of such 30 day period." Doc. #228-11 at 16 (¶ 10.2); Doc. #228-12 at 11 (¶ 10.2).

plugs, moulds, and tooling" owned by the licensee and related to manufacturing Lasers. Doc. #228-11 at 18 (¶ 10.8); *see also* Doc. #470-2 at 11-12 (¶ 37).[2]

In 2008, the Kirby Plaintiffs entered into a "Sale Agreement" with New Zealand-based Global Sailing. Doc. #470-2 at 4 (¶ 13). That agreement "was a valid contract that transferred all of [the Kirby Plaintiffs'] rights to G[lobal Sailing], including [the Kirby P]laintiffs' rights under the terms of the Head and Builder Agreements." *Kirby*, 2016 WL 4275576, at *4. In January 2009, Global Sailing sent a letter to the builder licensees indicating that the Laser rights had been transferred from the Kirby Plaintiffs to Global Sailing, providing an updated address for royalty payments, and stating that matters would continue to be "business as usual" and that "[a]ll extant agreements with Kirby, Inc., including rights and obligations, have been assigned to Global Sailing." Doc. #470-2 at 5 (¶ 16).

After the sale, defendants continued selling Lasers. *Id.* at 7 (¶ 21). Uncontroverted evidence submitted by Global Sailing indicates that LaserPerformance sold Lasers at least until 2015, but does not distinguish when during 2015 those sales took place. *See* Doc. #414-6 at 20-44. Further uncontroverted sales records appear to show Laser sales in 2017 and 2018, and those records list an entity named "Quartermoon" at the top, alongside named "LP Topco," "SINA," "Full Moon Holdings Ltd.," and "LaserPerformance NA." *See id.* at 45-48. Those records do not distinguish which entity sold which Lasers. *Ibid.* Defendants assert, without citing evidence, that they no longer sell Lasers. Doc. #470-2 at 7 (¶ 21).

---

[2] Defendants deny, without citing any evidence, the paragraph in Global Sailing's Local Rule 56(a) submission stating that LaserPerformance "has not performed its duties as listed under Article 10.8 of the 1983 Builder Agreement, which states that a Builder terminated for any reason must" dispose of Laser-related materials as quoted in the main text of this ruling. *See* Doc. #470-2 at 11-12 (¶ 37). In light of the record's support for this contractual language and defendants' failure to cite any evidence to refute Global Sailing's statement of fact as required by D. Conn. L. Civ. R. 56(a)(3), I deem it admitted that the 1983 Builder Agreement imposed these obligations.

The parties agree, however, that defendants stopped paying royalties, Doc. #470-2 at 7 (¶ 22), and that defendants received notice of a claim that they owed royalties, *id.* at 8 (¶ 24).[3] Global Sailing therefore argues that defendants' failure to pay royalties provides one basis for summary judgment that defendants have breached the Builder Agreements.

The parties have also argued over the Builder Agreements' intellectual property provisions. Global Sailing and LaserPerformance agree that the 1983 Agreement has been terminated, *id.* at 11 (¶ 36), and that LaserPerformance has not participated in negotiations to sell back plugs, moulds, and tooling used for making Lasers. *See* Doc. #414-11 at 4-5 (¶¶ 53-55). Still, LaserPerformance denies that it has breached any obligations under the 1983 Agreement. Doc. #470-2 at 11-12 (¶ 37). LaserPerformance admits that it contests Kirby's rights in the Laser design, *id.* at 10-11 (¶ 33), but argues that it has not disputed any *copyright* in the design. *Id.* at 10 (¶ 32). Quarter Moon, for its part, maintains that there are no design rights in the Kirby sailboat. *Id.* at 11 (¶ 34).

The parties' dispute landed on the federal docket in March 2013, when the Kirby Plaintiffs sued LaserPerformance, Quarter Moon, and several other defendants on numerous contract and trademark claims. *See* Doc. #1. Soon thereafter, Global Sailing entered the case as a defendant to LaserPerformance and Quarter Moon's counterclaims. *See* Doc. #40 at 20 (¶ 5). In 2015, Global Sailing argued (and submitted a sworn declaration maintaining) that because the Kirby Plaintiffs had not satisfied the Head Agreement and Builder Agreements' contractual condition that the Kirby Plaintiffs obtain consent from their counterparties before assigning their

---

[3] The parties do not appear to have reached agreement on when, precisely, each defendant stopped paying royalties. *See* Doc. #470-2 at 7 (¶ 22). I note, however, that by the time oral argument took place in a prior motion hearing in September 2015, defendants' counsel admitted that defendants had at some point in the past stopped paying royalties altogether. *See* Doc. #414-2 at 9. But because I deny plaintiffs' motion for summary judgment as to royalty payments on other grounds, I take no position in this ruling as to when each defendant stopped paying royalties.

