**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BRUCE KIRBY, INC., ET AL., Plaintiffs, vs. LASERPERFORMANCE (EUROPE) LIMITED, ET. AL., Defendants. | Civil Action No. 3:13-cv-00297-JAM |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR JUDGMENT, PUNITIVE DAMAGES,**
**ATTORNEYS' FEES, AND PRE-JUDGMENT INTEREST**

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................ 1

II.  The Court Should Enter Judgment Against QMI in the Amount of $4,337,157 for Willful Trademark Infringement Pursuant to the Jury's Award At Trial ............................................. 3

    A. Relevant Background ........................................................................................ 3

        1.   QMI and LPE Knowingly Sold Boats with Trademarked Plaques For Years ....... 3

        2.   QMI and LPE Willfully Stopped Paying Royalties to Build Laser Sailboats after Farzad Rastegar Failed to Purchase Kirby's Design Rights on behalf of QMI and LPE, Who Continued Selling Boats With Trademarked Plaques ........................... 5

        3.   QMI and LPE Knowingly Persisted in Selling Unauthorized Boats Bearing the Trademarked Plaques Without Paying Royalties ................................... 6

        4.   QMI and LPE Continued Their Illegal Acts While Trying to Sew Confusion as to Ownership of Royalties ............................................................................. 8

        5.   QMI and LPE Willfully Continued their Infringement and Misappropriation Until the Very Day the Rule Changed, Making Over $20,000,000 in Sales ................. 9

    B. QMI's Illegal Acts Constitute Willful Trademark Infringement, the Damages for Which the Jury Correctly Determined are $4,337,157 .................................................. 11

    C. QMI Failed to Prove Any Costs .......................................................................... 13

        1.   QMI Failed to Prove a Single Cost Through Documentary Evidence ................. 13

        2.   The Jury Found Murray Not Credible and Rightly Credited DeCusati over Murray 17

        3.   QMI Failed to Present Evidence of Costs for the Relevant Time Period ............ 19

    D. The Jury's Award is Equitable and Serves the Purposes of the Lanham Act .................. 19

        4.   BKI Proved, and the Jury Correctly Found, QMI was Unjustly Enriched by its Willful Trademark Infringement ............................................................... 20

        5.   BKI Proved, and the Jury Correctly Found, A Need to Deter QMI and Other Infringers by way of the Jury's Profits Award .......................................... 22

        6.   Equity is Further Served By Maintaining the Jury's Full Award Because The Jury Would Have Awarded Additional Compensatory Damages Against QMI Had They Not Determined QMI's Revenues Were its Profits ................................ 24

III. The Court Should Enter Judgment Against QMI and LPE For Misappropriation of Kirby's Name and For the Full Amount of the Jury's Award Against LPE of $2,520,578 ................. 24

    A. QMI and LPE Illegally Misappropriated Kirby's Name for Commercial Benefit .......... 24

    B. QMI and LPE were Unjustly Enriched by Their Illegal Misappropriation ..................... 25

IV. The Court Should Additionally Enter Judgment Against QMI and LPE for Punitive Damages under Claim 4, Jointly and Severally, in the Amount of $1,089,378 .................................... 26

V.  The Court Should Order QMI and LPE, Jointly and Severally, to Pay Kirby $944,208 in Attorneys' Fees ............................................................................................... 29

    A. The Court Should Award Kirby Attorneys' Fees Under 15 U.S.C. Section 1117(a) ....... 29

    1.     QMI and LPE had No Substantive Strength in Their Frivolous Litigating Position Concerning the Tried Claims; Their Positions Were Motivated By Bad Faith and Objectively Not Reasonable ................................................................................ 30

    2.     QMI and LPE Were Unreasonable in the Manner in Which They Litigated Their Case    33

    3.     An Award Kirby's Attorneys' Fees in the Amount of $944,208 is Warranted for Purposes of Compensation and Deterrence ........................................................ 36

    4.     All Kirby's Claims Elicited and Established QMI's Infringement....................... 36

VI. QMI and LPE's Total Lack of Defense Against Claim 4 and Meritless Counterclaims are Further Bases for Issuing a Joint and Several Fee Award ....................................................... 38

VII.    The Court Should Award Pre-Judgment Interest in the Amount of $5,719,526 .............. 39

  A.  The Court Should Award Pre-Judgment Interest on the Jury's $4,337,157 Award Under the Exceptional Case Doctrine of the Lanham Act............................................................ 39

  B.  To the Extent the Court Does Not Grant Pre-Judgment Interest Under the Exceptional Case Doctrine, the Court Should Award Pre-Judgment Interest on the Jury's Award of $4,337,157 Pursuant to Con.. Gen. Stat. 37-3a.................................................................. 40

  C.  The Court Should Award Pre-Judgment Interest on the Jury's Award of $2,520,578 Pursuant to Conn. Gen. Stat. 37-3a....................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
  933 F.3d 202 (2d Cir. 2019) ................................................................. passim
*American Honda Motor Co. v. Two Wheel Corp.*,
  918 F.2d 1060 (2d Cir.1990) ............................................................. 14, 39
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................ 15
*Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.*,
  17 U.S.P.Q.2d 1017, 1989 WL 236526 (S.D. N.Y. 1989) ........................ 14
*Audemars Piguet Holding S.A. v. Swiss Watch Intern.*, Inc.,
  46 F. Supp. 3d 255 (S.D.N.Y. 2014) ...................................................... 15
*Baiocchetti v. Smith, Dean & Assocs., Inc.*,
  No 11-CV-0795-MRK-WIG, 2012 WL 3728146 (D. Conn. Jan. 25, 2012) ........... 28
*Baker v. Urban Outfitters, Inc.*,
  431 F. Supp. 2d 351 (S.D.N.Y. 2006) .................................................... 30
*Bambu Sales, Inc. v. Ozak Trading Inc.*,
  58 F.3d 849 (2d Cir. 1995) ..................................................................... 15
*Banff, Ltd. v. Colberts, Inc.*,
  996 F.2d 33 (2d Cir. 1993) ..................................................................... 21
*Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*,
  No. 18-CV-6504-NRB, 2020 WL 729518 (S.D.N.Y. Feb. 13, 2020) .......... 30
*Berry v. Loiseau*,
  223 Conn. 786, 614 A.2d 414 (1992) ...................................................... 27
*Brandewiede v. Emery Worldwide*,
  890 F. Supp. 79 (D. Conn. 1994) ........................................................... 40
*Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*,
  No. 14-CV-6911-VEC-JLC, 2016 WL 658310 (S.D.N.Y. Feb. 17, 2016) ......... 39
*Chase v. Cohen*,
  519 F. Supp. 2d 267 (D. Conn. 2007) .................................................... 28
*Fogerty v. Fantasy, Inc.*,
  510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) ......................... 29
*Foncello v. Amorossi*,
  931 A.2d 924 (Conn. 2007) .................................................................... 25
*George Basch Co. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992) .................................................. 20, 21, 22, 23
*Gilmore v. Bergin*,
  No. 95-CV-01838-DFM, 1998 WL 1632526 (D. Conn. Sept. 22, 1998) .......... 40
*Goodrich v. Waterbury Republican-American, Inc.*,
  448 A.2d 1317 (Conn. 1982) .................................................................. 25
*Gracie v. Gracie*,
  217 F.3d 1060 (9th Cir. 2000) ............................................................... 37

*Gucci America, Inc. v. Weixing Li*,
  768 F.3d 122 (2d Cir. 2014) .................................................................. 13

*Hamilton–Brown Shoe Co. v. Wolf Brothers & Co.*,
  240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 (1916) .................................. 20

*Hylton v. Gunter*,
  313 Conn. 472 (2014)............................................................................. 27

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
  80 F.3d 749 (2d Cir. 1996) .................................................................... 30

*Int'l. Info. Sys. Sec. Certification Consortium v. Security Univ., LLC*,
  823 F.3d 153 (2d Cir. 2016) ................................................................... 11

*Kelly v. Kurtz*,
  193 Conn. App. 507, 219 A.3d 948 (2019) ............................................ 25

*Kelly-Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013) ............................................................. 31, 32

*Kerin v. U.S. Postal Serv.*,
  218 F.3d 185 (2d Cir. 2000) ................................................................... 38

*Kregos v. The Latest Line, Inc.*,
  No. 92-CV-398-WWE, 1998 WL 696007 (D. Conn. Aug. 31, 1998) ...................................... 40

*L & L Wings, Inc. v. Marco–Destin, Inc.*,
  676 F. Supp. 2d 179 (S.D.N.Y. 2009).............................................. 11, 31

*Label Sys. Corp. v. Aghamohammadi*,
  270 Conn. 291 (2004).............................................................................. 27

*Livingston v. Adirondack Beverage Co.*,
  141 F.3d 434 (2d Cir. 1998) ................................................................... 30

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
  885 F.2d 1 (2d Cir. 1989) .................................................................. 17, 21

*Manhattan Review LLC v. Yun*,
  765 F. App'x 574 (2d Cir. 2019)............................................................. 37

*Merck Eprova AG v. Brookstone Pharm., LLC*,
  No. 09-CV-9684-RJS, 2013 WL 3146768 (S.D.N.Y. June 10, 2013)......................... 26

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014) ................................................................... 22

*Millea v. Metro-North R.R. Co.*,
  658 F.3d 154 (2d Cir. 2011).................................................................... 37

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
  316 U.S. 203, 62 S. Ct. 1022, 86 L. Ed. 1381 (1942) ............................ 24

*Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*,
  349 F.2d 389 (2d Cir.1965)............................................................... 20, 21

*New York Racing Ass'n, Inc. v. Stroup News Agency Corp.*,
  920 F. Supp. 295 (N.D. N.Y. 1996) ....................................................... 14

*Nora Bevs., Inc. v. Perrier Grp. of Am., Inc.*,
  164 F.3d 736 (2d Cir. 1998).................................................................... 38

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
 572 U.S. 545 (2014) ............................................................................................. 29, 30
*Prime Management Co., Inc. v. Steinegger*,
 904 F.2d 811 (2d Cir.1990) ........................................................................................ 40
*Procter & Gamble Co. v. Amway Corp.*,
 280 F.3d 519 (5th Cir. 2002) ...................................................................................... 37
*R.I. Pools, Inc. v. Paramount Concrete, Inc.*,
 149 Conn. App. 839, 89 A.3d 993 (2014) ................................................................... 27
*Romag Fasteners, Inc. v. Fossil, Inc.*,
 979 F. Supp. 2d 264 (D. Conn. 2013) .................................................................. 21, 23
*Romag Fasteners, Inc. v. Fossil, Inc.*,
 No. 10-CV-1827-JBA, 2014 WL 3895905 (D. Conn. Aug. 8, 2014) ....................... 13, 24
*Sierra Club v. U.S. Army Corps of Eng'rs*,
 776 F.2d 383 (2d Cir. 1985) ....................................................................................... 39
*Silivanch v. Celebrity Cruises, Inc.*,
 No. 95-CV-0374-BSJ, 2000 WL 1211578 (S.D.N.Y.2000) ....................................... 40
*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
 909 F.3d 519 (2d Cir. 2018) .................................................................................. 29, 37
*Tiffany & Co. v. Costco Wholesale Corp.*,
 274 F. Supp. 3d 216 (S.D.N.Y. 2017) ......................................................................... 13
*Tolbert v. Queens Coll.*,
 242 F.3d 58 (2d Cir. 2001) ......................................................................................... 15
*Tomick v. United Parcel Serv., Inc.*,
 157 Conn. App. 312 (2015) ......................................................................................... 27
*Universal Church, Inc. v. Universal Life Church/ULC Monastery*,
 No. 14-CV-5213-NRB, 2019 WL 4601741 (S.D.N.Y. Sept. 19, 2019) ...................... 38
*Venetianaire Corp. of Am. V. A & P Import Co.*,
 429 F.2d 1079 (2d Cir. 1970) ..................................................................................... 31
*Venturi v. Savitt, Inc.*,
 191 Conn. 588, 468 A.2d 933 (1983) .......................................................................... 27
*Virgin Enterprises v. Nawab*,
 335 F.3d 141 (2d Cir. 2003) ....................................................................................... 11
*W. E. Bassett Co. v. Revlon, Inc.*,
 435 F.2d 656 (2d Cir. 1970) ....................................................................................... 23
*Waterbury Petroleum Prod., Inc. v. Canaan Oil & Fuel Co.*,
 193 Conn. 208, 477 A.2d 988 (1984) .......................................................................... 27
*WMS Gaming Inc. v. WPC Prods. Ltd.*,
 542 F.3d 601 (7th Cir. 2008) ...................................................................................... 15
*Zicherman v. Korean Air Lines Co.*,
 43 F.3d 18 (2d Cir.1994) ............................................................................................ 40