5

rights, it had no part in this case. *See* Doc. #222-1 at 3 (¶ 6); Doc. #472 at 2 (¶ 3). But I rejected this argument in August 2016, when I determined that the 2008 Sale Agreement had validly transferred the Kirby Plaintiffs' rights to Global Sailing. *Kirby*, 2016 WL 4275576, at *4.

Only in May 2017 did Global Sailing move to assert contract claims against defendants. *See* Doc. #298. I denied this motion because Global Sailing had not diligently sought leave to amend, and because giving Global Sailing leave to do so would prejudice defendants. Doc. #312 at 1-3. Global Sailing then filed a new case to assert its contract claims against defendants, *see Global Sailing Ltd. v. Rastegar*, 17cv1178 (D. Conn. 2017), and I consolidated that case with this one, *see* Doc. #321.[4] I then dismissed and granted summary judgment on many of the non-contract claims in July 2018. *See Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2018 WL 3614117 (D. Conn. 2018); *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2018 WL 3614116 (D. Conn. 2018). In the wake of those decisions, Global Sailing has now moved for summary judgment as to whether LaserPerformance and Quarter Moon have breached their respective Builder Agreements. *See* Doc. #434 at 4. I agree with Global Sailing in part, and so will grant in part and deny in part its motion for summary judgment.

### DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of

---

[4] These consolidated actions should not be confused with the non-consolidated case *Bruce Kirby, Inc. v. Quarter Moon, Inc.*, 17cv1389 (D. Conn. 2017), which the parties voluntarily dismissed in March 2019.

the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

Global Sailing has moved for summary judgment on the narrow question of whether each defendant breached its respective Builder Agreement. It has not moved for summary judgment on damages, and it views the precise extent of how any breach occurred as a question to be resolved in addressing damages. *See* Doc. #434 at 5 ("Each of these breaches . . . provide an independent basis for entry of summary judgment on the issue of liability. Put simply, GSL need only show one breach to prevail; here, it can show several.").

The parties agree that substantially similar law governs a breach of contract claim in Connecticut and Ontario. *See* Doc. #434 at 7; Doc. #470 at 4-11 (not challenging Global Sailing's claim that Connecticut and Ontario breach of contract claims are similar and noting that Connecticut and Ontario material breach standards resemble each other). I also agree. In Connecticut, a breach of contract claim requires that the parties form an agreement, the plaintiff performs as agreed, the defendant does not, and that nonperformance hurts the plaintiff. *See Meyers v. Livingston, Alder, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). "Under Ontario law, the elements of a claim for breach of contract are 'the particulars of the alleged contract including its terms, the nature of the alleged breach, causation and damages that are alleged to have flowed from the breach.'" *PPC Broadband, Inc. v. Transformix Engineering Inc.*, 2015 WL 339564, at *6 (N.D.N.Y. 2015) (quoting *McCarthy Corp. PLC v. KPMG LLP*, [2006] O.J. 1492, 2006 CanLII 11919, at ¶ 42 (Can. Ont. S.C.J.)).[5]

---

[5] *Available at* http://canlii.ca/t/1n1s9.

LaserPerformance and Quarter Moon have focused their opposition to summary judgment on two main lines of defense. First, they argue that Global Sailing brought suit too late under both Connecticut and Ontario law. Second, they argue that, regardless of timing, the Builder Agreements do not bind them. I address each objection in turn.

***Statute of limitations***

Defendants begin by arguing that Ontario and Connecticut's respective statutes of limitations for contract claims restrict Global Sailing's claims against LaserPerformance and Quarter Moon. *See* Doc. #470 at 1 n.1. Global Sailing objects on the ground that any failure of defendants to pay royalties is a continuing violation under both Connecticut and Ontario law, and so should reset the date from which the statutory clock runs to that of the most recent breach. *See* Doc. #471 at 10. I am unpersuaded by Global Sailing's argument.