**Statutes**

15 U.S.C. § 1114 ................................................................................................... 11
15 U.S.C. § 1125 ................................................................................................... 11
15 U.S.C. § 1117 ...................................................................................... 13, 29, 39
Conn. Gen. Stat.§ 37-3a ................................................................... 3, 39, 40

**Other Authorities**

16 Conn. Prac., Elements of an Action § 11:13 ..................................... 29
5 McCarthy on Trademarks and Unfair Competition § 30:66 (5th ed.) ..................................... 15
6 McCarthy on Trademarks and Unfair Competition § 32:124 (5th ed.) ..................................... 13
Restatement (Second) of Torts § 652C ................................................ 28

**TABLE OF EXHIBITS**

| Ex. | Description |
|---|---|
| A | Trial Exhibit BK 218 - Stipulation of Fact and Law Nos. 1 - 24 |
| B | Trial Exhibit BK 31 – License Agreement dated March 31, 1989 |
| C | Trial Exhibit BK 30 – License Agreement dated July 11, 1983 |
| D | Trial Exhibit BK 222 - Stipulation of Fact and Law No. 26 |
| E | Trial Exhibit BK 89 – Builder Plaque |
| F | Trial Exhibit BK 90 – Builder Plaque |
| G | Trial Exhibit BK 217 - Stipulation of Fact and Law No. 25 |
| H | Trial Exhibit DEFENDANTS' 605 – Cost Per Unit Analysis |
| I | Email dated January 27, 2020 from Benjamin N. Luehrs to Peter Fay and Email chain between Joan M. Burnett and Process Server |
| J | Trial Exhibit BK 18 – Email dated January 23, 2011 from Heini Wellmann to Farzad Rastegar copied to William Crane |
| K | Trial Exhibit BK 68 – Email dated December 9, 2010 from Matthew Abrahams to Farzad Rastegar copied to William Crane |
| L | Trial Exhibit BK 193 – Email dated May 12, 2013 from William Crane to Farzad Rastegar |
| M | Trial Exhibit BK 114 – Letter dated March 8, 2010 from Bruce Kirby to Jeff Martin of International Laser Class Association |
| N | Trial Exhibit BK 199 – Schedule of Payments |
| O | Trial Exhibit BK 219 – Quarter Moon, Inc. – US Sales by Month |
| P | Trial Exhibit BK 220 – Laserperformance (Europe) Limited – European Sales by Month |
| Q | Trial Exhibit BK 221 – Laserperformance (Europe) Limited – European Sales by Month |
| R | Trial Exhibit DEFENDANTS' 609 – Total Cost of Production Analysis |
| S | Trial Exhibit BK 19 – Email dated January 23, 2011 from Heini Wellmann to  Hank Barry, Jeff Martin |
| T | Trial Exhibit DEFENDANTS' 566 – Letter dated March 11, 2011 from Pryor Cashman LLP to Wesley W. Whitmyer, Jr. |
| U | Trial Exhibit BK 51 – Letter dated October 11, 2012 from Bruce Kirby and Bruce Kirby, Inc. to Quarter Moon, Incorporated |
| V | Trial Exhibit BK 52 – Letter dated November 15, 2012 from Bruce Kirby and Bruce Kirby, Inc. to Laser Performance Europe Ltd. and/or Performance Sailcraft Europe Ltd. |
| W | Trial Exhibit BK 65 – Email dated April 19, 2013 from Bahman Kia to Daniel Pearson copied to William Crane |
| X | Trial Exhibit BK 87 – Laser Class Rules – One Design |
| Y | Trial Exhibit DEFENDANTS' 608 – Unjust Enrichment Claim – US Sales by Month |
| Z | Trial Exhibit BK 33 – Agreement dated November 11, 2005 |
| AA | Trial Exhibit BK 88 – Laser Class Rules – One Design |
| BB | Defendants LaserPerformance (Europe) Limited and Quarter Moon, Incorporated's Damages Analysis, served December 24, 2014 |
| CC | Letter dated April 2, 2020 from Benjamin N. Luehrs to Doug Skalka with attached invoices |
| DD | A portion of the transcript of the deposition of William Crane, held on October 25, 2018 |

## I.  **Introduction**

This motion follows seven (7) years of litigation that finally concluded in February 2020 when a federal jury determined that (1) Quarter Moon, Incorporated ("QMI") willfully infringed Bruce Kirby, Incorporated's ("BKI") BRUCE KIRBY trademark, and (2) QMI and LaserPerformance (Europe) Limited ("LPE") misappropriated Bruce Kirby's name for commercial benefit (BKI and Bruce Kirby individually and collectively referred to as "Kirby"). The jury's verdict is correct as to liability. Now before the Court are issues concerning Lanham Act damages, which the jury awarded against QMI in the amount of $4,337,157, the amount of punitive damages to be awarded against both QMI and LPE for their misappropriation, and whether Kirby is entitled to legal fees and pre-judgment interest on the jury's award against QMI or the separate award against LPE in the amount of $2,520,578 for its misappropriation.

As to Lanham Act damages, the jury's verdict should be adopted. Kirby proved every element of its case to be awarded all QMI's revenues as its profits, as determined by the jury. First, as to willfulness, the evidence of record at trial conclusively established QMI's willful infringement of the BRUCE KIRBY trademark. QMI cannot contest the jury's verdict on this issue. As to the amount of profits to which Kirby is entitled, the Court should accept the jury's finding that QMI's "profits" under the Lanham Act are its revenues of $4,337,157. This finding is legally warranted on the sole basis that QMI did not submit a single piece of documentary evidence to prove its costs at trial. But further still, the jury rejected any notion that QMI's expert, William Murray ("Murray"), even reviewed—let alone testified to—documents that were sufficient to determine QMI's costs. The jury instead credited BKI's expert, Joseph DeCusati ("DeCusati"), who testified that QMI's cost information was wholly inadequate.

The Court should also enter judgment for the full amount of the jury's infringement award because it serves the purposes of the Lanham Act. The jury found that an award of

1

$4,337,157 was necessary to prevent QMI's unjust enrichment, deter future infringement, and serve the principles of equity. The jury's determination was correct. QMI and LPE were undoubtedly unjustly enriched by their illegal acts to the tune of $4,337,157 and $16,503,016, respectively. A $4,337,157 judgment against QMI will deter QMI, LPE, other infringers, and would-be infringers from seeking to profit off the intellectual property of others. Indeed, the jury's purposeful award demonstrates to the parties and public that infringement is not profitable.

Finally, equity is served by the jury's award because the jury capped damages against QMI for Claims 1, 2, and 4 at $4,337,157, presumably pursuant to the Court's instruction warning against duplicative damages. However, the record establishes Kirby also would have been awarded damages against QMI for common law misappropriation if the jury did not award $4,337,157 under the Lanham Act. An equitable result in these circumstances would leave the jury's award unchanged as any possible reduction of infringement damages must be offset by the lack of compensatory damages against QMI for misappropriation. Accordingly, for at least these reasons, the Court's judgment under the Lanham Act should include the jury's full award.

In addition to affirming the jury's award under the Lanham Act, the Court should also award Kirby punitive damages against QMI and LPE, jointly and severally, in the amount of $1,089,378. An award of $1,089,378, which comprises Kirby's litigation expenses less taxable costs, comports with the purpose of common law punitive damages in Connecticut and will assist in making Kirby whole in response to QMI and LPE's years-long illegal conduct. Indeed, punitive damages are needed to make Kirby whole as he has incurred, in fact, well over $1,089,378 in expenses over 7 years to bring QMI and LPE to account for their illegalities.

Finally, the Court should also award Kirby attorneys' fees against QMI and LPE, jointly and severally, in the amount of $944,208, and pre-judgment interest against QMI in the amount

of $3,563,526.70 and LPE in the amount of either $2,155,999.76 or $2,066,401.20. These figures are calculated pursuant to warranted by at least the "exceptional case" doctrine for Lanham Act claims, the Court's inherent authority, and Conn. Gen. Stat.§ 37-3a. As for the "exceptional case" standard, no case fits the bill more than this one. At all times relevant to this case, QMI and LPE have taken one frivolous and unreasonable position after another and needlessly extended these proceedings over seven years to ensure they could illegally sell unauthorized boats and willfully infringe the BRUCE KIRBY trademark as long as possible. For these and other reasons stated herein, this case warrants the Court's award of attorneys' fees and prejudgment interest.

Accordingly, pursuant to the following and the Declarations of Benjamin N. Luehrs and Robert D. Keeler, filed concurrently herewith, Kirby respectfully requests the foregoing relief.

## II. The Court Should Enter Judgment Against QMI in the Amount of $4,337,157 for Willful Trademark Infringement Pursuant to the Jury's Award At Trial

### A. Relevant Background

The evidence of record establishes QMI's willful infringement of the BRUCE KIRBY trademark. Willfulness requires a showing "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness." *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 209-10 (2d Cir. 2019). Kirby repeats the following key facts of willfulness here for the sake of completeness.

#### 1. QMI and LPE Knowingly Sold Boats with Trademarked Plaques For Years

QMI and LPE are the successors to two builder agreements to build and sell Laser sailboats. (*See* Trial Ex. BK-218 (Stipulation #1) at ¶¶ 10-16 (Ex. A hereto[1]).) At all times relevant to this proceeding, QMI sold Laser sailboats in the Americas, (Trial Ex. 31 (Ex. B) at

---

[1] Exhibits hereto having alphabetical designations are attached to the Declaration of Benjamin N. Luehrs, which is filed concurrently herewith.

20[2]), and LPE sold Laser sailboats in Europe and the Middle East. (Trial Ex. 30 (Ex. C) at 26.)

It is undisputed that the registered trademark BRUCE KIRBY is valid and owned by BKI, and that Kirby's trademarked name appeared on two plaques affixed to each boat sold by QMI and LPE prior to April 23, 2013. (Dkt. 600 (Trial Tr. Vol. 1 ("Vol. 1")) at 188:24-189:13 (Crane)[3]; Ex. A at ¶¶ 1-3, 7-9, and 19-23.) Indeed, both Kirby and William Crane ("Crane"), a non-lawyer yet paid "legal" consultant for QMI, (*see* Vol. 1 at 182:9-17 (Crane)), testified that for years QMI and LPE paid Kirby a royalty while using the two plaques that included Kirby's trademarked name. (Vol. 1 at 110:2-111:2 (Kirby), 113:5-114:10 (Kirby), 187:06-12 (Crane), 188:24-189:13 (Crane); 190:6-190:23 (Crane); 193:18-193:25 (Crane); *see also* Trial Ex. BK-89 (ISAF Plaque (Ex. E hereto)); Trial Ex. BK-90 (Builder Plaque (Ex. F hereto)); Trial Ex. 217 at ¶ 25 (Stipulation # 2 (Ex. G hereto)); and Ex. A at ¶¶ 10-17, 19-22.)

Kirby's trademarked name was included on Laser sailboats to sell boats. Customers sought out the plaques on the boats because they were required to make the boats eligible to race. (Vol. 1 at 114:11-115:17 (Kirby), 116:06-118:5 (Kirby), 137:14-17 (Kirby), 138:2-139:2 (Kirby); Dkt. 601 (Trial Tr. Vol. 2 ("Vol. 2")) at 304:22-24 (Crane), 305:19-24 (Crane); Ex. A at ¶¶ 22-23.) In other words, the plaques were required and used to make boat sales. (*Id.*) The requirement to use the trademarked plaques on each Laser sailboat appeared in at least the Laser sailboat construction manual, (Vol. 1 at 116:06-118:5 ("Kirby"), 189:14-190:05 (Crane)), and the Laser class rules as they appeared prior to April 23, 2013. (Tr. Ex. BK-87 (Ex. X hereto).)