To begin with, Connecticut law has traditionally applied the continuing course of conduct doctrine to torts, and the Connecticut Supreme Court has not applied the doctrine to claims based on breach of contract. *See St. Bernard Sch. of Montville v. Bank of Am.*, 312 Conn. 811, 834 n.11 (2014) (noting that "[a]lthough our Appellate Court has questioned the extent to which this doctrine applies outside of claims sounding in tort, we have no occasion to consider that question in the present case"). And in *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Systems, Inc.*, 2014 WL 7270160 (D. Conn. 2014), *aff'd*, 637 F. App'x 645 (2d Cir. 2016), I noted that even in the tort context, Connecticut courts require "a 'special relationship' between the parties or . . . later wrongful acts." *Id.* at *14-*15 (quoting *Stuart v. Snyder*, 125 Conn. App. 506, 510-11 (2010)). I did not apply the doctrine to a plaintiff's contract claims arising from the alleged ongoing misappropriation of its intellectual property. *Id.* at *15-*16.

8

More recent caselaw supports this point of view, including the authority on which Global Sailing relies: *RIDE, Inc. v. APS Technology, Inc.*, 2015 WL 9581728 (D. Conn. 2015). There, the court recognized the existence of the continuing conduct doctrine, but noted that the justifications for the doctrine counseled against its application to cases "that involve sophisticated parties who owed no duty to one another beyond the scope of their contractual relationship." *Id.* at *9. Accordingly, I am not convinced that Connecticut's continuing conduct doctrine applies to this case, which sounds in contract, is between sophisticated business entities, and involves a plaintiff who waited months after the dismissal of the Kirby Plaintiffs' contract claims to file its complaint.

Global Sailing's Ontario authority for the continuing conduct doctrine also undermines its position. As in *RIDE*, the court in *Sungard Availability Services (Canada) Ltd. v. ICON Funding ULC*, 2011 ONSC 7367 (Can. Ont. S.C.J.),[6] discussed Ontario's equivalent of the continuing violation doctrine. *Id.* at ¶¶ 35-41. But in doing so, it cited a long string of Ontario cases supporting the proposition "that where there is a failure to make the periodic payments that are due under the terms of [a contract requiring monthly payments], each individual failure to make such required payment constitutes a new breach of the contract, for which a new limitation period begins." *Id.* at ¶ 37 (collecting cases). Accordingly, the court held that the plaintiff before it was entitled to summary judgment only for missed monthly payments for the two years before the plaintiff had filed suit, but that the defendant was entitled to summary judgment on all other earlier payments. *Id.* at ¶ 41. So while Ontario law might recognize a continuing violation argument in some circumstances, it does not appear to me that Ontario law recognizes one arising from a contract like the 1983 Builder Agreement, where the dispute involves many

---

[6] *Available at* http://canlii.ca/t/fp9cm.

instances of unpaid royalties. I am therefore unpersuaded that either Connecticut's or Ontario's continuing violation doctrine aids Global Sailing here.

Global Sailing next argues that that its breach of contract claims should relate back to the Kirby Plaintiffs' original complaint in 2013. Doc. #471 at 10. It is unclear whether Global Sailing means to argue that its claims should relate back as a matter of amending parties as contemplated by the Federal Rules of Civil Procedure, or that its claims should relate back purely as an equitable matter.[7] But under either understanding, Global Sailing's argument falls short.

The Federal Rules govern the doctrine of relation back at Rule 15(c), and contemplate the changing of parties at Rule 15(c)(1)(C). Courts in this Circuit permit amendments that allow new plaintiffs to assert claims so long as defendants have adequate notice of the conduct that the new plaintiff complains about. *See, e.g.*, *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 290 (S.D.N.Y. 2009); *see also* Charles Alan Wright & Arthur R. Miller et al., 6A Fed. Prac. & Proc. § 1501 (3d ed. 2019). They are much less amenable, however, to new claims that attempt to relate back between *separate* lawsuits. *See, e.g.*, *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 2004 WL 487222, at *3 (S.D.N.Y. 2004) (antitrust complaint could not relate back to antitrust complaint in separate but similar action); *see also Palatkevich v. Coupak*, 152 F. Supp. 3d 201, 225-26 (S.D.N.Y. 2016) (defamation suit in federal court cannot relate back to defamation suit in state court).