The plaques signified that a boat was built according to the construction manual, which boat builders needed to strictly follow to make race-eligible boats. (Vol. 1 at 114:11-115:17 (Kirby), 116:06-118:5 (Kirby), 189:14-190:05 (Crane).) Thus, use of the plaques on Laser

---

[2] Page reference numbers in multipage exhibits refer to the ECF page number.
[3] Names have been included after each transcript citation to identify the testifying witness.

sailboats ensured the purchasing public that the boat for sale was identical to the other racing

boats. (Vol. 1 at 114:11-115:17 (Kirby), 116:06-118:5 (Kirby); Ex. A at ¶¶ 22-23.)

For decades, the trademarked plaques were always affixed in a specific, identifiable

location on Laser boats. (Vol. 1 at 114:11-115:17 (Kirby), 116:06-118:5 (Kirby).) Consistency

enabled purchasers of Laser sailboats to quickly locate the plaques before purchasing. (*Id*; *see

also* Ex. A at ¶¶ 22-23.) Sailors knew that the rules required plaques on the boats to race. (Vol. 1

at 114:11-115:2 (Kirby); Vol. 2 at 304:22-24 (Crane), 305:19-24 (Crane).) Thus, sailors would

look for the trademarked plaques in the place they sat for decades before completing a purchase.

(Vol. 1 at 114:11-115:17 (Kirby), 116:06-118:5 (Kirby), 137:14-17 (Kirby), 138:2-139:2

(Kirby); Vol. 2 at 304:22-24 (Crane), 305:19-24 (Crane); Ex. A at ¶¶ 22-23.)

    2.  <u>QMI and LPE Willfully Stopped Paying Royalties to Build Laser Sailboats after
Farzad Rastegar Failed to Purchase Kirby's Rights on Their behalf</u>

After decades of QMI and LPE paying royalties to Kirby and selling boats with the

BRUCE KIRBY plaques, Kirby decided to sell his rights in the Laser sailboat. (Vol. 1 at 122:09-

123:10 (Kirby), 124:24-125:1 (Kirby).) The first potential buyer with whom Kirby negotiated

was Mr. Farzad Rastegar ("Rastegar"). (*Id.*) Rastegar, who decided not to testify in this matter

despite Kirby's attempts to subpoena him, (Ex. I), represented the interests of QMI and LPE in

the negotiations. (Vol. 1 at 122:09-123:10 (Kirby), 124:24-125:1 (Kirby); *see also* Trial Ex. BK-

18 (Ex. J) (email to Rastegar regarding  issues between "LaserPerformance" and the ILCA);

Trial Ex. BK-68 (Ex. K) (email from Rastegar directing the payment of royalties); Trial Ex. BK-

193 (Ex. L) (email from Crane to Rastegar referring to "our" plaques); Vol. 1 at 124:15-18

(Court) (Court reciting that Rastegar's "involvement with the defendant is undisputed.").)

However, Rastegar failed to secure Kirby's rights. Near the end of their negotiations,

Rastegar took "a million dollars off the table," without prompting, leaving Kirby "stunned."

(Vol. 1 at 125:06-14 (Kirby).) Notwithstanding Rastegar's bad-faith dealing, Kirby quickly

found another interested buyer, Global Sailing Limited ("Global"), who was willing to pay the

full, fair price. (Vol.. 1 at 126:2-22 (Kirby).) It is undisputed that Kirby never sold the BRUCE

KIRBY trademark in this transaction or any other. (Ex. A at ¶ 8; Vol. 1 at 126:25-127:4 (Kirby).)

After Rastegar failed to obtain Kirby's rights, QMI and LPE each unilaterally ended their

decades-long practice of paying royalties to manufacture and sell boats. (Vol. 1 at 127:5-14

(Kirby), 190:06-23 (Crane), 196:08-197:2 (Crane).) At trial, QMI and LPE stipulated that their

failure to pay royalties was a condition of breach of their contractual agreements. (Ex. A at ¶¶

17-18.) Yet despite refusing to pay royalties to any third party, QMI and LPE continued to sell

boats with the same plaques, placed in the same location, as they had for decades. (Vol. 1 at

127:15-128:1 (Kirby), 196:08-197:2 (Crane), 197:23-198:7 (Crane).) They continued to sell

boats with plaques while in breach because the plaques made the boats desirable and saleable.

3.   QMI and LPE Knowingly Persisted in Selling Unauthorized Boats Bearing the
     Trademarked Plaques Without Paying Royalties

QMI and LPE's continued sale of Laser sailboats bearing the trademarked plaques was

unacceptable to both Kirby and Global. On March 8, 2010, after "numerous failed attempts to be

paid," Global and Kirby wrote a letter to Jeff Martin ("Martin), a former paid secretary of the

International Laser Class Association ("ILCA"), to suspend of issuance of plaques to QMI and

LPE. (Trial Ex. BK-114 (Ex. M); Vol. 1 at 128:2-9 (Kirby), 129:7-13 (Kirby); *see also, e.g., id*.

at 185:09-187:12 (Crane).) Global and Kirby wrote to ILCA because it was and is the governing

body of Laser sailboat racing and the body responsible for organizing and managing Laser

racing, including enforcement of Laser racing rules and distribution of the ILCA plaque. (Vol. 2

at 301:07-11.) Kirby testified he wanted ILCA to stop issuing plaques to QMI and LPE because

the plaques "had [his] name on them and [QMI and LPE] were building boats with those plaques

6

on them and not paying any royalties." (Vol. 1 at 129:16-20 (Kirby), 179:13-17 (Kirby).) Kirby

was clear in his testimony that QMI and LPE did not have authorization to use his trademarked

name after they stopped paying. (Vol. 1 at 134:20-24 (Kirby) (Q. "Mr. Kirby, when the

defendants stopped paying royalties, did they have your authorization to use your name on the

Laser sailboats?" A. No. When they stopped paying royalties, they had to stop building boats.").)

        QMI and LPE disregarded Kirby's letter, continued selling boats, and refused to resume

the royalties they had paid for decades. (Vol. 1 at 130:07-11 (Kirby).) Kirby's letter "meant

nothing to them." (Vol. 1 at 130:10-11 (Kirby).) Instead of heeding Kirby's protests (or abiding

by their contracts) QMI and LPE chose to willfully disregard Kirby and his rights.

        There were immediate consequences to QMI and LPE's continued sale of boats without

paying royalties. LPE's contract was terminated within two months, in May 2010. (Vol. 2 at

307:12-16 (Crane).) LPE never paid a royalty to build Laser sailboats after its termination.

However, to side-step LPE's termination, QMI in fact began smuggling plaques to LPE. (Vol. 2

at 307:21-22 (Crane).) Indeed, when faced with the termination of its European counterpart, QMI

resumed payment for plaques because QMI and LPE needed the plaques to sell boats. (*See* Ex.

M; Vol. 1 at 194:01-10 (Crane), 194:1-10 (Crane); BK-199 (Ex. N hereto).) Without plaques,

LPE never would have been able to sell another boat. Thus, QMI smuggled plaques to a

terminated builder so that QMI and LPE could each continue to sell boats with plaques bearing

the BRUCE KIRBY trademark. (Vol. 2 at 307:17-20 (Crane).) QMI knew LPE was not an

authorized builder and not eligible to receive plaques, but sent them anyway. QMI and LPE

knew they were not authorized by Kirby to sell boats using his name yet continued to do so,

using plaques that made this very assertion. (Ex. E ("Authorised by . . . Bruce Kirby").) QMI and

LPE continued using the same plaques in the same fashion as before to continue making money.

ILCA went along with QMI's scheme because ILCA was paid a fee for the plaques. (*See* Vol. 1 at 216:12-16 (Crane).) LPE's sales dwarfed QMI's and thus comprised an enormous percentage of ILCA's plaque sales. (*Compare* BK-219 (Ex. O hereto) *with* BK-220 *and* BK-221 (Exs. P and Q hereto).) However, QMI, LPE, and ILCA knew they could not keep up their arrangement forever, so they began a new tack to remove the BRUCE KIRBY trademark from the plaques. Their solution was to change the rules of Laser sailboat racing that required QMI and LPE's use of the BRUCE KIRBY trademark.

### 4. QMI and LPE Continued Their Illegal Acts While Trying to Sew Confusion as to Ownership of Royalty Rights

As stated above, QMI temporarily resumed its royalty payments after LPE was terminated because QMI and LPE needed plaques to sell boats. Eventually, however, QMI stopped paying royalties to anyone upon receipt of a draft rule change from ILCA that ultimately served to remove Kirby's trademarked name from the plaques.

On January 23, 2011, the president of ILCA, Heini Wellmann ("Wellmann"), emailed Rastegar and Crane a proposed rule change. (*See* Ex. J and BK-19 (Ex. S hereto); Vol. 1 at 199:10-200:08 (Crane), 201:24-204:08 (Crane).) The email was sent after a period of Rastegar's "impatienc[e]". (Ex. R.) The proposal sought to change the definition of a Laser sailboat "Builder" in the Laser class rules. (Ex. S; Vol. 1 at 199:10-200:08 (Crane), 201:24-204:08 (Crane).) To-date, the definition of an authorized "Builder" was a builder that had a "building agreement from Bruce Kirby or Bruce Kirby, Inc. to build the Laser." (Ex. S.) The proposed change would "eliminate" this expression and therefore eliminate the need for Kirby's trademarked name on the plaques. (Ex. S; Vol. 1 at 199:10-200:08 (Crane), 201:24-204:08 (Crane); Vol. 2 at 305:09-12 (Crane).) The rule change process began "as agreed" during a prior meeting between Wellmann and Rastegar in Norwalk, CT. (Ex. R.)

8

Importantly, it was at this very moment in time that QMI stopped paying royalties to anyone. As of February 1, 2011—a mere eight (8) days after Crane and Rastegar received the January 23, 2011 draft rule change from Wellmann—QMI stopped paying royalties to any third party and never paid royalties again. (Ex. N at 2; Vol. 1 at 203:3-204:8 (Crane).) QMI was apparently at ease infringing Kirby's federally registered BRUCE KIRY trademark once the rule change was set in motion. Importantly, moreover, by ceasing all royalty payments and ultimately changing the rules, QMI was effectuating the result it sought in 2008 when Rastegar tried, and failed, to buy Kirby's rights. QMI and LPE did not want to pay royalties in 2008 and decided to cease payments even after their bid to buy the rights failed.

When QMI initially began withholding royalties a second time, payments were directed to an escrow account owned by QMI's attorneys. (Ex. N at 2; Vol. 1 at 196:08-197:2 (Crane).) Notably, at this time QMI and LPE were informing Kirby through counsel that the "proper" owner of the rights was Kirby, not Global—a position on which they conveniently flipped at the outset of this case. (*Compare* Def. Tr. Ex. 566 (Ex. T hereto) *with* Dkt. 40 (Defs.' Answer) at 32.) However, QMI never intended to pay royalties to anyone after February 1, 2011, regardless of who owned the rights. The escrow payments ended soon after they began, and the account was later cashed out. (Vol. 1 at 196:08-197:2 (Crane).) Thus, QMI followed LPE's practice of simply not paying royalties to build and sell boats. QMI never paid royalties to any third party after February 1, 2011. (Ex. N at l; Vol. 1 at 196:08-197:2 (Crane).) Yet at all times during QMI and LPE's non-payment prior to April 23, 2013, they continued selling boats without authorization.

5. **QMI and LPE Willfully Continued their Infringement and Misappropriation Until the Very Day the Rule Changed, Making Over $20,000,000 in Sales**

In view of QMI and LPE's unceasing illegal conduct, Kirby persisted in his efforts to prevent further unauthorized sales. On October 11, 2012, Kirby sent a letter to QMI and Crane

stating that "[b]ased upon your failure to pay royalties as set forth in my letter to you dated July 17, 2012 (copy enclosed) your right to build the licensed design (Kirby Sailboat) is hereby terminated. . . . You are no longer entitled to obtain plaques . . . ." (Trial Ex. BK-51 (Ex. U hereto).) Kirby sent an identical letter to LPE a month later. (Trial Ex. BK-52 (Ex. V hereto).)