This case is in that second category. It is true that the contract claims in Global Sailing's operative complaint resemble those the Kirby Plaintiffs first asserted against the same

---

[7] Courts in this District have generally held that, although state law governs tolling and statutes of limitation in diversity cases, federal law—specifically Fed. R. Civ. P. 15—governs the relation back doctrine. *See Jefferies v. BCI Burke Co., LLC*, 2018 WL 529955, at *1-*3 (D. Conn. 2018); *see also Applied Data Processing, Inc. v. Burroughs Corp.*, 58 F.R.D. 149, 151-53 (D. Conn. 1973) (Newman, J.) (discussing this issue in more depth). *Cf.* Charles Alan Wright & Arthur R. Miller et al., 6A Fed. Prac. & Proc. § 1503 (3d ed. 2019) (noting that "[w]hen the federal rule is more liberal than the state rule, the clear weight of authority is that Rule 15(c) governs" and "the conclusion that Rule 15(c) generally controls is sound and fully consistent with the Supreme Court's governing-law standards").

defendants. *Compare* Doc. #329 at 8-11 (¶¶ 29-31, 34-39), *with* Doc. #23 at 21-23 (¶¶ 120-35). But that operative complaint does not amend the Kirby Plaintiffs' original complaint: instead, it amends Global Sailing's complaint that Global Sailing filed because I denied its initial motion to amend as untimely. *See* Doc. #329 at 1-2. I also denied that motion to amend as prejudicial to defendants, *see* Doc. #312 at 2-3, and did so on the understanding that defendants specifically feared the prejudice that would come from their statute of limitations defense being compromised. *See* Doc. #307 at 11-13; Doc. #314 at 10. I decline to allow Global Sailing to vitiate the effect of my prior ruling by allowing a new action to claim the benefit of relation back when I denied Global Sailing that relief under Rule 15.

Nor is there an equitable basis on which to allow Global Sailing's claims to relate back to those of the Kirby Plaintiffs. Although Global Sailing points generally to *TD Properties, LLC v. VP Buildings, Inc.*, 602 F. Supp. 2d 351 (D. Conn. 2009), that decision—in its discussion of the CUTPA statute of limitations and relation back under that statute—does not discuss any separate equitable relation back doctrine. *See id.* at 363-65. To the extent that an equity-based argument is another attempt to circumvent my prior ruling that Global Sailing delayed in bringing its claims, its purpose "does not invoke equity or establish clean hands." *Lee v. Marvel Enters., Inc.*, 765 F. Supp. 2d 440, 452 (S.D.N.Y. 2011). In short, I conclude that Global Sailing's claims cannot relate back to the Kirby Plaintiffs' original complaint.

I am therefore persuaded that the Ontario and Connecticut statutes of limitations for contract claims apply here. The statute of limitations for a breach of contract claim is two years in Ontario and six years in Connecticut. *See* Limitations Act, S.O. 2002, c 24, Sched B, s 4 (Can. Ont.);[8] Conn. Gen. Stat. § 52-576(a). Applying these periods to Global Sailing's claims, Global

---

[8] *Available at* http://canlii.ca/t/53jvd.

Sailing cannot establish liability as to LaserPerformance for actions prior to July 13, 2015, and cannot establish liability as to Quarter Moon for actions before July 13, 2011. But as Global Sailing points out, these limits do not preclude summary judgment. *See* Doc. #471 at 9. Although they limit the basis for liability to events after each date, Global Sailing may still establish liability for events taking place afterward.

### *Enforceability of the builder contracts*

Defendants also argue that I should deny summary judgment because Global Sailing initially denied the existence of a contractual relationship with defendants, and that even if Global Sailing was properly a party to the Builder Agreements, it breached its own obligations under those agreements. *See* Doc. #470 at 4-5.

That Global Sailing once denied the existence of a contract between itself and defendants does not raise a dispute of material fact. Although Global Sailing filed a declaration stating that the 2008 Sale Agreement had not validly transferred the Kirby Plaintiffs' rights under the Builder Agreements to itself, *see* Doc. #222-1 at 3 (¶ 6), that declaration asserted a legal conclusion—and one that I found to be incorrect when I concluded that "the 2008 [a]greement was a valid contract that transferred all of [the Kirby Plaintiffs'] rights to [Global Sailing], including [the Kirby Plaintiffs'] rights under the terms of the Head and Builder Agreements." *Kirby*, 2016 WL 4275576, at *4. Accordingly, the 2008 Sale Agreement's validity is law of the case. *See Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009). And while "[c]ourts 'may depart from the law of the case for cogent or compelling reasons including an intervening change in law, availability of new evidence, or the need to correct a clear error or manifest injustice,'" *EEOC v. Day & Zimmerman NPS, Inc.*, 265 F. Supp.