Kirby sent these letters despite this Court's finding that he sold his rights to Global because QMI and LPE "were building boats and putting the plaque on them with my name and not paying royalties." (Vol. 1 at 180:03-05 (Kirby).) Kirby sent the letters "[t]o stop [QMI and LPE] from building the boat with the plaques with [his name] and not paying anybody anything." (Vol. 1 at 180:8-17 (Kirby).) When asked at trial if he wanted them to stop, Kirby replied he "sure did." (Vol. 1 at 180:6-7 (Kirby).)

Like Kirby's previous letters, however, QMI and LPE recklessly disregarded Kirby's protests and continued to trade off Kirby's trademarked name using the same plaques in the same fashion to sell the same boats, as before. QMI and LPE refused to cease their illegal actions until the very day the rule change was put into effect on April 23, 2013. (Vol. 1 at 203:19-204:08 (Crane); Trial Ex. BK-88 (Ex. AA hereto).) The rule change eliminated Kirby from the rules and, as a result, the plaques were changed. (*Id.*; Vol. 2 at 305:09-12 (Crane).) QMI had ordered new plaques without Kirby's trademarked name just four days before the rule changed. (Tr. Ex. BK-65 (Ex. W hereto); Vol. 1 at 206:10-207:10 (Crane).)

QMI's sales between February 1, 2011 – April 23, 2013 (the time period of QMI's unauthorization) total $4,337,157. (*See* Ex. O; (Vol. 2 at 260:2-261:9 (DeCusati).) LPE's sales during May 2010 – April 23, 2013 (the period of LPE's misappropriation) total $16,503,016. (*See* Ex. P; Vol. 2 at 262:9-263:18 (DeCusati).) LPE's sales during February 1, 2011 – April 23, 2013 (the time period of QMI's non-payment) total $12,140,425. (*See* Ex. Q; (Vol. 2 at 263:22-

264:16 (DeCusati).) These figures are undisputed. (Vol. 2 at 342:12-20.)

Pursuant to the foregoing, QMI and LPE never respected Kirby's intellectual property and privacy rights. At any time prior to April 23, 2013, QMI and LPE could have, but did not, cease their infringement and misappropriation by simply not selling boats. QMI and LPE instead chose to make over $20,000,000 in illegal sales regardless of the consequences.

B.  *QMI's Illegal Acts Constitute Willful Trademark Infringement, the Damages for Which the Jury Correctly Determined are $4,337,157*

As determined by the jury, the foregoing facts establish QMI's infringement of a registered trademark under 15 U.S.C. § 1114 and false designation of origin under 15 U.S.C. § 1125. (*See* Dkt. 575 at 1-2); *see Virgin Enterprises v. Nawab*, 335 F.3d 141, 146-48 (2d Cir. 2003) (for trademark infringement under both Section 32 and Section 43(a) of the Lanham Act a plaintiff must prove it (1) has a valid trademark (2) entitled to protection and (3) a likelihood that the defendant's use will cause confusion in the marketplace). The jury's deliberations on these infringement claims were greatly simplified by QMI's stipulation to the claims' first two elements. (Ex. A at ¶¶ 7-9; Dkt. 579 at 9.) Thus, to prevail on its trademark claims, Kirby need only have demonstrated that QMI's use of the BRUCE KIRBY trademark was likely to cause confusion as the source, sponsorship, approval, or affiliation of QMI's goods. *See Int'l. Info. Sys. Sec. Certification Consortium v. Security Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016).

The evidence presented at trial conclusively establishes that QMI's continued, identical use of the BRUCE KIRBY trademark after years of using the mark while paying royalties falsely implied Kirby's sponsorship and/or affiliation of unauthorized Laser sailboats, and therefore caused a likelihood of confusion regarding the same. *See, e.g., L & L Wings, Inc. v. Marco–Destin, Inc.*, 676 F. Supp. 2d 179, 188-89 (S.D.N.Y. 2009) (likelihood of confusion established by holdover licensee). QMI completely failed to overcome the abundance of facts establishing its

11

infringement, including how QMI used the literal trademark at issue to sell boats and falsely tried to tell customers **un**authorized boats were in fact "[a]uthorised by . . . BRUCE KIRBY." (Ex. E.) This is clear trademark infringement and there can be no disputing the jury's verdict.

The jury also correctly found QMI's infringement to be willful. (Dkt. 575 at 1-2.) Indeed, the record is replete with QMI's "aware[ness] of the infringing activity" and "reckless disregard" and/or "willful blindness" for Kirby's rights. The record shows that since at least 2008 it was QMI and LPE's goal and intention to sell boats without paying royalties. They took matters into their own hands and simply stopped paying royalties after Rastegar's bad-faith dealing backfired. Then, instead of resuming royalties like they had for years, QMI and LPE sought to change the rules instead of changing their illegal actions. QMI and LPE's unauthorized sale of boats was stipulated to be a condition of breach of QMI and LPE's builder agreements. Worse still, QMI knowingly sent plaques to a **terminated** builder (LPE) to ensure Rastegar's group could continue making sales in Europe. QMI's willfulness is further shown by the fact that royalty payments stopped a mere eight days after QMI and LPE received a draft rule change from ILCA and ultimately changed the plaques the very day the new rule went into effect. Like the jury's verdict on infringement, there is no disputing the jury's finding as to QMI's willfulness.

Finally, QMI presented no credible defense to their willful infringement at trial. QMI's only arguments comprised vague assertions regarding trademark ownership that directly contradict the record, an agreement not signed by Kirby, (Vol. 2 at 305:25-306:18; Trial Ex. BK-33 (Ex. Z hereto) at 7), and the bald assertion that QMI's knowing **unauthorized** use of the BRUCE KIRBY trademark was somehow "fair." Each of these arguments were destroyed by the testimony from both parties at trial. In truth, QMI and LPE continuously and recklessly disregarded Kirby's protests and instructions to cease use of his trademarked name. QMI and

LPE could have simply stopped making and selling infringing boats, but instead they made a calculated decision to continue doing so to make over $20,000,000 in sales. The facts herein clearly establish QMI and LPE's willful infringement and misappropriation. The jury provided justice concerning to liability; equity now demands an accounting.

C.  *QMI Failed to Prove Any Costs*

With liability established, the jury turned to damages. *4 Pillar*, 933 F.3d at 209 (to support an award for profits there first must be a finding that the infringement was willful). The Second Circuit has not explicitly ruled as to whether there is a federal right to a jury trial as to an accounting of profits. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:124 (5th ed.). However, in *Gucci America, Inc. v. Weixing Li*, a trademark infringement action under 15 U.S.C. Section 1117(a), the Second Circuit characterized the accounting of profits as an "equitable remedy." 768 F.3d 122, 130 (2d Cir. 2014); *see also Tiffany & Co. v. Costco Wholesale Corp.,* 274 F. Supp. 3d 216, 220 (S.D.N.Y. 2017) (jury verdict treated as advisory); *Romag Fasteners, Inc. v. Fossil, Inc.*, No. 10-CV-1827-JBA, 2014 WL 3895905, at *1 (D. Conn. Aug. 8, 2014) (same). Thus, in an abundance of caution, regardless of where the Court comes out on the state of the law and whether or not the jury's determination was advisory, Kirby believes the Court should set out findings of fact that would support the jury's determination. Importantly, however, even an advisory jury is "an important part of the data taken into consideration in arriving at the court's independent conclusion." *Tiffany & Co.*, 274 F. Supp. 3d at 220. Indeed, as further addressed below, the jury correctly determined QMI's revenues of $4,337,157 should be its profits under the Lanham Act as QMI failed to prove costs, the jury understood QMI's expert to have no credibility, and the award is equitable and serves the Lanham Act's purposes. The Court therefore should not amend the jury's award in entering judgment on Claims 1 and 2.

1.  QMI Failed to Prove a Single Cost Through Documentary Evidence

The Court should not amend the jury's $4,337,157 trademark damages award because QMI completely failed to prove any costs at trial. The burden of proving costs falls exclusively to the infringer; Kirby need only prove revenues. 15 U.S.C. § 1117(a).

It is undisputed that, after being sanctioned for violating this Court's discovery order to produce cost information, (Dkt. 558), QMI failed to introduce at trial a single piece of documentary evidence concerning costs related to the sale or manufacture of Laser sailboats. The Court should award QMI's $4,337,157 in revenues as its profits under the Lanham Act on this basis alone at least because "[i]f [an] infringer provides no evidence from which the court can determine the amount of any cost deductions, there is no obligation to make an estimate, and 'costs' need not form any part of the [Court's] calculation of profits." 5 McCarthy on Trademarks and Unfair Competition § 30:66 (5th ed.). Courts in this Circuit and around the country routinely hold that failure to introduce evidence of costs is firm grounds for an award equal to QMI's revenues. *See American Honda Motor Co. v. Two Wheel Corp.,* 918 F.2d 1060, 1063 (2d Cir.1990) ("Ordinarily, a plaintiff that has proved the amount of infringing sales would be entitled to *that* amount unless the defendant adequately proved the amount of costs to be deducted from it." (emphasis added)); *Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.*, 17 U.S.P.Q.2d 1017, 1989 WL 236526, *6 (S.D. N.Y. 1989) (no documentary evidence supported defendant's estimate of a profit margin: "Since [defendant] has provided no reasonable basis from which the Court can determine the amount of any deductions, they need not form part of the calculation."); *New York Racing Ass'n, Inc. v. Stroup News Agency Corp*., 920 F. Supp. 295, 301 (N.D. N.Y. 1996) (when the infringer fails to prove cost deductions, "then the profits to which the plaintiff is entitled under the Lanham Act are equal to the infringer's gross sales."); *Audemars Piguet Holding S.A. v. Swiss Watch Intern*., Inc., 46 F. Supp. 3d 255, 292 (S.D.N.Y.

2014), *rev'd in part on reconsideration*, No. 12-CV-5423-LAP, 2015 WL 150756 (S.D.N.Y. Jan. 12, 2015) (no overhead costs were adequately proven); *WMS Gaming Inc. v. WPC Prods. Ltd*., 542 F.3d 601, 609 (7th Cir. 2008), as amended (Sept. 16, 2008) ("Courts consistently find that when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales."). Notably, even evidence of bills are not proof of deductible *costs* without documentary evidence the bills were paid. *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995), *abrogated for other reasons by 4 Pillar*.

QMI's complete failure to introduce any documentary evidence of costs at trial provides a sufficient basis to accept the jury's award. However, even if the Court were to disregard QMI's failure and the jury's determination, Kirby's damages expert, DeCusati, actually looked at QMI's purported cost documents that were *not* entered into evidence and provided his expert opinion the documents are wholly insufficient to establish costs in this matter. The parties stipulated that DeCusati and QMI's damages expert, Murray, reviewed the exact same documents purporting to establish QMI's costs. (Trial Ex. BK-222 (Stipulation #3) (Ex. D hereto).) However, DeCusati repeatedly opined that the documents reviewed by Murray "didn't come anywhere close to being sufficient to prove expenses" and did not allow a reasonable expert to come to a cost determination. (Vol. 2 at 269:8-24 (DeCusati).) The jury clearly found DeCusati's testimony persuasive and credited DeCusati over Murray, an act which the Court stated is "important to what the jury does." (Vol. 2 at 247:20-247:25 (Court)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."); *Tolbert v. Queens Coll.,* 242 F.3d 58, 73 (2d Cir. 2001) ("[T]he matter of which of permissible

inferences were to be drawn from that evidence was solely within the province of the jury.").