3d 179, 200 (D. Conn. 2017) (quoting *Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009)), defendants have not argued that any of those factors apply here. *See* Doc. #470 at 4-5.

But defendants principally argue that rather than carrying on with "business as usual" as it claimed to do in its notice to licensees of the Sale Agreement, *see* Doc. #414-3, Global Sailing breached the Builder Agreements with the intent of destroying defendants' business in Europe and the Americas—thus relieving defendants of their obligation to perform. *See* Doc. #470 at 5-6. Defendants' basis for this argument is that Global Sailing's purchase of rights to the Laser under the 2008 Sale Agreement failed to abide by the provisions of the Builder Agreements governing the assignment of the Kirby Plaintiffs' rights. *Ibid.* I do not agree.

First, defendants have not fulfilled their evidentiary burden to put forward evidence giving rise to a dispute of material fact. The Builder Agreements required that the Kirby Plaintiffs' assign their rights in the agreement to an assignee who would "enter into an agreement with [the licensees] on terms and conditions identical with the terms and conditions of this Agreement." *See* Doc. #228-11 at 21 (¶ 11.4); Doc. #228-12 at 15 (¶ 11.4). Global Sailing's letter to builder licensees stated that its business relationship with the licensees would continue with them unchanged from the relationship they had with the Kirby Plaintiffs. *See* Doc. #414-3 at 2-3 ("With the exception of these changes [to where to send royalty payments], it is business as usual.").

Defendants look to their pleadings as raising a dispute "whether [Global Sailing] performed in accordance with the terms of the 1983 Builder Agreement and stood ready to continue 'business as usual.'" Doc. #470 at 5 (citing Doc. #40 at 24-26 (¶¶ 26-34)). But even assuming the Builder Agreements' language allows for a conclusion that Global Sailing—rather than the Kirby Plaintiffs—was in breach, allegations in pleadings like defendants' counterclaims

13

and Global Sailing's answers do not raise factual disputes on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).[9]

Defendants point to the averment in Global Sailing's declaration that the Kirby Plaintiffs and Global Sailing had not satisfied the Builder Agreements' assignment provisions. *See* Doc. #470 at 5-6; Doc. #222-1 at 3 (¶ 6)). In my ruling on the Sale Agreement's validity, I did not need to decide whether the Kirby Plaintiffs and Global Sailing had in fact complied with those Builder Agreement provisions, *see Kirby* 2016 WL 4275576, at *3-*4, so Global Sailing's statement from 2015 may not be incorrect as a matter of law. At the same time, aside from a legally conclusory statement that the parties "failed to satisfy" those provisions alongside several others, *see* Doc. #222-1 at 3 (¶ 6), Global Sailing's declaration does not suggest any *facts* showing that the relationship between Global Sailing and defendants continued other than as it had between defendants and the Kirby Plaintiffs.

Second, even if defendants can raise a dispute of fact whether Global Sailing breached the Builder Agreements, no evidence suggests that Global Sailing committed a *material* breach by suggesting that business should continue as usual. Under Connecticut law, "a total breach of the contract by one party"—that is, "an uncured material failure of performance"—"relieves the injured party of any further duty to perform further obligations under the contract." *Bernstein v. Nemeyer*, 213 Conn. 665, 672-73 (1990); *Shah v. Cover-It, Inc.*, 86 Conn. App. 71, 75 (2004). A material breach is one that "go[es] to the root or essence of the agreement between the parties, or . . . which touches the fundamental purpose of the contract and defeats the object of the parties

---

[9] For the same reasons, defendants' pleadings-based argument that Global Sailing denied being owed royalties under the previous understanding of the Builder and Sale Agreements is insufficient to raise a genuine dispute of fact. *See* Doc. #470 at 8-9 (citing Doc. #470-2 at 12-15).

in entering into the contract." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) (quoting 23 Williston on Contracts § 63:3 at 438-39 (4th ed. 2002)). And whether a material breach has occurred is a question of fact. *See Independence Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F. Supp. 2d 183, 189 (D. Conn. 2007); *Alaimo v. Beacon Indus., Inc.*, 89 Conn. App. 363, 365 (2005) (*per curiam*).