The jury's award shows it found persuasive a core theme in DeCusati's testimony regarding the need for general ledgers and invoices to adequately assess cost information. (Vol. 2 at 266:21-267:9 (DeCusati), 269:13-224 (DeCusati), 270:2-271:8 (DeCusati), 274:9-21 (DeCusati), 276:20-25 (DeCusati), 278:2-8 (DeCusati).) DeCusati testified that "one of the basic documents [he] would ask for would be the financial statements of the company, and moving backwards, the general ledgers of the company. . . . Armed with that information, the expert should then request invoices to support and to identify that those expenses are truly related to this sailboat because most companies sell more than one product." (Vol. 2 at 266:21-267:11 (DeCusati).) When asked if he, as an expert, would have asked for general ledgers and invoices to perform a cost calculation, DeCusati testified that, to the extent this information exists, he "would **_need_** it to provide a credible opinion." (Vol. 2 at 274:9-21 (DeCusati).) Crane testified that QMI indeed maintained general ledgers and invoices (like all companies). (Vol. 1 at 204:11-205:18 (Crane).) However, QMI **_did not even produce_** general ledgers or invoices, let alone introduce them into evidence. In fact, not only did QMI fail to introduce general ledgers, QMI's expert **_did not even ask for them_**, let alone review them. (Vol. 2 at 368:13-15 (Murray), 369:14-16 (Murray), 370:03-05 (Murray), 370:23-24 (Murray)). With respect to invoices, the jury made a witness credibility determination in favor of DeCusati that QMI also failed to produce or review invoices. (*Compare* Vol. 2 at 370:25-371:04 (Murray) *with id.* at 271:09-16 (DeCusati).)

QMI's failure to produce, introduce, or review key cost information led DeCusati to conclude QMI failed to prove costs for each type of expense sought to be deducted, including boat-manufacturing and component costs and overhead expenses. DeCusati testified that, after looking at the documents relied upon by Murray, he had "no ability to know what the costs are

based on the information produced to [him] or that [he] reviewed in this matter." (Vol. 2 at 279:10-12 (DeCusati).) He "had no ability and [he] saw no documents that allowed him to calculate or prove any of the expenses or costs for the defendant." (Vol. 2 at 280:1-5 (DeCusati).) Thus, DeCusati established, and the jury correctly found, that QMI failed to prove both the amount of costs or that any costs are related to the Laser. (*See* Vol. 2 at 279:4-12.)

By way of just one example of QMI's failure to prove costs, QMI failed to prove overhead expenses as it did not "carry its burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods." *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 7–8 (2d Cir. 1989). In *Manhattan*, the defendant offered "inadequate evidence of its [product] overhead[ and] the record contain[ed] only data pertaining to [the defendant's *overall* selling expenses." *Manhattan*, 885 F.2d 1, 7–8 (emphasis added). QMI's failure is similar in that the only indication in the record of overhead expenses was an "overall summary" of expenses. *Manhattan*, 885 F.2d 1, 7–8. Indeed, just like the defendant in *Manhattan*, QMI's "expenses for the relevant three year period do not indicate whether and to what extent [the] expenses are attributable to" the product in question. *Id*. Moreover, QMI testified it possesses the necessary specific information, namely general ledgers and invoices, (Vol. 1 at 204:11-205:18 (Crane)), but QMI did not produce this information during discovery or introduce it at trial. Neither did Murray request nor review this information, and DeCusati rejected that overhead expenses could be determined from the evidence Murray did review. (Vol. 2 at 273:23-274:8 (DeCusati).) Thus, QMI "has not adequately demonstrated that reliable data are unavailable. Estimates should not be used unless such a showing has been made." *See Manhattan*, 885 F.2d at 8. QMI is not entitled to any cost deductions, including for overhead.

2. <u>The Jury Found Murray Not Credible and Rightly Credited DeCusati over Murray</u>

The jury made innumerable credibility judgments between DeCusati and Murray and

conclusively determined DeCusati to be more credible. At the outset of the second day of trial the Court poignantly stated that these credibility determinations are "important to what the jury does." (Vol. 2 at 247:20-247:25 (Court).) The jury's task in this case was readily apparent as DeCusati and Murray looked at the exact same documents purporting to show cost information and came to entirely contradictory conclusions. (*See* Ex. D.)

For instance, DeCusati and Murray gave contradictory testimony regarding the core issue of whether QMI's documents were sufficient to determine costs. (*Compare* Vol. 2 at 337:09-12 (Murray) *with id.* at 269:8-24 (DeCusati).) The experts further disagreed on simple issues such as what constitutes a reliable source document. DeCusati testified that an expert properly ***starts*** with financial statements from a company and "***work[s] back to*** . . . general ledgers . . . and [then] [] work ***backwards*** to the invoices" to ultimately determine and prove costs. (Vol. 2 at 269:16-18 (DeCusati); *see also id.* at 274:03-18 (DeCusati).) Murray, on the other hand, speciously testified that general, year-end financial statements (and unaudited ones at that) are "one of the best measures" of expenses. (Vol. 2 at 359:16-21 (Murray).) The jury knows Murray's testimony is false, especially when viewed in conjunction with the credible opinion of DeCusati.

As one final example, the experts disagreed even on the simple question of whether Murray reviewed invoices. (*Compare* Vol. 2 at 370:25-371:04 (Murray) ("I did look at invoices, yes.") *with id.* at 271:12-13 (DeCusati) (Q. "Did we look at any invoices [last week]? A. No.").) Contradictory testimony on this issue is important because if Murray could not be trusted to testify as to whether he reviewed invoices, he could not be trusted on the ultimate issues concerning the sufficiency of QMI's evidence or a determination as to cost amounts. DeCusati testified and confirmed repeatedly that Murray did not review invoices. DeCusati told the truth.

Accordingly, on each issue related to QMI's costs, down to the most minute detail, it is

18

evident the jury credited DeCusati over Murray. The jury made its determinations without DeCusati even specifically addressing Murray per the Court's order. (Vol. 2 at 248:17-248:25 (Court); *see also id.* at 248:17-248:25 (Court).) And because there was no evidence of costs, the jury credited DeCusati's testimony that the amount of QMI's profits that should be awarded to Kirby for trademark infringement totals $4,337,157. Even if the jury was acting in an advisory capacity in determining profits, the Court gave the jury specific instructions on what was to be considered in reaching a verdict. While the Court has the authority to countermand the verdict of an advisory jury, as long as a reasonable interpretation of the trial record supports the advisory verdict in this case, the jury's advice should be taken and the verdict validated. Accordingly, the Court should come to the same conclusion as DeCusati and the jury and uphold the jury's award.

3.   QMI Failed to Present Evidence of Costs for the Relevant Time Period

Finally, even if the Court were to credit QMI's mere testimonial evidence of costs, Murray failed provide any testimony concerning the relevant time period. By awarding profits between February 1, 2011 and April 23, 2013, the jury determined this was the relevant time of QMI's unauthorized sales. (*See* Ex. O.) However, Murray testified he was not providing any opinions that go back to February 2011. In fact, Murray testified he did not consider damages prior to October *2012* (Vol. 2 at 365:15-25 (Murray).) Even the exhibits to Murray's report only go back to October 2011. (*See, e.g.,* Defs. Tr. Ex. 605 (Ex. H hereto).) Accordingly, even if the Court were to take Murray's testimony into account, he only provided an (unsupported) opinion as to costs between October *2012* and April 2013. (*Cf.* Defs. Tr. Ex. 608 (Ex. Y hereto); Trial Ex. 609 (Ex. R hereto).) This is yet another reason the jury's award should be upheld.

D.   *The Jury's Award is Equitable and Serves the Purposes of the Lanham Act*

The Court should determine the jury's $4,337,157 award for willful trademark infringement is equitable in view of the facts in this case. The jury's award was based on two

"categorically distinct rationales," namely unjust enrichment and deterrence. *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992); (Dkt. 575 at 3.) QMI has indicated it intends to argue the jury's award does not comport with the purposes of the Lanham Act. (*See* Dkt. 586 at 3.) QMI is wrong. Aside from properly and correctly determining QMI's infringement to be willful and excluding any costs from QMI's profits, the jury's award also perfectly encapsulates the purposes of the Lanham Act to prevent an infringer's unjust enrichment, deter future infringement, and ensure trademark infringement is not profitable.

4.   BKI Proved, and the Jury Correctly Found, QMI was Unjustly Enriched

On account of the jury's finding that QMI willfully infringed the BRUCE KIRBY trademark to make millions of dollars in infringing sales, Kirby has met every legal element to show QMI was unjustly enriched by its infringement. Unjust enrichment has been a basis for an accounting of an infringer's profits since at least 1916 when the Supreme Court in *Hamilton-Brown* likened an infringer to a trustee who acquired the profits "by [the] wrongful use of the [trust] property." *Hamilton–Brown Shoe Co. v. Wolf Brothers & Co.*, 240 U.S. 251, 259, 36 S.Ct. 269, 60 L.Ed. 629 (1916). The Second Circuit has applied the unjust enrichment rationale in non-competitor settings, such as the case here, since at least 1965. In its seminal decision *Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389, 395–96 (2d Cir.1965), regarding the equity view of the unjust enrichment theory, which the Second Circuit endorsed as "the proper one" at least in the indirect competition context, the Second Circuit noted:

> [T]he justification for an accounting is found in the principles of unjust enrichment traditionally applicable where property is used for profit without the owner's permission, and, if the view is carried to its logical conclusion, an accounting should be awarded automatically in most cases. In particular, since the accounting is not dependent upon presumed injury to the plaintiff, it is irrelevant that the plaintiff was not selling in the market exploited by the infringer.

*Id.* at 392. Indeed, as Second Circuit Judge Moore aptly noted in his concurrence to and dissent

from *Monsanto*: "Plaintiff undoubtedly has been adversely affected by defendant's unlawful infringement. Defendant, in turn, has made sales of mattress pads and at least to this extent has unjustly enriched itself." 349 F.2d at 398 (Moore, J. concurring and dissenting). The Second Circuit's sound reasoning in *Monsanto* has never been overruled and remains good law.[4]

However, *George Basch* and *4 Pillar* note that in addition to willfulness "a district court must still balance equitable factors in assessing the propriety of a profits award. These include, but are not limited to: (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." *4 Pillar*, 933 F.3d at 214 (citing *George Basch*, 968 F.2d at 1540).

Here, Kirby established both loss of goodwill ***and*** actual consumer confusion (despite being in a non-competitor relationship), and the jury's award embodies all the factors described above. The confusion perpetuated by QMI was inherent in its infringing use of the BRUCE KIRBY trademark to indicate Kirby's authorization when such authorization was explicitly withheld. Customers made their purchases based on QMI's infringing use of the mark, which undoubtedly benefited QMI in at least the amount of $4,337,157. Indeed, the jury specifically designated "unjust enrichment" as a basis for its award. QMI was wholly responsible for its

---

[4] There is *dicta* in *4 Pillar* that, under the unjust enrichment rationale, a defendant becomes accountable for its profits when the plaintiff can show that the defendant's sales would otherwise have gone to the plaintiff. *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 212 (2d Cir. 2019). However, the parties in *4 Pillar* were direct competitors. *Id.*, 933 F.3d at 207. Moreover, requiring proof that sales would have gone to the plaintiff in the case of non-competitors would directly conflict with the holdings of *Mansanto* and *George Basch*. *See Banff, Ltd. v. Colberts, Inc.,* 996 F.2d 33, 35 (2d Cir. 1993) ("[S]o long as willfulness is established, an accounting of profits may be based upon 1) unjust enrichment, 2) damages, or 3) deterrence of a willful infringer." (citing *George Basch*)); *see also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd*., 885 F.2d 1, 6 (2d Cir. 1989) (stating in contempt setting that "an award based on the defendant's profits, resting upon principles of unjust enrichment, focuses on the defendant's wrongdoing, not on damage to the plaintiff." (citing *Monsanto*, 349 F.2d at 395); *see also Romag Fasteners, Inc. v. Fossil, Inc.*, 979 F. Supp. 2d 264, 281–82 (D. Conn. 2013). The Court in *4 Pillar* cited *George Basch* and never even discussed *Monsanto*, let alone make any explicit holding to overrule it. Accordingly, *Monsanto* remains the law of this Circuit in non-competitor settings.

infringement as the party to the Builder Agreement and thus in charge of the decision to continue to willfully infringe the BRUCE KIRBY trademark. In addition to its own wrongdoing, QMI was also key to LPE's misappropriation as QMI smuggled plaques to LPE. Further still, QMI was in part the impetus to the rule change, which QMI sought because it was knowingly infringing and misappropriating Kirby's trademarked name. As to delay, Kirby did everything in his power to try to stop QMI's infringement and promptly file this present suit. And, after seven years of litigating, there is absolutely no alternative remedy for Kirby's relief. Moreover, there has never been any evidence of unclean hands against Kirby. This entire case has rather been about QMI and LPE's unclean hands and bad faith, exclusively, while using Kirby's rights without authorization and illegally trading off Kirby's good will.