Defendants offer a similar standard for material—or "fundamental"—breach under Ontario law: a "fundamental breach of contract is a breach that substantially deprives the innocent party of the benefit of the agreement." Doc. #470 at 7 (citing *772067 Ont. Ltd. v. Vict. Strong Mfg. Corp.*, 2017 ONSC 2719, at ¶ 70 (Can. Ont.)).[10]

In both Connecticut and Ontario, courts consider several factors to determine if a material breach has occurred. Connecticut courts examine:

> (a) the extent to which the injured party will be deprived of the benefit which it reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure its failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

---

[10] *Available at* http://canlii.ca/t/h3j4z.

15

*See Bernstein*, 213 Conn. at 672 n.8 (quoting Restatement (Second) of Contracts § 241).

Ontario courts employ a similar test, and look to the following factors:

1. The ratio of the party's obligations not performed to that party's obligations as a whole;

2. The seriousness of the breach to the innocent party;

3. The likelihood of repetition of such breach;

4. The seriousness of the consequences of the breach; and

5. The relationship of the part of the obligation performed to the whole obligation.

*See 772067 Ont.*, 2017 ONSC 2719, at ¶ 70 (citing *Spirent Comm'cns of Ottawa Ltd. v. Quake Techs. (Can.) Inc.*, 2008 ONCA 92, at ¶ 36 (Can. Ont.)).[11]

Both jurisdictions' factors weigh heavily in favor of immateriality in this case. The summary judgment record does not reflect what terms, if any, changed between Global Sailing and the licensees such that the licensees would have been affected. Even more fundamentally, there is no evidence in the summary judgment record that defendants lost the benefit of their bargain with the Kirby Plaintiffs: the ability to build and sell Lasers. Even if Global Sailing is a culpable party and defendants are innocent ones, the seriousness to defendants of any breach and the extent to which they have been harmed is minimal.

Similarly, insofar as the evidence shows defendants to have continued to sell Lasers well after the Kirby Plaintiffs' transfer of rights to Global Sailing, the ratio of any breach to the overall scale of the contract also is minimal, as is the risk of future breaches. I am therefore unpersuaded that a reasonable finder of fact could conclude that Global Sailing materially

---

[11] *Available at* http://canlii.ca/t/1vp4h.

breached the Builder Agreements, and so I conclude there is no genuine dispute of fact that the Builder Agreements are enforceable against defendants.

*Scope of breach*

Although Global Sailing has established that the Builder Agreements bound defendants, Ontario's and Connecticut's statutes of limitations limit its summary judgment motion's scope. The next issue I must determine is whether Global Sailing is entitled to summary judgment in whole or in part in light of these limits.

Global Sailing claims that Quarter Moon has sold Lasers without paying royalties, *see* Doc. #434 at 10-11, and that Quarter Moon has improperly challenged the existence of design rights to the Laser, *see* Doc. #471 at 8-9. Defendants argue that they could not have breached the Builder Agreements' "no contest" provisions because they only contested Kirby's rights in the Laser after the 2008 Sale Agreement. *See* Doc. #470 at 9-10.

This argument is unpersuasive. The 2008 Agreement transferred all of the Kirby Plaintiffs' rights under the Builder Agreements to Global Sailing, and defendants do not explain why the 2008 Agreement would have made any special exception for intellectual property rights. So because the summary judgment record reflects that Quarter Moon continued to challenge the existence of design rights in the Laser as of October 2018—long after the limitations date of July 13, 2011, *see* Doc. #414-7 at 1, 4 (¶ 28), I agree that there is no genuine fact dispute that Quarter Moon has breached the 1989 Builder Agreement's "no contest" provision.

But the evidence does not support granting summary judgment to Global Sailing on the basis that Quarter Moon has sold Lasers without paying royalties. The extent of the documentary evidence in support of sales by Quarter Moon are the sales records listing various entities at the top, followed by records of individual sales. *See* Doc. #414-6 at 45-48. As I noted *supra*, those

records do not distinguish between individual sellers. *Ibid.* At summary judgment, I must draw all evidentiary inferences in the nonmovant's favor—in this case, Quarter Moon. *See* Fed. R. Civ. P. 56. Therefore, in light of Quarter Moon's denial that it still sells Lasers, the failure of either party's briefing to address this issue, and absent any evidence tying any individual entity to any individual Laser sale, I cannot conclude that Quarter Moon actually sold any Lasers merely from its name appearing alongside those of other entities on a record that also lists Laser sales. Accordingly, I will deny summary judgment to Global Sailing on the question of whether Quarter Moon breached its Builder Agreement by selling Lasers without paying royalties.