Accordingly, the jury correctly found QMI was unjustly enriched by its infringement. QMI sold Laser sailboats with the BRUCE KIRBY trademark knowingly without authorization, and, in fact, contrary to Kirby's explicit instructions. QMI's revenues during the period of its unauthorized use (February 1, 2011 – April 23, 2013) total $4,337,157. This is the amount of QMI's unjust enrichment for which the Court should enter judgment.

5.   BKI Proved, and the Jury Correctly Found, A Need to Deter QMI and Others

In addition to unjust enrichment, the jury correctly awarded QMI's profits on the basis of deterrence. (Dkt. 575 at 3.) The deterrence rationale "is not compensatory in nature, but rather seeks to protect the public at large." *George Basch*, 968 F.2d at 1539. The profits that can be awarded based on deterrence is in no way limited relative to the other distinct rationales; a court may "award a defendant's ***full*** profits based ***solely*** on deterrence." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014) (emphasis added). "It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose all

its profits from its use . . . ." *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970).

The evidence of record established an egregious case of willful infringement and misappropriation perpetrated by QMI and LPE. QMI ceased its infringement and practice of smuggling plaques to a terminated builder only after it achieved a rule change that was required to ensure boats without Kirby's trademarked name were saleable. Moreover, the fact that QMI ceased its infringement does not limit the need for deterrence as the deterrence rationale seeks to dissuade specific infringers and infringers at large. *George Basch*, 968 F.2d at 1539. ("By awarding the profits of a bad faith infringer to the rightful owner of a mark, we promote the secondary effect of deterring public fraud regarding the source and quality of consumer goods and services."). A just result in this case requires upholding the jury's full award to empower the trademark laws of this Circuit and communicate to infringers and would-be infringers that infringement is not and will never be profitable here. The jury surely had this purpose in mind when they unanimously awarded Kirby $4,337,157 as QMI's profits. (*See* Dkt. 579 at 19.)

Finally, Kirby expects QMI will argue the jury's award constitutes an inequitable wind-fall. (*See* Dkt. 586 at 3.) But the Court should maintain the jury's award to present the opposite, inequitable result of providing a windfall to the infringer, QMI. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 979 F. Supp. 2d 264, 281 (D. Conn. 2013) (seeking to avoid "the unsatisfying result of a mechanical windfall to the infringer" if it was held that "an indirect competitor cannot show injury because there was no diversion of sales"). The jury's award is particularly established here because QMI completely failed to prove costs or persuade the jury that Murray even reviewed sufficient evidence to determine costs. These facts establish key distinctions to any case QMI may cite in support of its misguided "wind-fall" argument. Indeed, courts throughout the country, including the highest court in the land, do not hesitate and are not dissuaded from

awarding a trademark plaintiff all an infringer's profit. *See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207, 62 S. Ct. 1022, 1025, 86 L. Ed. 1381 (1942) ("There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."); *Romag Fasteners,* 2014 WL 3895905, at *11 (same).

Accordingly, the Court should uphold the jury's award of $4,337,157 in profits on the basis of deterrence alone or, at minimum, in addition to the basis of QMI's unjust enrichment.

> 6.  <u>Equity is Further Served By the Jury's Award As They Would Have Awarded More Damages on Claim 4 Had They Not Awarded QMI's Revenues As Profits</u>

The record establishes Kirby also would have been awarded damages against QMI for common law misappropriation if the jury did not award $4,337,157 under the Lanham Act. The jury awarded $0 against QMI for the misappropriation of Kirby's name despite (1) finding QMI liable for the misappropriation of Kirby's name, (2) finding that an award of punitive damages against QMI to be justified over and above 100% of its revenues, and (3) finding LPE liable and owing damages in the amount of $2,520,578 for precisely the same conduct as QMI. These results must also be viewed in relation to the Court's warning against an award of duplicative damages. (Dkt. 575 at 3.) And while the verdict form did not require the jury to explain its rationale, what is implicit from the verdict is that the jury found QMI's conduct reprehensible and its excuses insufficient. The record thus demonstrates the jury would have awarded further damages against QMI for misappropriation had it not awarded all QMI's revenues as its Lanham Act profits. Accordingly, the Court in equity should maintain the jury's full award of $4,337,157.

**III.** **<u>The Court Should Enter Judgment Against QMI and LPE For Misappropriation of Kirby's Name and For the Full Amount of the Jury's Award Against LPE of $2,520,578</u>**

> A.  *QMI and LPE Illegally Misappropriated Kirby's Name for Commercial Benefit*

The jury correctly determined that QMI and LPE misappropriated Kirby's name.

Connecticut law has long recognized a cause of action for such misappropriation. *Foncello v. Amorossi*, 931 A.2d 924, 929 (Conn. 2007); *Goodrich v. Waterbury Republican-American, Inc.*, 448 A.2d 1317, 1329 (Conn. 1982); *see also* Restatement (Second) of Torts § 652C.

As the Court instructed, the elements of misappropriation are (1) use of the Bruce Kirby name, (2) without Kirby's consent, (3) for the purpose of appropriating the commercial value of the name, and (4) use of the Bruce Kirby name was beneficial. (Dkt. 579 at 16-17.) QMI and LPE's liability for misappropriating Kirby's right of publicity is established by all the facts provided above. QMI and LPE used Kirby's name to sell boats without Kirby's authorization and commercially benefitted from the same to the tune of over $20,000,000. QMI and LPE knew they did not have authorization to use Kirby's name, but did so anyway to make money. The jury therefore correctly determined QMI and LPE's liability for misappropriation.

### B.   *QMI and LPE were Unjustly Enriched by Their Illegal Misappropriation*

Having found QMI and LPE liable for, the jury was asked to determine compensatory damages, which the Court instructed are measured by the commercial benefit obtained by the defendants or by the harm to the plaintiff. (Dkt. 579 at 21); *see also Kelly v. Kurtz*, 193 Conn. App. 507, 528, 219 A.3d 948, 966 (2019); *see also* 16 Conn. Prac., Elements of an Action § 11:13. The jury determined damages against LPE to be $2,520,578 and QMI to be $0.

The jury's award against LPE constitutes approximately 15% of its total sales of Laser sailboats ($16,503,016) following its termination in May 2010—the date LPE began selling boats using Kirby's name without his authorization—through the time LPE ceased using the plaques (April 23, 2013). (Ex. P.) LPE's sales from the last day of QMI's royalty payments (February 1, 2011) to April 23, 2013 were $12,140,425. (Ex. Q). Using this timeframe results in a compensatory damages award against LPE equal to approximately 20% of LPE's total sales. As stated above, QMI's sales during this same time period were $4,337,157. (Ex. O.)

25

For both QMI and LPE, the jury could have awarded Kirby the total commercial benefit of their illegal misappropriation in the amounts of $4,337,157 and $16,503,016, respectively. However, the jury awarded $0 in compensatory damages against QMI because they had already awarded Kirby all QMI's revenues. For LPE, the jury awarded a much lower amount than $16,503,016, specifically 15% of LPE's sales since its termination. LPE cannot contest the amount of this award as LPE's American counterpart, QMI, advocated for approximately a 14% profit margin on their unauthorized sale of Laser sailboats in late 2012 and 2013. (*See* Exs. R and Y.) Notably, Crane testified the boat hulls were manufactured in ***Europe*** in the Spring of 2012. (Vol. 1 at 197:5-22 (Crane).) Accordingly, for at least these reasons the jury's $2,520,578 award against LPE should be included in the Court's entry of judgment.

## IV. The Court Should Additionally Enter Judgment Against QMI and LPE for Punitive Damages under Claim 4, Jointly and Severally, in the Amount of $1,089,378

In addition to affirming the jury's awards under the Lanham Act and Connecticut common law, the Court should also award Kirby punitive damages against QMI and LPE, jointly and severally, in the amount of $1,089,378. The parties agreed to submit to the jury the question of whether punitive damages should be awarded and to address the specific amount of such damages with the Court thereafter. (Vol. 1 at 43:15-19.) The jury unanimously found that the evidence at trial warranted punitive damages against QMI and LPE. (Dkt. 575 at 4.) Connecticut law demonstrates that the amount of punitive damages against QMI and LPE, jointly and severally, should be $1,089,378, which comprises a calculation of Kirby's legal fees less taxable costs.[5] Kirby's calculation of punitive damages is provided in the Fee Declaration of Benjamin

---

[5] Kirby's calculation of "taxable costs" is made without prejudice to asserting under Federal Rule 54 additional costs such as reasonable "out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients" under the Lanham Act (as a fee-shifting statute), or "costs beyond the limits of those prescribed by statute" pursuant to the Court's inherent powers. *See Merck Eprova AG v. Brookstone Pharm., LLC*, Case No. 09-CV-9684-RJS, 2013 WL 3146768, at *5 (S.D.N.Y. June 10, 2013).

N. Luehrs at ¶¶ 33-35 ("Fee Declaration"), filed concurrently herewith.

In order to award punitive or exemplary damages, the evidence of record must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. *Venturi v. Savitt, Inc.*, 191 Conn. 588, 592, 468 A.2d 933, 935 (1983). Connecticut has long recognized the common law rule that "punitive damages serve primarily to compensate the plaintiff for his injuries and, thus, are properly limited to the plaintiff's litigation expenses less taxable costs." *Berry v. Loiseau*, 223 Conn. 786, 827, 614 A.2d 414 (1992). Courts recognize the crucial role of punitive damages in making a party whole. *Tomick v. United Parcel Serv., Inc.*, 157 Conn. App. 312, 339 (2015); *see also Hylton v. Gunter*, 313 Conn. 472, 485-86 (2014) (noting that common-law punitive damages are "akin to statutorily authorized attorney's fees in practicality and purpose . . . fully compensating injured parties"); *Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291, 335 (2004) (common-law punitive damages "fulfill[] the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury").

However, the Connecticut Supreme Court has also recognized that punitive damages, "when viewed in the light of the increasing costs of litigation, also serves to punish and deter wrongful conduct." *Berry v. Loiseau*, 223 Conn. at 827; *see also Waterbury Petroleum Prod., Inc. v. Canaan Oil & Fuel Co.*, 193 Conn. 208, 237–38, 477 A.2d 988, 1004 (1984) ("Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim."). Notably, an award of common law punitive damages is capped at litigation expenses, but expenses may differ from a lodestar-type calculation. *See R.I. Pools, Inc. v. Paramount Concrete, Inc.,* 149 Conn. App. 839, 877, 89 A.3d 993, 1017 (2014) (reversing

punitive damages award based on lodestar calculation unequal to expenses actually incurred).

An award of $1,089,378 comports with the purposes of punitive damages in Connecticut and will assist in making Kirby whole following QMI and LPE's years-long illegal conduct. Indeed, punitive damages are needed to make Kirby whole as he has incurred, in fact, well over $1,089,378 in expenses over 7 years to bring QMI and LPE to account for their illegal actions. (*See* Fee Declaration at Ex. 12.) Kirby's compensation is therefore by no means complete. Punitive damages are required. Moreover, and with respect to LPE in particular, the jury awarded only $2,520,578 out of a possible award of $16,503,016 of commercial benefit. The jury's award supports additional punitive damages as the jury explicitly sought punitive damages over and above 100% of QMI revenues, and LPE is guilty for the same illegal acts as QMI.

Additionally, the Court should make QMI and LPE jointly and severally liable for any punitive damages awarded. QMI and LPE have litigated this entire case as a single entity. They have filed joint pleadings, have the same 30(b)(6) witness, made the same failing arguments, and have been represented by the same counsel throughout this case. More importantly, QMI and LPE have conspired together in their illegal acts to misappropriate Kirby's name. Liability for punitive damages should therefore be joint and several. *See Chase v. Cohen,* 519 F. Supp. 2d 267, 283 (D. Conn. 2007) ("Defendants have failed to point to any explicit, well-defined or dominant public policy prohibiting imposition of joint and several liability for punitive damages, when, as here, two defendants act in concert in violation of state law."); *Baiocchetti v. Smith, Dean & Assocs., Inc.*, No 11-CV-0795-MRK-WIG, 2012 WL 3728146, at *4 (D. Conn. Jan. 25, 2012) (awarding punitive damages jointly and severally).

Accordingly, the Court should award Kirby its legal fees and expenses in the amount of $1,089,378 as punitive damages against QMI and LPE and make the award joint and several.

**V.  The Court Should Order QMI and LPE, Jointly and Severally, to Pay Kirby $944,208 in Attorneys' Fees**

*A.  The Court Should Award Kirby Attorneys' Fees Under 15 U.S.C. Section 1117(a)*

Separate from an award for punitive damages, Kirby is entitled to his attorneys' fees in the amount of $944,208. A calculation of legal fees using the rates from the Court's January 31, 2020 Order, (*see* Dkt. 558 at 10-11), is provided in the Fee Declaration at ¶¶ 22-32.

Attorneys' fees may be awarded under the Lanham Act to a prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). The Second Circuit has recently ruled that *Octane Fitness*'s definition of an "exceptional case" applies to the attorneys' fees provision in the Lanham Act. *See Sleepy's LLC v. Select Comfort Wholesale Corp*., 909 F.3d 519, 530–31 (2d Cir. 2018). In *Octane Fitness*, without tying the determination expressly to a finding of willfulness, the Court defined such a case as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). The Court called for district courts to be given wide latitude as they engage in a "case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. In that "case-by-case exercise," courts may consider factors including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. at 554 n.6, 134 S.Ct. 1749 (citing *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 n.19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994)).

"An action is 'frivolous' when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co*., 141 F.3d 434, 437

(2d Cir. 1998) (internal quotation marks omitted). "[B]ad faith motivation" can be inferred from the assertion of allegations that are knowingly not true. *See Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 358 (S.D.N.Y. 2006); *Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, No. 18-CV-6504-NRB, 2020 WL 729518, at *4 (S.D.N.Y. Feb. 13, 2020).

The "exceptional" standard "demands a simple discretionary inquiry; it imposes no specific evidentiary burden." *Octane Fitness*, 572 U.S. at 557. A party seeking attorneys' fees under the Lanham Act must establish its entitlement to such fees by a preponderance of the evidence. *See Octane Fitness*, 572 U.S. at 557-58. Notably, "[t]he unavailability of actual damages as a remedy . . . does not preclude [a plaintiff] from recovering . . . attorney fees." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996).

No case meets *Octane Fitness*'s standard of an "exceptional" case more than this one. At all times relevant to this case, QMI and LPE have taken one frivolous and unreasonable position after another, needlessly extending these proceedings over seven years' time to ensure they could illegally sell unauthorized boats and willfully infringe the BRUCE KIRBY trademark as long as possible. The following examples are by no means exclusive, but provide the Court with more than sufficient bases to find this case exceptional and award Kirby all its fees.

1. <u>QMI and LPE had No Substantive Strength in Their Frivolous Litigating Positions Which Were Motivated By Bad Faith and Objectively Not Reasonable</u>

QMI failed to put forth any reasonable case against its infringement. The first two elements of Kirby's claims were met by stipulation. (Ex. A at ¶¶ 7-9.) The only question that remained was whether QMI's use of plaques to trade off the BRUCE KIRBY trademark was likely to cause confusion as to BKI's sponsorship and authorization. As shown above, and as was made plain at trial, QMI caused and was likely to cause confusion as to Kirby's sponsorship and/or authorization when QMI used the BRUCE KIRBY trademark on sailboat plaques without

authorization and, in fact, falsely told purchasers that boats were "authorized" when QMI knew

they were not. There was therefore no substantive support for QMI's litigating position.[6]

QMI's frivolous position on the issue of infringement was further made clear by its so-

called "defenses." QMI's primary defense was a document that Kirby never even signed:



(Ex. Z at 7.) The line next to Kirby's name is illustrative of QMI's entire case: empty.

QMI next attempted, and failed, to assert a descriptive fair use defense. There was no

strength to this argument. Descriptive fair use is a fact-intensive affirmative defense that requires

proof that the use was "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith."

*Kelly-Brown v. Winfrey*, 717 F.3d 295, 305 (2d Cir. 2013). The first two prongs are not satisfied

if an alleged infringer uses another's mark "to attract public attention." *Id.* at 308; *Safeway*

*Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499 (2d Cir. 1962) (finding mark that was

used to attract public attention not descriptive); *Venetianaire Corp. of Am. V. A & P Import Co.*,

429 F.2d 1079, 1082 (2d Cir. 1970). As to the third prong, a lack of good faith may be inferred

by and is equated with "a subsequent user's intent to trade on the good will of the trademark

holder by creating confusion as to source or sponsorship." *Kelly-Brown*, 717 F.3d at 312.

Here, the evidence of record from both Kirby and Crane establishes that the BRUCE

KIRBY trademark was specifically used to attract public attention to sell boats. The purchasing

public understands that the presence of the BRUCE KIRBY trademark on a boat means that the

boat was eligible to race. Thus, the buying public's attention was drawn the trademarked plaques

---

[6] There would have been no substantive support for QMI's position even if this case did not involve an infringer akin to a holdover licensee. See, e.g., *L & L Wings*, 676 F. Supp. 2d at 188-89.

to ascertain Kirby's name. QMI therefore chose to falsely communicate Kirby's sponsorship and affiliation to increase sales. QMI's fair use defense is dead on arrival for these reasons alone.

In addition, Kirby expects QMI and LPE to argue that the presence and relative size of other marks on the boat demonstrates that QMI did not use the BRUCE KIRBY trademark as a trademark. However, any discussion of the LASER trademark backfired at trial when Crane testified as to how "valuable" Defendants consider their own intellectual property despite willfully infringing Kirby's. (Vol. 1 at 217:9-16 (Crane).) Moreover, co-existent marks do not establish descriptive fair use. *See Kelly-Brown*, 717 F.3d at 310. Indeed, in this case it is the significance and consistency of QMI's use of the BRUCE KIRBY trademark that captures a consumer's attention, not its relative size or visibility. *See id.* at 309 ("Repetition is important because it forges an association in the minds of consumers between a marketing device and a product."). The evidence shows the BRUCE KIRBY trademark was a focal point for buyers because it served as a ticket to admission to race. Purchasers sought out the trademarked plaques.

Finally, even if QMI possessed any semblance of a case with respect to the first two prongs of its fair use defense, it failed to present any evidence of good faith. The entire record demonstrates QMI's willful infringement and bad faith. Notably, the standard of whether this case is "exceptional" is in relation to Kirby's Lanham Act claim of infringement, not necessarily willful infringement. *4 Pillar*, 933 F.3d at 215 (describing *Octane Fitness* as not "tying the determination [of "exceptionality"] expressly to a finding of willfulness"). However, with respect to willfulness, the jury unanimously and repeatedly found QMI to be a bad actor and for good reason. QMI paid royalties for years and abruptly stopped after Rastegar failed to obtain Kirby's rights on behalf of QMI and LPE. The ceasing of royalty payments was directly tied to a rule change scheme concocted by QMI and LPE through payments to ILCA. The royalty

payments stopped eight days after QMI and LPE received the draft rule change that ultimately allowed them to change the plaques. Moreover, the jury did not merely find QMI to be a willful infringer. By awarding punitive damages, the jury found QMI and LPE's conduct to be "***outrageous*** because of reckless indifference to the rights of others, or . . . for an intentional and wanton violation of those rights." (Dkt. 579 at 22 (emphasis added).) Indeed, the jury found QMI and LPE's actions "extraordinary" and awarded punitive damages "to protect the community and to be an expression of the jury's indignation at the misconduct." (*Id.* at 23.)

At bottom, the infringed trademark in this case is BRUCE KIRBY and the undisputed evidence of record establishes that QMI willfully used the BRUCE KIRBY trademark without authorization to make millions of dollars. QMI had no substantive strength in its litigating position with respect to the tried claims; their positions were frivolous and objectively not reasonable in factual and legal components. Accordingly, the Court should award Kirby its attorneys' fees under the Lanham Act in the amount of $944,208.

2. <u>QMI and LPE Were Unreasonable in the Manner in Which They Litigated Their Case</u>

QMI and LPE's litigation tactics in this case were egregious. In this case QMI and LPE have taken contradictory positions, violated the Federal Rules, violated an order of this Court, gave conflicting testimony under penalty of perjury, and tried repeatedly to retract factual admissions. The following examples of QMI and LPE's conduct are by no means exhaustive:

*First,* QMI and LPE spoke out of both sides of their mouths with respect to the ownership of Kirby's design rights. The evidence shows that QMI and LPE told Kirby he owned the design rights following the 2008 sale to Global Sailing, (Ex. T), yet QMI argued at trial that, at the time QMI sent these letters, it was clear Kirby did ***not*** own the rights. (*See* Dkt. 603 (Trial Tr. Vol. 3 ("Vol. 3") at 457:6-16.) The jury rejected this plain contradiction.

*Second*, QMI and LPE brought at least seven (7) meritless counterclaims against Kirby

that had no basis in fact or law. (*See* Dkt. 40 at 35-41 (Counterclaims Claims 2-9).) Despite

seeking over $10,000,000 for their baseless counterclaims, QMI and LPE never once established,

or even attempted to establish, the legal elements of their actions or damages (nor could they).

(*See* Ex. BB.) QMI and LPE admitted and stipulated to Kirby's ownership of the BRUCE

KIRBY trademark (Count 2), and there has never been a shred of evidence presented in this case

that Kirby tortiously interfered with business relations (Counterclaim 3), conspired to do so

(Counterclaim 4), competed unfairly (Counterclaim 5), breached the Builder agreements he sold

(Counterclaims 6 and 7), breached the agreement he did not sign (Counterclaim 8), or was

unjustly enriched (Counterclaim 9). QMI and LPE "voluntarily" dismissed these counterclaims

before trial because they knew the severe consequences of bringing frivolous claims. However,

because QMI and LPE's baseless counterclaims needlessly demanded Kirby's attention, the

parties agreed Kirby "reserve[d] its rights to seek attorneys' fees." (Dkt. 516.) Thus, QMI and

LPE's baseless counterclaims are an additional reason to find this case exceptional.

*Third*, QMI and LPE repeatedly withheld pertinent discovery from Kirby. Discovery in

this case opened at least as early as July 2013 and closed in December 2014. (Dkt. 171.) QMI

and LPE had still refused to produce interrogatory and documents by July 28, ***2014***, including

cost and sales information, based on meritless objections to things like "confidentiality." (*See*

Dkt. 146-1 at 10.) This necessitated Kirby to file a motion to compel, which the Court granted.

(*See*, *e.g.*, Dkt. 146-3 at 12-13; *see also* Dkt. 146-1 at 15; Dkt. 159; Dkt. 163 at 2.) QMI and

LPE's meritless withholding of discovery is yet another reason to find this case exceptional.

*Fourth*, when QMI and LPE did ultimately produce documents after the Court's order,

the production included massive PDFs of thousands of pages (two PDFs of over 8,000 pages) of

discrete documents. These productions made litigating much more difficult than necessary.

*Fifth*, even after the Court ordered the production of documents, QMI and LPE still did not produce cost information. Instead, they intentionally violated the Court's order and failed to produce the requested information in their possession. (*See* Dkt. 538 ("Motion for Sanctions").)

*Sixth,* while QMI and LPE ultimately made a Court-ordered production of cost information on December 3, 2019—mere months before trial and over 5 years after the Court ordered such documents to be produced—their delinquent production required Kirby to file a motion for sanctions and motion *in limine*. (*See* Dkt. 526 ("Motion in Limine").) The late production further required Kirby's counsel take two depositions the week before trial, which were necessarily scheduled around jury selection. Kirby's time should have been spent preparing for trial rather than taking depositions due to QMI and LPE's discovery violation.

*Seventh*, on December 12, 2019, one day before the parties' Joint Trial Memorandum was due, QMI and LPE produced over ***9,000*** documents comprising over ***77,000*** pages. (*See* Motion for Sanctions at 7.) Many of the documents should have been produced earlier, and at least one produced document was a key document at trial. For instance, as shown above, QMI and LPE's willful infringement and misappropriation began when they began selling boats without paying royalties. QMI and LPE's delinquent December 12, 2019 production included direct evidence of when QMI stopped paying royalties, namely February 1, 2011. (Ex. N.) Exhibit N bears a date of May 2013 and thus has been in Defendants' possession for years. Moreover, this document was covered by Kirby's document requests served in February ***2014***. (*See, e.g.*, Dkts. 146-3 and 146-5 at Request Nos. 6-8, 15, 17, 21, 42, 63.) QMI and LPE never produced the document prior to December 12, 2019 and instead left Kirby to grapple with vague assertions from QMI's 30(b)(6) witness as to when royalties ceased. (Ex. DD at 37:23-38:8 ("I don't know when it stopped.").)

*Eighth*, QMI & LPE repeatedly filed meritless motions to amend their pleadings to

remove damning admissions. (*See* Dkts. 396 and 404.)

*Ninth*, QMI refused to set forth its position as to the termination of the 1989 Builder Agreement through its 30(b)(6) witness, Crane. (*See* Motions in Limine at 14-15.)

*Tenth,* Crane also refused to provide testimony as a 30(b)(6) witness as to QMI's position on attributing the sale of Laser sailboats by LaserPerformance LLC to QMI. (*Id.* at 12-13.) QMI ultimately stipulated to this clearly established fact, but that was only after Kirby compiled in its Motion in Limine all Defendants' supporting admissions in this case, some of which were made directly to this Court via declaration. (*See* Motion in Limine at 13; Dkts. 127 and 134.)

*Eleventh*, QMI and LPE harassed Mrs. Kirby for depositions. QMI and LPE pursued her deposition even after the Court ruled on the contract claims. (Dkt. 442.) The Magistrate Judge determined there was no basis for this, (Dkt. 449), but prior to that determination Kirby was left with no choice but to concede his deposition a second time to spare his spouse. (Dkt. 442 at 4.)

Accordingly, it cannot be disputed that this case "stands out" as exceptional and warrants an award of fees to Kirby. The jury saw straight through all QMI's game-playing at trial. The Court should do the same and award Kirby fees in the amount of $944,208.

3.   An Award of Kirby's Attorneys' Fees is Warranted for Compensation and Deterrence

The need for Kirby's compensation and QMI's deterrence in this case are stated above with respect to Kirby's request for punitive and infringement damages, respectfully. The same reasoning applies with respect to Kirby's request for fees.

4.   All Kirby's Claims Elicited and Established QMI's Infringement

Kirby should be awarded all his fees in this case, without attribution, because each of the claims he brought were inextricably intertwined with the Lanham Act claims. The Ninth and Fifth Circuits have created a narrow exception to the rule that Lanham Act fee awards must be limited to Lanham Act claims. According to these Courts, the prevailing party may recover total

36

attorneys' fees incurred in litigation containing both Lanham Act and non-Lanham Act claims if the "claims are so intertwined that it is impossible to differentiate between." *Gracie v. Gracie*, 217 F.3d 1060, 1069 (9th Cir. 2000); *Procter & Gamble Co. v. Amway Corp*., 280 F.3d 519, 527 (5th Cir. 2002); *see also Sleepy's LLC*, 909 F.3d at 532. In *Sleepy's LLC*, the Second Circuit did not address the issue but advised courts to approach this line of reasoning with "great care." *Id.* More recently, however, the Second Circuit in an unpublished decision affirmed a fee award in which the court below concluded that hours expended on non-compensable state law claims were "intertwined with work on the Copyright and Lanham Act claims, and [] therefore compensable." *Manhattan Review LLC v. Yun*, 765 F. App'x 574, 578 (2d Cir. 2019) (summary order) (citing *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 168 n.4 (2d Cir. 2011) ("Hours spent on legal work that furthers both fee-shifting and non-fee shifting claims [are compensable] because they would have been expended even if the plaintiff had not included non-fee-shifting claims in his complaint.")). The Court should follow the Ninth and Fifth Circuits and, in its discretion, find the hours expended on non-Lanham Act claims in this case are compensable.

However, even if the Court does not adopt the specific doctrine regarding "intertwined" claims, Kirby should still be awarded all his fees because even Kirby's dismissed claims established key elements of Kirby's trademark and misappropriation claims. For instance, determining the facts surrounding QMI and LPE's breach of the Builder Agreements and the timing of their non-payment of royalties determined the timing of their lost authorization. Moreover, though they are distinct claims, Kirby's proofs under the Lanham Act, CUTPA, and for common law misappropriation comprise essentially the same facts—use of Kirby's trademarked name without authorization resulting in sales (and thus unjust enrichment) made off of Kirby's goodwill. *See, e.g., Nora Bevs., Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 751

(2d Cir. 1998) (citing cases from the District of Connecticut for the proposition that a violation of the Lanham Act establishes liability under CUTPA). Accordingly, there is no reason for the Court to break Kirby's fees into discrete components. Kirby is entitled to all its fees.

### a. At Minimum, All Fees Incurred After the Court's June 21, 2017 Order Must Relate to Kirby's Lanham Act Claims

The Court decided Kirby's Motion for Clarification on June 21, 2017. (*See* Dkt. 312.) The Court's Order clarified that Kirby's trademark-related claims remained in the case. Again, Kirby's proofs under the Lanham Act, CUTPA, and for misappropriation comprise essentially the same facts. Thus, at minimum, it cannot be disputed that all Kirby's fees after June 21, 2017 must relate to Kirby's Lanham Act claims. Kirby's calculated fees from July 2017 through March 2020 total $289,285. (*See* Fee Declaration at Ex. 12 Col. 18 from July 2017 – March 20.)

### b. QMI and LPE Already Owe Kirby at least $9,000 Pursuant to the Court's Order

On January 31, 2020, the Court ordered two depositions at Defendants' expense. (*See* Dkt. 558.) On April 2, 2020, Kirby's counsel forwarded its bill for these depositions in the amount of $9,748 and asked for payment by April 16. (Ex. CC.) Defendants have yet to respond.

## VI. **QMI and LPE's Total Lack of Defense Against Claim 4 and Meritless Counterclaims are Further Bases for Issuing a Joint and Several Fee Award**

"One of the recognized common law exceptions to the American [R]ule against fee shifting is that attorneys' fees may be awarded where the party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000); *see also Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14-CV-5213-NRB, 2019 WL 4601741, at *3 (S.D.N.Y. Sept. 19, 2019). A claim is brought in bad faith if it is "(1) meritless; and (2) brought for improper purposes such as harassment or delay." *Id*. (internal footnote omitted). "The award of fees pursuant to this exception is an exercise of a federal court's inherent equitable powers." *Sierra Club v. U.S. Army Corps of*

*Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985).

As shown above, QMI and LPE's Counterclaims 2-9 in this case were meritless, brought for improper purposes, such as harassment and delay, and QMI and LPE had no meritorious defense to Kirby's claims of infringement and misappropriation. Moreover, as described above, each of Kirby's claims in this case are related in that they elicited and established QMI and LPE's infringement and misappropriation. Accordingly, the Court should further include these reasons, in addition to all the reasons stated above regarding Defendants' joint actions, as bases to issue a joint and several fee award against QMI and LPE.

## VII.   The Court Should Award Pre-Judgment Interest in the Amount of $5,719,526

*A.   The Court Should Award Interest on the Jury's $4,337,157 Award Under the Lanham Act*

An award of prejudgment interest is "within the discretion of the trial court and is also normally reserved for exceptional cases." *4 Pillar*, 933 F.3d 202 at 215 (citing *Am. Honda*, 918 F.2d at 1064). Second Circuit "case law draws no distinctions between the showing required to support [an award of prejudgment interest] and that required to justify an award of attorney's fees. *4 Pillar*, 933 F.3d at 216. Where a court awards prejudgment interest, "it is within the trial court's discretion to choose what rate to apply." *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, No. 14-CV-6911-VEC-JLC, 2016 WL 658310, at *11 (S.D.N.Y. Feb. 17, 2016).

As alternative options, Kirby calculated prejudgment interest using the rates found in Conn. Gen. Stat. § 37-3a and 15 U.S.C. § 1117(b). A calculation of pre-judgment interest using each of these rates is included in the Declaration of Robert D. Keeler ("Interest Declaration"), filed concurrently herewith. Kirby requests application of the Conn. Gen. rate dating back to when QMI first began its infringement and misappropriation, which results in a calculation of interest in the amount of $3,563,526.70. (*See* Interest Declaration at ¶¶ 8-12.)

Accordingly, for all the reasons stated above concerning equity, the need for Kirby's

compensation, and the exceptionality of this case, the Court should award pre-judgment interest in the amount of $3,563,526.70 against QMI pursuant to the exceptional case doctrine.

B. *If the Court Does Not Award Interest Under the Lanham Act, It Should Award Interest on the Jury's Award of $4,337,157 Pursuant to Conn. Gen. Stat. 37-3a*

Connecticut General Statute § 37–3a provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions ... as damages for the detention of money after it becomes payable." "Whether such an award is appropriate is left to the equitable discretion of the court." *Kregos v. The Latest Line, Inc.*, No. 92-CV-398-WWE, 1998 WL 696007, at *1 (D. Conn. Aug. 31, 1998); *see also Gilmore v. Bergin,* No. 95-CV-01838-DFM, 1998 WL 1632526, at *12-13 (D. Conn. Sept. 22, 1998) (after jury award of damages, court awarded prejudgment interest); *Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 82 (D. Conn. 1994), *aff'd*, 66 F.3d 308 (2d Cir. 1995) ("An award of prejudgment interest pursuant to Section 37–3a is an equitable determination within the discretion of the court." (citing *Prime Management Co., Inc. v. Steinegger*, 904 F.2d 811, 817 (2d Cir.1990)); *Silivanch v. Celebrity Cruises, Inc.*, No. 95-CV-0374-BSJ, 2000 WL 1211578 at *1 (S.D.N.Y.2000) (citing cases, including *Zicherman v. Korean Air Lines Co.*, 43 F.3d 18, 20, 24 (2d Cir.1994) (general maritime law), *aff'd in part and rev'd in part on other grounds*, 516 U.S. 217 (1996).

Thus, for all the reasons stated above concerning equity, the need for Kirby's compensation, and the exceptionality of this case, the Court should award pre-judgment interest in the amount of $3,563,526.70 on the jury's award pursuant to Conn. Gen. Stat. 37-3a.

C. *The Court Should Award Interest on the Jury's Award of $2,520,578 Pursuant to Conn. Gen. Stat. 37-3a*

For all the same reasons above, the Court should also award pre-judgment interest in the amount of $2,155,999.76 on the jury's award of $2,520,578 pursuant to Conn. Gen. Stat. 37-3a. A calculation of such interest is provided in the Interest Declaration at ¶¶ 13-16.

Respectfully submitted,

April 22, 2020                    */s/ Benjamin N. Luehrs*
                                 Wesley W. Whitmyer, Jr., ct03509
                                 Walter B. Welsh, ct01220
                                 Benjamin N. Luehrs (phv08980)
                                 Robert D. Keeler, ct29692
                                 WHITMYER IP GROUP LLC
                                 600 Summer Street
                                 Stamford, CT  06901
                                 Tel. 203 703-0800
                                 Fax 203 703-0801
                                 Email: litigation@whipgroup.com
                                        wwelsh@whipgroup.com
                                        bluehrs@whipgroup.com
                                        rkeeler@whipgroup.com

                                 *Attorneys for Plaintiffs*
                                 *Bruce Kirby, Inc. and Bruce Kirby*