As to LaserPerformance, Global Sailing contends that it is entitled to summary judgment because LaserPerformance sold Lasers without paying royalties, Doc. #434 at 8-9, improperly challenged the design rights to the Laser, *id.* at 9, and failed to meet its post-termination obligations as to plugs and tooling, *ibid.*

I will deny summary judgment on any of LaserPerformance's Laser sales. The extent of the summary judgment record as to LaserPerformance's Laser sales is principally the sales records showing that LaserPerformance continued to sell Lasers into 2015. *See* Doc. #414-6 at 20-44. Those records do not indicate when in 2015 those sales happened, and as with Quarter Moon's potential sales, no party's briefing has attempted to clarify this factual ambiguity.

Because the limitations period as to LaserPerformance only began in July 2015, I cannot consistent with Rule 56 allow Global Sailing a favorable inference from those undifferentiated records that any sales occurred within the limitations period during the second half of 2015. To the extent that remaining sales records indicate the existence of an entity titled "LaserPerformance NA," no evidence shows that entity to be the same as defendant

LaserPerformance (Europe), or that LaserPerformance NA made any individual Laser sales. *See id.* at 45-48.

Next, I will grant Global Sailing summary judgment on LaserPerformance's challenge to design rights in the Laser. The parties agree that LaserPerformance has contested the design rights to the Laser, and the summary judgment record reflects that as of October 2018, LaserPerformance continues to do so. *See* Doc. #414-11 at 1, 3 (¶ 46). Aside from the argument regarding the transfer of rights to Global Sailing that I rejected *supra*, *see* Doc. #470 at 9-10, LaserPerformance principally objects to summary judgment on the ground that the definition of "Copyright" is unclear and therefore raises an issue of material fact. *See id.* at 11 (citing Doc. #228-32 (Head Agreement)). I am unpersuaded. The 1983 Builder Agreement explicitly stated that "Copyright" collectively referred to "copyright and industrial design rights" in the Laser. Doc. #228-11 at 4 (¶ 2.1). Although the parties do not reference any Ontario authority on contract interpretation, I note that "words do not become ambiguous simply because lawyers or laymen contend for different meanings," *R.T. Vanderbilt Co, Inc. v. Continental Cas. Co.*, 273 Conn. 448, 463 (2005), and where—as here—defendants have challenged the design rights in the Laser, I take them to have challenged one portion of what the Builder Agreement defines as "Copyright" in violation of the agreement's no-contest clause.

Finally, I will grant Global Sailing summary judgment on LaserPerformance's post-termination obligations. Although LaserPerformance tries raising a factual dispute over whether the agreement was terminated, *see* Doc. #470 at 9-10, defendants admit that the 1983 Builder Agreement is terminated in their Rule 56(a)(2) statement, so I will treat that fact as undisputed. *See* Doc. #470-2 at 11 (¶ 36). The agreement required LaserPerformance to stop manufacturing Lasers, and to stop using the associated plugs, moulds, and tooling. Because Global Sailing has

not established that LaserPerformance continued selling or manufacturing Lasers within the limitations period, I am not persuaded that it has established that LaserPerformance breached these obligations. But the agreement also required that LaserPerformance attempt to negotiate a sale of the plugs, moulds, and tooling involved in manufacturing Lasers, and the summary judgment record indicates that LaserPerformance still had not done so as of October 2018. *See* Doc. #414-11 at 4-5 (¶¶ 53-55). Accordingly, I will grant summary judgment to Global Sailing on what looks to be a very narrow issue of whether LaserPerformance has, within the limitations period, failed to participate in a good-faith attempt to sell back Laser manufacturing materials to Global Sailing or another licensee.

## CONCLUSION

For the reasons set forth above, Global Sailing's motion for partial summary judgment (Doc. #415) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Global Sailing's claim that Quarter Moon improperly challenged the design rights to the Laser after July 13, 2011; is GRANTED as to Global Sailing's claim that LaserPerformance improperly challenged the design rights to the Laser after July 13, 2015; is GRANTED as to Global Sailing's claim that LaserPerformance failed to attempt negotiate a sale of the Laser plugs, moulds, and tooling after July 13, 2015; and is DENIED in all other respects.

It is so ordered.

Dated at New Haven this 9th day of August 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge