# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE KIRBY, INC. *et al.*,<br>    *Plaintiffs*,<br><br>    v.<br><br>LASERPERFORMANCE (EUROPE)<br>LIMITED *et al.*,<br>    *Defendants*. | No. 3:13-cv-00297 (JAM)<br>No. 3:17-cv-01158 (JAM) (consol.) |

## ORDER RE POST-TRIAL MOTIONS

This case is about a long-running dispute involving Laser sailboats.[1] In 2013, plaintiffs Bruce Kirby and his namesake company Bruce Kirby, Inc. ("BKI") filed this action against multiple defendants including defendants Quarter Moon, Inc. ("QMI") and LaserPerformance (Europe) Ltd. ("LPE").

Following years of pre-trial litigation, I presided over a jury trial in February 2020 on claims for trademark infringement under the Lanham Act and for common law misappropriation of Bruce Kirby's name. The jury returned a verdict in favor of both Kirby and BKI. First, it awarded damages of $4,337,157.49 to BKI for trademark infringement by QMI. Second, it found both QMI and LPE liable to Kirby for misappropriation of his name, awarding damages of $2,520,578.81 against LPE and nominal damages against QMI. It also found that both QMI and LPE should be liable for punitive damages for the misappropriation claim in an amount to be determined by the Court.

Defendants have moved to dismiss for lack of jurisdiction and for a new trial (Doc.

---

[1] I detail this case's relatively complex history at length in prior rulings. *See Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2019 WL 3767510, at *1-*3 (D. Conn. 2019); *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2018 WL 3614117, at *1-*3 (D. Conn. 2018); *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2016 WL 4275576, at *1-*2 (D. Conn. 2016).

#641), while plaintiffs have moved for entry of judgment in their favor (Doc. #610). For the reasons set forth below, I will deny defendants' motion to dismiss and for a new trial, but I will grant in major part plaintiffs' motion for entry of judgment (subject to a reduction in the damages award), for attorneys' fees under the Lanham Act, and for punitive damages under Connecticut common law. All in all, I will award damages of $4,577,315.14 along with payment of $804,179.44 in punitive damages, which includes attorneys' fees in the amount of $734,528.30.

## BACKGROUND

The facts set forth below are based on evidence introduced at trial, and they constitute the Court's findings of fact pursuant to Fed. R. Civ. P. 52(a). Bruce Kirby designed the Laser sailboat in 1969. Doc. #600 at 98-99, 173-74 (Kirby).[2] He incorporated BKI as the company for his boat designs and he remains the sole owner. Doc. #610-3 at 3 (¶¶ 1-3) (BK 218); *see also* Doc. #600 at 106 (Kirby). BKI is a design company and does not manufacture or build Laser sailboats. Doc. #600 at 139-140 (Kirby).

Lasers are recognized as a distinct class of sailboats by the International Sailing Federation ("ISAF"), now known as World Sailing. The Laser class is governed by the International Laser Class Association ("ILCA"), an association of Laser owners and builders. In 1974, ILCA and ISAF entered an agreement requiring that all Lasers built and raced be constructed using a single set of design and material specifications detailed in the 310-page Laser Construction Manual (the "Construction Manual"). This is known as the "One Design" rule. *See* Doc. #600-27 (BK 88).

Since at least the early 1980s, Kirby and BKI have licensed the Laser design rights to builders around the world under agreements known as "Builder Agreements." Defendants QMI

---

[2] Transcript references to "Kirby" are to the testimony of Bruce Kirby, and transcript references to "Crane" are to the testimony of William Crane, who was a senior official of QMI and LPE.

and LPE were two of the builders who made and sold Lasers. Doc. #600 at 188 (Crane). In 1983, Kirby and BKI executed a Builder Agreement with LPE's predecessor in interest, and LPE eventually acquired all rights to the 1983 Agreement. *See* Doc. #610-3 at 4 (¶¶ 10, 12) (BK 218). In 1989, Kirby and BKI executed a Builder Agreement with QMI's predecessor in interest, and QMI likewise was later assigned the original builder's rights in 1997. *See id*. at 4-5 (¶¶ 13, 16) (BK 218).

These Builder Agreements required LPE and QMI to pay royalties to BKI and Kirby for the right to manufacture and sell Lasers. *See, e.g.*, *ibid*. (¶¶ 11, 15, 17) (BK 218). A builder's failure to pay royalties on time was a condition of default. *Id*. at 5 (¶¶ 18) (BK 218).

The Builder Agreements also required Laser sailboats to be built according to the Construction Manual. *See id*. at 6 (¶ 22) (BK 218). Among other specifications, the Construction Manual required that each Laser sailboat must have affixed to the cockpit two small plaques— which are adhesive labels—known as the "ISAF Plaque" and the "Builder Plaque." *See ibid*. (¶ 22) (BK 218); *see also* Doc. #600 at 110 (Kirby).

ILCA issued the ISAF Plaque to each Laser built by an authorized builder after assigning each Laser a unique sail number, which was included on that boat's ISAF Plaque. Doc. #610-3 at 5-6 (¶¶ 19-20) (BK 218). BKI designated the authority to ILCA to issue the ISAF Plaques on BKI's behalf. Doc. #600 at 156-57 (Kirby). This ISAF Plaque was required for a Laser to compete in certain racing events and included the phrase "Authorised by the International Sailing Federation, the International Laser Class Association, Bruce Kirby Inc. & Trade Mark Owner." Doc. #610-3 at 5-6 (¶ 20) (capitalization omitted); *see also id*. at 5 (¶ 19) (image of ISAF Plaque). The phrase on the ISAF Plaque, "Authorised by … Bruce Kirby Inc.," meant that "it is

in fact a Laser designed by Bruce Kirby, Inc. and he has authorized the use of the design of his boat." Doc. #601 at 71:4-6 (Crane).

Per the Construction Manual, each Laser was also required to have affixed the Builder Plaque, which included the phrase "Laser Sailboat Designed by Bruce Kirby[.]" Doc. #610-3 at 6 (¶ 21) (image of Builder Plaque) (capitalization omitted). For this Builder Plaque, QMI and LPE "were supplied the language from the construction manual of what went on the manufacturer's plaque and we applied our own logo and we made those plaques ourselves, we didn't buy those." Doc. #600 at 215:20-23 (Crane).

These two plaques, the ISAF Plaque and the Builder Plaque, were always affixed in the "same place"—to the backside of each Laser's cockpit—and "[p]eople would look for them there." *Id*. at 114:19-20 (Kirby). This was because "anyone who knew much about the boat and who wanted to race it looked for the plaque[s because they] made the boat authentic, it made it a legal Laser…one that was built to the specs in the builders['] manual." *Id*. at 114:22-115:2 (Kirby). Moreover, the Construction Manual dictated the specifications of these two plaques as well as their positioning and placement on each Laser. *See id*. at 116-17 (Kirby). ILCA's representatives would inspect the boats at the builders' plants, as well as at major races, to confirm that they were manufactured in compliance with the Construction Manual. *See id*. at 145 (Kirby).

For years QMI and LPE paid Kirby and BKI a royalty while selling Lasers affixed with the two plaques including Kirby's name. *Id*. at 113-14 (Kirby). But in 2008, Kirby decided to sell his rights in the Laser boat design. He and his company entered into a sales contract with a New Zealand company called Global Sailing Limited ("GSL") to receive $2.6 million for all of his interest in the Laser design, including certain intellectual property rights and all rights under

4

agreements entered into between plaintiffs and third parties relating to the Kirby Sailboat. *Id*. at 118, 126-27, 140, 145-46 (Kirby); Doc. #617-4 (Def. Ex. 513). This sales agreement is referred to as the 2008 Agreement.

Notably, however, BKI did not sell the BRUCE KIRBY trademark to GSL in the 2008 Agreement. Doc. #600 at 118 (Kirby). BKI remained the owner of the BRUCE KIRBY mark, which was registered on November 11, 2008. Doc. #610-3 at 4 (¶¶ 7-9) (BK 218); *see also* Doc. #600 at 109, 126-27 (Kirby).

After the 2008 sale to GSL, "a little confusion" over royalties ensued. Doc. #600 at 127:7 (Kirby). But it is undisputed that QMI and LPE were no longer required to pay royalties to Kirby or BKI; rather, they were to pay royalties to GSL. Doc. #600 at 141 (Kirby). At some point after the sale to GSL, QMI and LPE stopped paying royalties altogether. *See id*. at 127-28 (Kirby); *id*. at 190 (Crane).

After defendants stopped paying royalties, Kirby tried to get QMI and LPE to stop selling Lasers with his name. *See id*. at 128:4-5 (Kirby) ("Well, I tried to get them to stop building boats with my name on it and not paying royalties."). In March 2010, he sent a letter to Jeff Martin, the ILCA secretary, requesting that ILCA cease issuing plaques in light of the failure of QMI and LPE to pay royalties. *Id*. at 129-30 (Kirby). Kirby wanted ILCA to stop issuing plaques to QMI and LPE because the plaques "had [his] name on them and [QMI and LPE] were building boats with those plaques on them and not paying any royalties." *Id*. at 129:17-20 (Kirby). Even after entering into the 2008 Agreement with GSL (after which royalties were no longer payable to Kirby rather than to GSL), Kirby wrote this letter because ILCA "was still issuing plaques with my name to builders [and] I was telling them to stop sending plaques." *Id*. at 179:15-17 (Kirby). In May 2010, the Builder Agreement with LPE was terminated. Doc. #601 at 76 (Crane).

Some months later, in early 2011, ILCA officials discussed changing the Laser rules, specifically seeking to "remove Bruce Kirby's name from the builder's plaque as well as the Laser plaque that would have the sail number." Doc. #600 at 201:25-202:2 (Crane). At the end of January 2011, QMI made its last royalty payment. *Id*. at 203:6 (Crane) (agreeing that "the last accrued royalty payment that was paid was from January 31, 2011").

But both LPE and QMI continued to sell Lasers with the plaques. In October 2012 and November 2012, Kirby sent letters to QMI and LPE, in which he wrote, "You are no longer entitled to obtain plaques or in any manner whatsoever take any action regarding the licensed design (Kirby Sailboat)." Docs. #610-21 (BK 51); #610-22 (BK 52). He did this because QMI was "building boats and putting the plaque on them with my name and not paying royalties." Doc. #600 at 180:4-5 (Kirby). He also wanted "[t]o stop [LPE] from building the boat because they'd been building the boat with plaques with my name and not paying anybody anything." *Id*. at 180:15-17 (Kirby).[3] In short, he wanted LPE and QMI to "stop." *Id*. at 180:6-7 (Kirby). Still, both companies kept selling Lasers as before.

In March 2013, Kirby and BKI filed this lawsuit against QMI and LPE. Doc. #1. On April 23, 2013, a rule change went into effect that eliminated the requirement for an authorized builder to have a Builder Agreement to build the Laser. Doc. #610-3 at 7 (¶ 24) (BK 218). Prior to that date, Kirby's name appeared on two plaques affixed to each boat sold by QMI and LPE. Doc. #600 at 203-04 (Crane). But afterwards, neither QMI nor LPE sold Lasers with plaques bearing the Kirby name. *Ibid*.

At trial, plaintiffs' expert witness—Joseph DeCusati—testified about defendants' revenue from sales of Lasers. QMI's revenue from Laser sales in the United States during the

---

[3] LPE's previous name was Performance Sailcraft Europe. *See* Doc. #600 at 188 (Crane).

period from February 1, 2011 to April 23, 2013 totaled $4,337,157. Doc. #601 at 30 (DeCusati); *see also* Doc. #610-15 (BK 219).[4] LPE's revenue from non-U.S. Laser sales during the same period totaled $12,140,425. Doc. #601 at 32-33 (DeCusati); *see also* Doc. #610-17 (BK 221).[5] Although plaintiffs' expert acknowledged certain documentation from defendants that showed "the cost of materials for sales of boats produced outside North America and for those sold within North America for the period of 2009 through 2014[,]" he did not consider the documentation "sufficient information to provide [him] with the costs" because it "simply d[id] not go to the depth necessary to prove expenses." Doc. #601 at 34:25-35:14, 36:10-11 (DeCusati).

Defendants' expert witness—William Murray—testified about QMI's and LPE's revenue from Laser sales during the period from October 2011 to April 2013, as well as testifying about costs for materials, labor, and overhead related to sales of Lasers. Doc. #601 at 113-33 (Murray). Based primarily on annual financial statements, the bill of materials for the Laser (which is a list of all the items that go into a given product), as well as an additional costed bill of materials for the hull and additional components—the biggest component of the Laser—defendants' expert calculated the production cost per boat for U.S. sales from October 2011 to April 2013. *See* Doc. #601 at 114-20 (Murray); *see also* Def. Ex. 607 (total cost of production analysis); Doc. #610-10 (Def. Ex. 605) (summary of the cost per boat by month); Def. Ex. 606 (cost of additional components, part of the materials cost).[6] The defendants' expert also calculated QMI's sales for

---

[4] The parties stipulated to the fact that LaserPerformance LLC's revenues from the sale of Laser sailboats, as well as LaserPerformance LLC's costs concerning those sailboats, are attributable to QMI. Doc. #610-9 at 2 (¶ 25) (BK 217).

[5] LPE's non-U.S. sales for the period of June 1, 2010 through April 23, 2013 totaled $16,503,016. Doc. #601 at 31-32 (DeCusati); *see also* Doc. #610-16 (BK 220).

[6] The parties stipulated that the expert witnesses were relying upon the same cost information. *See* Doc. #610-62 (¶ 26) (BK 222).

the months of October 2011 to April 2013. *See* Doc. #601 at 132-33 (Murray); *see also* Def. Ex. 604 (U.S. sales by month).

The case went to jury trial on BKI's two claims against QMI for violations of the Lanham Act and Kirby's one claim against both QMI and LPE for misappropriation of his name.[7] After deliberations, the jury returned a verdict in favor of BKI against QMI for trademark infringement under the Lanham Act. Doc. #573-1 at 1 (jury verdict form). The jury further determined that QMI committed willful trademark infringement and willful false designation of origin, but that QMI did not commit trademark infringement by means of a counterfeit. *Id.* at 1-2. The jury also found that QMI did not prove its fair use defense. *Id.* at 1. The jury awarded $4,337,157.49 in damages to BKI for trademark infringement, finding that damages were so warranted under both the Lanham Act's unjust enrichment and deterrence theories of damages. *Id.* at 3.

The jury also found QMI and LPE liable for common law misappropriation of the Bruce Kirby name. Doc. #573-1 at 2. It awarded Kirby $2,520,578.81 in damages against LPE, but—in light of the damages already assessed against QMI under the Lanham Act—it awarded Kirby only $1 in nominal damages for misappropriation by QMI. *Id.* at 4.

The jury further determined that Kirby had proved the factual predicate for the Court to enter an additional award of punitive damages. It found that Kirby had proved that the defendants "engaged in an intentional and wanton violation of his rights or that [they] engaged in outrageous conduct with reckless indifference to Mr. Kirby's rights such that the Court should award punitive damages." *Id.* at 4.

The parties have filed a number of post-trial motions. *See* Docs. #610 (plaintiffs' motion

---

[7] GSL separately filed an action against defendants principally for non-payment of royalties, and the parties have separately settled GSL's claim, with separate judgment entered. Doc. #650.

for entry of judgment); #641 (defendants' motion for a new trial).[8]

DISCUSSION

I address each post-trial motion in turn.

**_Defendants' motion to dismiss for lack of standing_**

QMI argues that neither Kirby nor BKI have standing because they presented no evidence of any injury in connection with their claims under the Lanham Act or under state law. *See* Doc. #642 at 15-17. Federal courts may only hear "Cases" or "Controversies." U.S. Const., Art. III, § 2. "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). Standing "remains open to review at all stages of the litigation." *Stepniak v. United Materials, LLC*, 305 F. App'x 789, 790 (2d Cir. 2009) (quoting *National Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994)).

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Although the standing inquiry does not depend on the merits of a plaintiff's claim, a plaintiff's standing to bring suit "often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

I will first consider BKI's standing under the Lanham Act. BKI brings its claims against QMI under the Lanham Act, which was intended "to make actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair

---

[8] I have considered all the parties' related and supplemental filings including those arguments raised in defendants' post-trial brief. Doc. #611.

competition." *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013) (internal quotations omitted). "Toward this end, the Act provides separate causes of action for, among other things, infringement of registered and unregistered trademarks." *Ibid.*; *see also* 15 U.S.C. § 1114 (registered trademark); *id.* § 1125 (unregistered trademark or trade dress).

A trademark registrant has a legally protected interest in its mark conferred by the Lanham Act. When there is unauthorized use of a mark, the invasion of that legally protected interest constitutes injury to the trademark registrant for the purpose of Article III standing. *See Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 131 (3d Cir. 2004) (explaining that "the [trademark] infringement amounts to borrowing the senior user's reputation and goodwill, which is an injury in and of itself"); *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 822 (C.D. Ill. 2009) ("Flagstar clearly asserts 'an invasion of a legally protected interest'" because "Flagstar is the undisputed [trademark] owner … and asserts that the continued use of Freestar's mark violates its rights under the Lanham Act and will cause harm to the value of its registered marks."). As Judge Learned Hand explained,

> [a merchant's] mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.

*Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928); *Gap, Inc. v. G.A.P Adventures Inc.*, 2011 WL 13262980, at *2-*3 (S.D.N.Y. 2011) (quoting *Yale Elec. Corp.*, 26 F.2d at 974).[9]

---

[9] *See also E. Iowa Plastics, Inc. v. PI, Inc.*, 832 F.3d 899, 905 (8th Cir. 2016) (discussing plaintiff's constitutional standing to bring a trademark infringement claim under section 38 of the Lanham Act and explaining that "[a]nother conceivable form of non-monetary injury [for purposes of Article III standing] is damage to the goodwill associated with EIP's trademark, for we have recognized that loss of goodwill may not be easily quantifiable.").

BKI is undisputedly the trademark registrant of the BRUCE KIRBY mark. Doc. #642 at 14. And its status as trademark registrant of the BRUCE KIRBY mark is key to its constitutional standing to maintain this case. If a plaintiff does not own the mark in question, "the plaintiff cannot plausibly allege that it has suffered 'an invasion of a legally protected interest' and thus cannot establish injury-in-fact." *Prime Hookah, Inc. v. Disc. Smoking Prod., Inc.*, 2019 WL 1650100, at *3 (D.N.J. 2019) (citing *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 777 (Fed. Cir.), *amended on reh'g in part*, 104 F.3d 1296 (Fed. Cir. 1996)). Thus, "[t]o have standing in an action for violation of trademark rights, a party must own the subject mark at the time the lawsuit is filed." *Ibid.*; *see also Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 80 (2d Cir. 2013) (explaining for a trademark infringement action that the "minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim") (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008)).

Defendants argue that, when BKI transferred some of its interests to GSL in 2008, BKI also transferred the BRUCE KIRBY trademark. Doc. #642 at 16. But I have already considered and rejected that argument. I have previously ruled that the 2008 Agreement did *not* include the sale of the BRUCE KIRBY trademark. Doc. #312 at 3-4; *see also Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2018 WL 3614116, at *2 (D. Conn. 2018). So although it may be true that "the Lanham Act transfers [statutory] standing to assignees, even if that party is not the registrant, to ensure that only the current owner of the mark can claim infringement," *Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014), the Second Circuit has explained that "a transfer of an ownership interest in a mark is a predicate to standing for any putative 'assign.'"

*Fed. Treasury Enter. Sojuzplodoimport*, 726 F.3d at 75. And BKI remained the owner of the

BRUCE KIRBY mark, with all attendant rights.[10]

Insofar as defendants argue that BKI suffered no injury because QMI had permission to

use the trademark, this goes to the merits of BKI's claim, not to whether BKI has standing.

"[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-

matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case."

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (citation

omitted); *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 213 (2d Cir. 2020) (noting that the

elements of a statutory claim are "not jurisdictional when the plaintiff pleaded a colorable claim

arising under the Constitution or laws of the United States, absent a contrary indication of

congressional intent.") (citations omitted).

Defendants further argue that Kirby lacks standing for his common law misappropriation

claim, pointing again to his assignment of certain rights to GSL. Doc. #642 at 17. As noted

above, to establish Article III standing, a plaintiff must allege an injury-in-fact, which means "a

plaintiff must show that he or she suffered an invasion of a legally protected interest that is

concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*

*v. Robins*, 136 S. Ct. 1540, 1548 (2016) (internal quotations omitted). Where a plaintiff

complains of an injury that is intangible in nature, the Supreme Court instructs courts "to

consider whether an alleged intangible harm has a close relationship to a harm that has

---

[10] Nor do defendants offer any persuasive reason why my prior ruling that BKI did not transfer the BRUCE KIRBY trademark to GSL in 2008 should not hold. *See also* Doc. #645 at 21-23. Indeed, as I observed previously in my ruling on reconsideration, "defendants themselves did not seek dismissal of these particular counts [the Lanham Act claims] on standing grounds (likely because defendants knew that the BRUCE KIRBY® trademark had not been sold to GSL)." Doc. #312 at 3.

traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 1549.

Kirby's misappropriation claim against QMI (as well as LPE) is predicated on the wrongful use of his name. It is well established under the common law that a person has a protected interest in the exclusive use of his own identity, insofar as it is represented by his name or likeness. Insofar as the use may be of benefit to him or others, it is against the law to use someone's name or likeness to advertise the defendant's business or product, or for some other commercial purpose, without the person's consent. *See Bruce Kirby, Inc.*, 2018 WL 3614116, at *5. Connecticut recognizes a cause of action in tort for "appropriation of [someone's] name or likeness." *Ibid.* (quoting *Foncello v. Amorossi*, 284 Conn. 225, 234 (2007)). "Actions to remedy defendants' invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American courts, and the right of privacy is recognized by most states." *Gorss Motels, Inc. v. Sysco Guest Supply, LLC*, 2017 WL 3597880, at *3 (D. Conn. 2017) (internal quotations omitted).

It was an invasion of privacy for defendants to use Kirby's name for some commercial advantage without his consent. Such an invasion of privacy constitutes an intangible harm that is actionable under traditional privacy torts. *See Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019) (explaining that "[h]arms actionable under traditional privacy torts include 'unreasonable intrusion upon ... seclusion,' 'appropriation of the other's name or likeness,' 'unreasonable publicity given to the other's private life,' and 'publicity that unreasonably places the other in a false light before the public.'") (quoting Restatement (Second) of Torts § 652A(2)(a)–(d) (1977)). Accordingly, the invasion of Kirby's privacy is an intangible harm that suffices to establish an injury-in-fact to give rise to standing. *See Leyse v. Lifetime Entm't Servs.,*

*LLC*, 679 F. App'x 44, 46 (2d Cir. 2017) ("The injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice.") (citation omitted); *Gorss Motels, Inc.*, 2017 WL 3597880, at *4.

In sum, BKI and Kirby both had standing to maintain their claims. Therefore, I will deny defendants' post-trial motion to the extent that it argues that plaintiffs lacked standing.

### Defendants' motion for new trial

Defendants move for a new trial on all claims pursuant to Rule 59 of the Federal Rules of Civil Procedure. Doc. #641; *see also* Doc. #642 (memorandum of law). Rule 59(a) provides that the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." The standard for granting a motion for a new trial is lower than the standard for granting a Rule 50 motion for judgment as a matter of law—a judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted); *see also Kennedy v. Supreme Forest Prod., Inc.*, 295 F. Supp. 3d 113, 118–19 (D. Conn. 2017).

Still, the Second Circuit has emphasized "the high degree of deference [that should be] accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Raedle,* 670 F.3d at 418. Nor is a motion for a new trial "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). The Court may only grant a motion for new trial "if the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice[.]" *Stampf v. Long Island R.R. Co.*, 761

F.3d 192, 202 (2d Cir. 2014); *Kennedy*, 295 F. Supp. 3d at 119.

Defendants move for a new trial on the Lanham Act claims on the basis that there was no evidence presented at trial to support the jury's conclusion that QMI used the BRUCE KIRBY trademark without the consent of BKI. Doc. #642 at 19-21. I do not agree and conclude that a new trial is not warranted on this basis. The jury had a sound evidentiary basis to find that QMI indeed used the trademark BRUCE KIRBY without BKI's consent.

BKI registered the BRUCE KIRBY mark in 2008, and it retained ownership of the trademark even after its sale of other Laser-related rights to GSL that same year. *See* Doc. #610-3 at 4 (¶¶ 7-9) (BK 218). Kirby, the sole owner of BKI, testified at trial that he wrote a letter in March 2010 to the ILCA secretary, in which he requested that ILCA stop issuing plaques to QMI and LPE because the plaques "had [his] name on them and [QMI and LPE] were building boats with those plaques on them and not paying any royalties." Doc. #600 at 129:17-20 (Kirby). In response to questioning from counsel, Kirby further testified that once QMI and LPE stopped paying royalties, they did not have authorization to use his name—BRUCE KIRBY—on the Laser sailboats. Doc. #600 at 134:23-24 (Kirby) ("When they stopped paying royalties, they had to stop building boats."). The jury had enough evidence before it to conclude that the continuing use of the BRUCE KIRBY trademark was without BKI's consent.

Defendants next argue that there was no evidence presented to support the jury's conclusion that QMI's use of the BRUCE KIRBY mark caused consumer confusion. Doc. #642 at 21-22. Again, the jury had a sufficient evidentiary basis to find that QMI's unauthorized use of the BRUCE KIRBY trademark caused customer confusion about the sponsorship or approval of the Laser. Evidence was presented at trial, pursuant to the parties' stipulation, that prior to the ILCA rule change that went into effect on April 23, 2013, Lasers were required to have the

Builder Plaque, which included the phrase "Laser Sailboat Designed by Bruce Kirby," affixed to the backside of the cockpit in order to be race eligible. Doc. #610-3 at 6-7 (¶¶ 21, 24) (BK 218) (capitalization omitted). Kirby testified that the Builder Plaque (along with the ISAF Plaque) were always affixed in the "same place" on each Laser and that "[p]eople would look for them there." Doc. #600 at 114:19-20 (Kirby). According to Kirby, this was because "anyone who knew much about the boat and who wanted to race it looked for the plaque[s because they] made the boat authentic, it made it a legal Laser…one that was built to the specs in the builders['] manual." Doc. #600 at 114:22-115:2 (Kirby).

Crane's testimony likewise emphasized that a given Laser would not be race-eligible if it was not built in compliance with the Construction Manual, which in turn required the plaques. Doc. #600 at 189-90 (Crane); *see also* Doc. #601 at 73 (Crane). Crane further confirmed that what Laser customers "wanted to know, is that a boat was class legal," and that was "[b]ecause they wanted to race the boats in Laser races[.]" Doc. #601 at 74:19-24 (Crane).

All in all, there was evidence in the record that the Builder Plaque, which included the trademark BRUCE KIRBY, was an important visual indication of a Laser's compliance and eligibility to a potential customer looking to race such a boat. From this, the jury could have reasonably inferred that the Builder Plaque with the unauthorized trademark implied to customers that a Laser was sponsored or approved by BKI, the owner of the BRUCE KIRBY mark. The jury's verdict in favor of BKI on the trademark infringement claims was not against the weight of the evidence, was not seriously erroneous, and was not a miscarriage of justice. I will deny defendants' motion for a new trial on BKI's Lanham Act claims insofar as defendants challenge the jury's verdict on QMI's liability.

As to Kirby's state law misappropriation claim, defendants first challenge the jury's

verdict as to QMI's liability, arguing that the jury's finding that QMI used Kirby's name without his consent was "against the weight of the evidence." Doc. #642 at 22. Defendants argue the misappropriation claim "should be set aside," largely on the same basis as their argument for a new trial on the Lanham Act claims against QMI. *Id*. at 22-23.

Under Connecticut law, a defendant may not publicize a person's name for the purpose of appropriating to the defendant's benefit the commercial or other value associated with that person's name without their authorization. *See Gleason v. Smolinski*, 2009 WL 2506607, at *4 (Conn. Super. Ct. 2009) ("The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose.") (quoting Restatement (Second) of Torts § 652C (1977), cmt (b)); *see also Jonap v. Silver*, 1 Conn. App. 550, 557–58 (1984). In other words, as I charged the jury, Kirby had to prove that QMI and LPE used his name in a way that went beyond mere references to him in connection with his public activities without obtaining his consent to do so. *See* Doc. #603 at 28.

I have already described how the jury had an evidentiary basis to conclude that QMI used BKI's mark without authorization. Here, too, the jury had an evidentiary basis to find that the defendants used Kirby's name for commercial purposes without obtaining his consent to do so by including Kirby's name on the Builder Plaque and selling Lasers.

Defendants next argue that LPE is entitled to a new trial on the misappropriation claim on the basis that there was insufficient evidence to support the jury's conclusion as to damages. Doc. #642 at 23-26.[11] Under Connecticut law, damages for misappropriation may be measured

---

[11] Although the jury returned verdicts in favor of Kirby on his misappropriation claim against LPE as well as QMI, it awarded only nominal damages against QMI, and defendants seek a new trial solely as to Kirby's misappropriation claim against LPE on the issue of damages. *See* Doc. #642 at 23.

by the commercial benefit obtained by the defendant through the wrongful use of another's name or likeness. *See Kelly v. Kurtz*, 193 Conn. App. 507, 528–30 (2019). As I charged the jury, Kirby bore the burden to provide sufficient evidence to calculate with reasonable certainty the commercial benefit that LPE derived from using his name on the Builder Plaque on the Lasers it sold. *See* Doc. #603 at 37-38.

As noted above, evidence was presented that customers looked to see if a Laser was legal or race-eligible, and a boat's eligibility was signaled in part by the Builder Plaque. The jury could rationally infer it was reasonably certain that a customer would not have purchased a non-compliant Laser—that is, a Laser that did not bear the Builder Plaque with the Bruce Kirby name. On this basis, the jury could be reasonably certain that any time LPE sold a Laser, LPE commercially benefitted through the use of Kirby's name.

Furthermore, the jury's damages award corresponds to the evidence of revenue obtained by LPE from its non-U.S. sales of Lasers after Kirby directly communicated with LPE that he wanted them to "stop" selling boats with his name. In October and November 2012, Kirby sent letters to LPE (and QMI) because he wanted "[t]o stop [LPE] from building the boat because they'd been building the boat with plaques with my name and not paying anybody anything." Doc. #600 at 180:15-17 (Kirby). [12]

The trial evidence showed that LPE's revenue from non-U.S. sales of Lasers from October 2012 until April 23, 2013 totaled $2,520,578.81. *See* Doc. #610-16 (BK 220). This is the

---

[12] Kirby also testified that he wanted to stop QMI which was "building boats and putting the plaque on them with my name and not paying royalties." Doc. #600 at 180:4-5 (Kirby).

precise amount of the jury's damages award to Kirby for his misappropriation claim against LPE.[13] Doc. #573-1 at 2.

The jury had a sound basis to ascertain damages, as measured by LPE's commercial benefit obtained through unauthorized use of Kirby's name. I will therefore deny the motion for a new trial on Kirby's misappropriation claim against LPE on this basis.[14]

Defendants also seek "to set aside the jury's finding and order a new trial on the issue of punitive damages against LPE on the grounds that the evidence is insufficient to [prove] LPE engaged in an intentional and wanton violation of Kirby's right to his name." Doc. #642 at 26. As I noted above with respect to the jury's damages award against LPE, the evidence showed that Kirby communicated directly with LPE (and QMI) that he wanted them to stop selling Lasers with his name. There was also evidence presented at trial that LPE and QMI may have been involved in (or at least privy to) discussions in early 2011 surrounding the ILCA rule change, which eventually took effect on April 23, 2013. *See* Doc. #600 at 199-200 (Crane). Nevertheless, evidence at trial demonstrated that LPE (along with QMI) continued to sell Lasers with Kirby's name on it through 2011 and into April 2013. And although defendants argue that LPE was required to include Kirby's name on the Lasers LPE sold under "the Construction Manual, the 2005 Agreement, and the ILCA Rules," Doc. #642 at 26, there was also evidence

---

[13] And plaintiffs' expert testified that LPE's revenues from non-U.S. Laser sales from June 2010-April 23, 2013, and February 2011-April 23, 2013, totaled $16,503,016.32 and $12,140,425.15, respectively. Doc. #601 at 31-33 (DeCusati); *see also* Doc. #610-16 (BK 220).

[14] For the same reasons, I also decline to grant defendants' alternative request to enter an "order of remittitur reducing the damages awarded to nominal damages and offer Kirby the option of a new trial." Doc. #642 at 23; *see also Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291, 320 (2004) ("A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur."); *id.* at 323 ("The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury…. The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption…") (citation omitted).

presented at trial showing that LPE's Builder Agreement was terminated in May 2010. Insofar as the Builder Agreements required the parties to construct Lasers in compliance with the Construction Manual (which in turn required that Lasers bear the ISAF Plaque and the Builder Plaque, among other requirements), after May 2010 LPE was no longer bound by its Builder Agreement. The jury thus had an evidentiary basis to conclude that LPE was intentionally and wantonly selling Lasers with Kirby's name on them, even after Kirby put LPE on notice that he wanted it to stop.

As with its verdict in favor of BKI on the Lanham Act claims, the jury's verdict in favor of Kirby on the misappropriation claims was not against the weight of the evidence, was not seriously erroneous, and was not a miscarriage of justice. Therefore, I will deny defendants' motion for a new trial on Kirby's misappropriation claim.

### Plaintiffs' motion for entry of judgment

Plaintiffs move for entry of judgment of the jury's verdict pursuant to Rule 58, Rule 54, and Rule 52, which provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Doc. #610. I will first address the Lanham Act claim, then the misappropriation claim, and then subsidiary issues of attorneys' fees, punitive damages, and prejudgment interest.

### Lanham Act trademark infringement

Plaintiffs first seek entry of judgment on the Lanham Act claims in favor of BKI and ask the Court to award damages to BKI from QMI in the amount that was awarded by the jury: $4,337,157.49. Doc. #610-1 at 11. This award represents the total of QMI's gross revenues from U.S. sales of Lasers from February 2011 to April 23, 2013. *See* Doc. #610-15 (BK 219). The jury

made this damages award under deterrence and unjust enrichment theories. *See* Doc. 573-1 at 3.

The Lanham Act provides several remedies to the registrant of a trademark whose rights have been violated, including an award of profits, referred to as an accounting of profits or disgorgement of profits. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014) (citing and quoting 15 U.S.C. § 1117(a)). "[A]n accounting is appropriate if defendant is unjustly enriched [] or if an accounting is necessary to deter a willful infringer from doing so again." *Larsen v. Ortega*, 816 F. Supp. 97, 112 (D. Conn. 1992) (internal quotations omitted), *aff'd,* 990 F.2d 623 (2d Cir. 1993). But the Act also provides that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

As an initial matter, I must determine whether the jury's damages award of QMI's profits is advisory.[15] Before trial, defendants objected to instructing the jury on Lanham Act damages "on the grounds that BKI's claims for damages under the Lanham Act are to be decided by the Court, rather than by the jury" because BKI claims only an accounting for QMI's profits, and "[a]n accounting for profits authorized by the Lanham Act is equitable relief, rather than legal relief." Doc. #522-13 at 32. I nonetheless instructed the jury on awarding damages in the event it found QMI liable for trademark infringement. *See* Doc. #579 at 18-20. Defendants now argue that I should treat the jury's award of profits as advisory and reject it entirely. Doc. #615 at 21. Plaintiffs acknowledge that it is uncertain whether or not the jury's determination was advisory because "[t]he Second Circuit has not explicitly ruled as to whether there is a federal right to a

---

[15] Neither party suggests that the jury's verdict as to QMI's *liability* for trademark infringement and false designation of origin was advisory.

jury trial as to an accounting of profits," and they request that I set out findings of fact in support of the jury's determination because of this uncertainty. Doc. #610-1 at 21.

Under Federal Rule of Civil Procedure 39, a court "may try any issue with an advisory jury" when it is "not triable of right by a jury," unless the parties consent to try the issue "by a jury whose verdict has the same effect as if a jury trial had been a matter of right." Fed. R. Civ. P. 39(c). Although the Second Circuit has not determined whether there is a right to a trial by jury for an accounting and disgorgement of profits in a trademark infringement case, it has characterized the accounting of profits in a trademark infringement action for the purposes of an award under 15 U.S.C. 1117(a) as an "equitable remedy." *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 130 (2d Cir. 2014). Several federal appeals courts have explained that, because a determination of a defendant's profits for the purposes of a damages award under the Lanham Act is equitable in nature, there is no right to a jury trial on that issue. *See Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1358-59 (11th Cir. 2019) (collecting cases). Because there is no right to a jury trial for an accounting and disgorgement of profits in a trademark infringement case, and because defendants timely objected to the jury determining that issue, it follows that the jury's determination of Lanham Act damages is advisory. *See* Fed. R. Civ. P. 39(c); *see also Dymskaya v. Orem's Diner of Wilton, Inc.*, 2015 WL 1038394, at *7–8 (D. Conn. 2015).

When accepting the aid of an advisory jury, the Court must make its own independent findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). *See, e.g.*, *DeFelice v. American Int'l Life Assur.*, 112 F.3d 61, 65 (2d Cir. 1997) (noting that a trial court using an advisory jury must both make "its own factual findings and conclusions, in reliance upon the advisory jury's verdict if the court so chooses, and ... explain how it arrived at

22

those findings and conclusions."). But "[t]he views of an advisory jury may be 'an important part of the data taken into consideration in arriving at the court's independent conclusion.'" *NAACP v. Acusport Corp.*, 226 F. Supp. 2d 391, 400 (E.D.N.Y. 2002) (quoting *Birnbaum v. United States*, 436 F. Supp. 967, 988 (E.D.N.Y. 1977)).

I have thoroughly considered the trial record and the parties' submissions, and I have also taken into consideration the jury's damages award. My above discussion of the trial evidence constitutes the Court's findings of fact pursuant to Rule 52(a) with respect to the accounting of QMI's profits. *See Larsen*, 816 F. Supp. at 100. Based on these facts, I make the following conclusions of law pertaining to an accounting of QMI's profits, as is also required by Rule 52(a).

Under the Lanham Act, a trademark owner may recover profits that an infringer obtained by violating the owner's rights. *See* 15 U.S.C. § 1117(a). As the Supreme Court has recently ruled, a remedy of profits under the Lanham Act may be based upon but does not require a finding that a defendant's trademark infringement was willful. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). I conclude in my discretion—and especially on the basis of the evidence showing that QMI engaged in a willful trademark violation—that it is appropriate for deterrence and compensatory purposes for the Court to award profits as the measure of damages.

To calculate an award of profits in a Lanham Act case, the plaintiff bears the burden to prove at the outset the amount of the defendant's revenues from infringing sales. *See Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990). Based on the evidence presented at trial and as recounted in the facts above, I conclude that plaintiffs have carried their burden of establishing that QMI's gross revenue from U.S. sales of Lasers from February 2011

to April 23, 2013 was $4,337,157.49. *See* Doc. #610-15 (BK 219); *see also* Def. Ex. 604 (monthly units sold and revenue from October 2011 through April 2013). This is the sum—QMI's gross sales—that was determined by the jury to be QMI's profits for the purpose of awarding trademark damages.

Once a plaintiff has met this initial burden to prove revenues, the burden shifts to the defendant to prove any costs or deductions it claims should be subtracted from the infringing revenues. 15 U.S.C. § 1117(a); *see also Am. Honda Motor Co.*, 918 F.2d at 1063; *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 268 (W.D.N.Y. 2013). Here, plaintiffs argue that judgment should enter as to the full amount of damages awarded by the jury, contending that the jury's verdict reflects that QMI failed to prove any of its costs. *See* Doc. #610-1 at 19, 21-28.

But under the Lanham Act, my determination of and calculation of a damages award must be guided by principles of equity. *See* 15 U.S.C. § 1117(a). A court must "balance equitable factors in assessing the propriety of a profits award," and "[t]hese include, but are not limited to: (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." *4 Pillar Dynasty LLC v. New York & Company, Inc.*, 933 F.3d 202, 214 (2d Cir. 2019). I have considered all these factors, while mindful that "district courts should attend closely to the need to fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall" and that "when a plaintiff sustains its burden of proving willfulness, courts should consider not only whether an enhanced profits award is appropriate, but also whether the disgorgement of *all* profits attributable to the infringing product is necessary to achieve the

desired deterrent effect." *Ibid.* (emphasis in original).

Notwithstanding the jury's decision to award BKI damages in an amount equal to QMI's revenues without a discount for its costs, I conclude that equity warrants some accounting for QMI's adequately proven costs. As I explain below, the award of damages should be reduced by QMI's material costs which have been adequately proven with reasonable certainty but not for other costs such as labor and overhead.

*Materials costs*

Defendants' expert testified at length about his analysis of the costs to produce each Laser from October 2011 to April 2013, breaking out the production costs in terms of materials, labor, and overhead. *See* Def. Ex. 605 (cost per unit analysis); *see also* Def. Ex. 606 (cost of additional components, which is part of the materials cost). As to the material costs, the expert testified that he looked at the bill of materials for the Laser overall, as well the bill of material costs for the boat's hull, which is the most expensive component for the Laser. Doc. #601 at 117 (Murray). He also explained that to verify these numbers, he looked at various invoices, including invoices of hull costs. *Id.* at 138 (Murray). Based on the Court's month-by-month calculations which are detailed in an appendix to this ruling, QMI's materials costs for October 2011 to April 23, 2013 totaled $1,353,187.39. *See* Appendix Table 1.[16]

Defendants did not present evidence of the Laser production costs for the months *prior to*

---

[16] More should be said about the manner of calculation for April 2013. In the defense exhibits showing QMI's monthly sales and the cost of production analysis from October 2012 to April 2013, it is not clear whether the figures for April 2013 are based on the *full* month or only include sales for the *partial* month until April 23, 2013. *See* Docs. #610-25 (Def. Ex. 608) (QMI's sales); #610-18 (Def. Ex. 609) (total cost of production analysis). But comparing defendants' April 2013 total sales figure to plaintiffs' sales figure for that month—which explicitly states that it includes QMI's sales only through April 23, 2013—it is likely that defendants' figure includes sales for the full month of April because it is higher. *Compare* Doc. #610-25 (Def. Ex. 608) *with* Doc. #610-15 (BK 219). Plaintiffs' figures, however, do not include the number of units sold. *See* Doc. #610-15 (BK 219). As a result, I am unable to ascertain precisely how many units were sold from April 1 through April 23, 2013 (as opposed to the entire month of April 2013). By relying on both the plaintiffs' figure for gross sales of $109,260.44 from April 1 to April 23, 2013 (BK 219) and the defendants' figures for units sold, gross sales, and production costs in April 2013

25

October 2011. *See* Def. Ex. 605 (cost per unit analysis from October 2011 to April 2013). The jury, however, clearly contemplated a longer period of infringement, because it awarded as trademark damages QMI's gross revenue from sales of Lasers during the period from February 2011 to April 23, 2013. As noted above, the evidence presented at trial amply shows that QMI's last royalty payment was on January 31, 2011, right before February 2011.

It is appropriate to reduce QMI's gross revenue from sales of Lasers during February 2011 to September 2011 by the per unit materials cost that defendants calculated for October 2011. The earliest calculation of the per unit materials cost provided by the defense expert is for October 2011. Def. Ex. 605. That per unit materials cost remains constant for the next seven months, through April 2012, after which QMI began buying hulls in Euros rather than U.S. dollars. *Ibid*. On this basis, it is reasonable to infer that the per unit materials cost for October 2011 would also be the same for the eight months immediately preceding (February 2011 to September 2011).

There is one more complication. Plaintiffs have not provided any figures as to the number of Lasers sold per month; it was defendants' expert who provided the number of units sold from October 2011 to April 2013. *See* Def. Ex. 604. Without the number of units sold each month from February 2011 to September 2011, I am unable to directly calculate the deduction for materials cost (which is on a per unit basis) from QMI's gross sales (which is on a monthly basis) for those months.

However, there is a manner to reasonably estimate this amount on the basis of the evidence showing *monthly* materials costs as a percent of *monthly* gross sales during the period

---

(Def. Exs. 604 and 605), it is a reasonable estimate that QMI sold 29 units from April 1 to April 23, 2013, which results in total materials costs of $64,740.68 and net sales of $44,519.76 over that period.

of October 2011 to April 23, 2013, which ranges from 45% to 62% and averages 52%. Accordingly, it is reasonable to reduce QMI's gross sales for the months from February 2011 to September 2011 by 52%, for a sum total for net sales of $847,171.36. *See* Appendix Table 2.

*Labor and overhead costs*

Although I conclude that QMI should receive the benefit of a reduction for the amount of its per unit materials costs, I conclude that it has not adequately proven an amount that should be deducted for labor and overhead costs. "Every infringer shoulders the burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods." *Lee Valley Tools, Ltd.*, 288 F.R.D. at 268 (internal citation and quotations omitted); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 654-56 (S.D.N.Y. 2007) (explaining that "in assessing the defendant's net profit from the infringing sales, courts are to use the 'full absorption' method, but only if the defendant proves the connection between a general expense such as overhead and the infringing sales," compared to the "incremental" approach, "in which only those costs that were incurred as a direct result of the production of the infringing items are to be deducted"). Thus, "the infringer is also entitled to deduct fixed or overhead costs if the defendant can show what portion of overhead contributed to the production and sale of the infringing products." *Lee Valley Tools, Ltd.*, 288 F.R.D. at 268 (internal quotations omitted).

At trial, the defense expert acknowledged that he relied only on reports from company personnel ($42 per hour, and four hours of labor "to prep a boat for distribution") to reach his calculations for the labor costs of producing Lasers. Doc. #601 at 124-25 (Murray). Defendants' expert explained that he calculated the per unit overhead costs based on QMI's total sales of boats—which included Lasers and other boats—by calculating the "percent of revenue that goes to the administrative costs" on an annual basis, and then taking that percent of the average

revenue per Laser to calculate per unit overhead costs. *See* Doc. #601 at 126-29; *see also* Def. Ex. 605 (cost per unit analysis). But on cross examination, the expert acknowledged that he did not review any documents to determine whether the overhead in the financial statements was, in fact, attributable to the Laser sailboats (as opposed to other production lines). Doc. #601 at 137 (Murray).

Defendants' effort to connect their figures for labor and overhead costs to the specific infringing activity—revenue from Laser sales—thus falls short. *See River Light V, L.P. v. Lin & J Int'l, Inc.*, 2015 WL 3916271, at *7 (S.D.N.Y. 2015) ("While Defendants introduce tax returns from 2011 to the present as evidence of deductible costs, the tax returns necessarily reflect *aggregate* costs borne by Lin & J, not costs associated with the manufacture, marketing, and sale of the counterfeit goods…"); *ibid*. (declining to reduce gross sales where defendants "have made only a cursory—and wholly unsubstantiated—attempt to connect the deductions sought to the specific infringing activity."). Because defendants have not sufficiently substantiated the amount and connection between these general expenses and the infringing sales of Lasers, a reduction in QMI's gross sales by the per unit labor and overhead costs is not warranted.

### Calculation of damages for violations of Lanham Act

In light of the discussion above, I conclude that the damages award should be calculated on the basis of QMI's revenues of $4,337,157.49 minus allowable materials costs for the period from February 2011 to April 23, 2013. I have conducted a month-by-month calculation of these costs as set forth in Table 1 and Table 2 in the Appendix to this ruling. These calculations result in total materials costs of 2,280,421.16 (which includes $927,233.77 for the period from February 2011 to September 2011 and $1,353,187.39 for the period from October 2011 to April

23, 2011), resulting in a just damages award under the Lanham Act for BKI against QMI of $2,056,736.33.

### *Common law misappropriation of name*

Plaintiffs also seek entry of judgment on the jury's verdict as to QMI's and LPE's liability for Kirby's state law claim of misappropriation of his name, as well the jury's award of compensatory damages for misappropriation against LPE. Doc. #610-1 at 32. For the same reasons that I concluded that defendants were not entitled to a new trial on Kirby's misappropriation claims, I also conclude that the jury had evidence upon which it reasonably concluded that QMI and LPE unlawfully misappropriated Bruce Kirby's name.

I also conclude that the jury had sufficient evidence from which to reasonably conclude that Kirby was entitled to $2,520,578.81 in compensatory damages from LPE for misappropriation. Again, this sum represents the total of LPE's sales of Lasers from October 2012 through April 23, 2013. Under Connecticut law, damages for such misappropriation may be measured by the commercial benefit obtained by the defendants. As I noted in assessing defendants' motion for a new trial, there was evidence presented at trial that, even after its Builder Agreement was terminated, LPE benefitted commercially from selling Lasers prior to April 23, 2013—and those boats only had value as race-eligible Lasers in part thanks to the inclusion of Kirby's name on the Builder Plaque.

I am not persuaded by defendants' argument that "Kirby failed to present evidence of the commercial benefit of using his name for sales of Lasers in Europe and the Middle East" and that the jury's award of LPE's revenues (rather than, for example, profits) was based on a misunderstanding of law. Doc. #615 at 26. Defendants misplace their reliance on *Kelly v. Kurtz*, 193 Conn. App. 507 (2019). In that case, the trial court set aside a jury's damages award for

misappropriation where plaintiff "presented *no* evidence of the commercial value of that benefit" and where there was "*no* evidentiary basis" for the damages award. *Id.* at 530 (emphasis added). As demonstrated by my discussion of the trial evidence above, that is simply not the case here. Furthermore, unlike with QMI, there was *no* evidence of LPE's cost of production of Lasers introduced at trial. I have no basis in the record to reduce the jury's award for any costs incurred by LPE. Nor do defendants point to any cases that make clear "commercial benefit" for the purpose of awarding damages for a misappropriation claim *cannot* be based on gross revenue.

For the same reasons that I have denied defendants' motion for a new trial on Kirby's misappropriation claims, I decline to set aside the jury's verdict as to QMI's and LPE's liability for misappropriation of Kirby's name. And in the absence of authority showing that a jury *cannot* measure "commercial benefit" in terms of LPE's revenue from sales of the Lasers bearing Bruce Kirby's name, I further decline to set aside the jury's damages award against LPE for misappropriation. Accordingly, I will grant plaintiffs' motion for entry of judgment as to QMI's and LPE's liability for misappropriation of Kirby's name, and I will grant their motion as to the jury's award of compensatory damages against LPE in the amount of $2,520,578.81.

### Attorneys' fees for Lanham Act claim

Plaintiffs next seek an award of $758,415.15 in attorneys' fees and an award of $885,889.66 in punitive damages. Doc. #640 at 1.[17] As an initial matter, "the Lanham Act does not authorize an additional award of punitive damages ... So long as its purpose is to compensate a plaintiff for its actual injuries—even though the award is designed to deter wrongful conduct— the Lanham Act remains remedial." *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d

---

[17] These requested sums are based on the hourly rates set forth in this Court's ruling on plaintiffs' pretrial motion for sanctions and attorney's fees. Doc. #640-1 at 4; *see also Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2020 WL 502653, at *5 (D. Conn. 2020).

103, 113 (2d Cir. 1988); *see also Larsen*, 816 F. Supp. at 112. Insofar as plaintiffs seek punitive

damages, they may only do so in connection with Kirby's misappropriation claims.

Notwithstanding the unavailability of punitive damages under the Lanham Act, the Act

provides that a court "may award reasonable attorney fees to the prevailing party" in

"exceptional cases." 15 U.S.C. § 1117(a). In *Sleepy's LLC v. Select Comfort Wholesale Corp*.,

909 F.3d 519, 529-31 (2d Cir. 2018), the Second Circuit revised its approach to the definition of

"exceptional," adopting the test set forth by the Supreme Court in *Octane Fitness, LLC v. Icon*

*Health & Fitness, Inc*., 572 U.S. 545 (2014), for "exceptional cases" under the attorneys' fees

provision of the Patent Act. An exceptional case under the Lanham Act's fee-shifting provision

for prevailing parties is one that stands out from others with respect to the substantive strength of

a party's litigating position, considering both the governing law and the facts of the case, or the

unreasonable manner in which the case was litigated. *See Sleepy's LLC*, 909 F.3d at 530-31.

When considering an award of attorneys' fees under the Lanham Act, "[c]ourts are to 'evaluate

the totality of the circumstances,' looking to 'a wide variety of factors, including frivolousness,

motivation, objective unreasonableness (both in the factual and legal components of the case)

and the need in particular circumstances to advance considerations of compensation and

deterrence.'" *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo "Spartak"*, 791 F. App'x

284, 285 (2d Cir. 2020) (quoting *Sleepy's LLC*, 909 F.3d at 530).

The jury properly concluded that QMI engaged in willful trademark infringement and

false designation of origin. *See* Doc. #573-1 at 1-2 (verdict). Indeed, BKI's infringement claim

was very strong. QMI willfully used its mark despite being told it could no longer do so. It kept

using the trademark and Bruce Kirby's name for its continuing commercial advantage while

paying royalties to no one. It is hard to view defendants' dogged litigation of this action as much

more than a stalling tactic against an elderly man—Bruce Kirby—in hopes of delaying or

deferring altogether a day of reckoning. This case is "one that stands out from others with respect

to the substantive strength of a party's litigating position." *Sleepy's LLC*, 909 F.3d at 530

(quoting *Octane Fitness*, 572 U.S. at 554).

Moreover, the manner in which this case was litigated, with its complex history, weighs

in favor of qualifying this action as an exceptional case under the totality of the circumstances.

For example, certain of the defendants' actions roughly two months before trial, which led to my

imposing sanctions for violating discovery orders and awarding attorneys' fees to the plaintiffs,

illustrate the unreasonable manner in which the case was litigated at times. *Compare Lavatec*

*Laundry Tech. GmbH v. Voss Laundry Sols.,* 2018 WL 2426655, at *14 (D. Conn. 2018)

(awarding attorneys' fees because "Voss's 'sanctionable conduct,' which formed the basis for

holding Voss in contempt, renders this case 'exceptional' for the purpose of awarding attorneys'

fees under the Lanham Act"), *with Graduation Sols., LLC v. Acadima, LLC*, 2020 WL 1528082,

at *2 (D. Conn. 2020) (declining to award attorneys' fees in part because "Plaintiff does not

point to any similar litigation misconduct in this case"); *see also Sleepy's LLC*, 909 F.3d at 530.

Accordingly, I conclude that this case qualifies as exceptional within the meaning of the Lanham

Act, as is required to allow for an award of reasonable attorneys' fees.

Plaintiffs' attorneys' fee request does not distinguish between the legal fees incurred for

BKI's trademark claims and Kirby's misappropriation claims, apparently on the basis that all

legal work on the state law claims was inextricably linked with the legal work on the Lanham

Act claims.[18] Under some circumstances, legal fees incurred in connection with state law claims

---

[18] *See* Doc. #610-1 at 44-45; *see also, e.g.*, Docs. #640 at 2 ("Each of the billing entries highlighted in green and blue is directly related to Kirby's Lanham Act claims (Claims 1 & 2) and/or concern legal work that is inextricably intertwined with legal work related to these claims and related proofs."); #640-4 at 2 (summary table for 2013 fees, drawing no distinction between federal trademark and state claims); *id.* at 3 (2013 billing records addressed only to

may be compensated under the Lanham Act when the legal issues are intertwined. The Second

Circuit recently affirmed a district court's fee award under the Lanham Act where the court

concluded that certain hours expended on issues relating to both non-compensable state law

claims and compensable Copyright and Lanham Act claims were "intertwined …, and [] 

therefore compensable." *Manhattan Review LLC v. Yun*, 765 F. App'x 574, 578 (2d Cir. 2019);

*see also Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 168 n.4 (2d Cir. 2011) ("Hours spent on

legal work that furthers both fee-shifting and non-fee shifting claims [are compensable] because

they would have been expended even if the plaintiff had not included non-fee-shifting claims in

his complaint."); *Sleepy's, LLC*, 909 F.3d at 531-32 (discussing "narrow exception" that allows

fee recovery for claims that are inextricably intertwined with Lanham Act claims). In other

words, where there are fees related to non-compensable claims, the Court on its own may

segregate the hours spent on compensable and non-compensable claims to reach the appropriate

fee award under the Lanham Act.

I agree with plaintiffs that the legal work on the Lanham Act trademark claim was

inextricably bound up with the legal work for the common law misappropriation claim. Proof of

the elements of misappropriation did not require much more than the elements required to prove

trademark infringement. Indeed, some of the elements factually overlapped. For example, the

jury was asked whether Kirby proved by a preponderance of the evidence that LPE and QMI

used his name without his consent for the purpose of appropriating to its benefit the commercial

value of the name. Similarly, I charged the jury that for trademark infringement, BKI must prove

by a preponderance of the evidence that QMI, without BKI's consent, used the BRUCE KIRBY

---

"Bruce Kirby, Inc." with client number 01160 and making no billing distinction between BKI and Kirby or federal trademark and state claims); #640-10 at 3 (2019 billing records addressed only to "Bruce Kirby, Inc." with client number 01160 and making no billing distinction between BKI and Kirby or federal trademark and state claims); #640-12 at 2 (SUMMARY OF LEGAL FEE REQUEST).

trademark in commerce in a way that was likely to cause confusion as to the source, sponsorship, approval, or affiliation of QMI's products. That there were elements with factual proof in common for the trademark and misappropriation claims weighs strongly in favor of a conclusion that the federal and state law claims were inextricably linked.

Because I have concluded that this case is one that warrants an award of attorneys' fees under the Lanham Act, I must next examine plaintiffs' fee request to decide if it is reasonable. It is well established that courts evaluating a request for attorneys' fees must conduct a "lodestar analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 108 (2d Cir. 2014). The resulting amount "is only presumptively reasonable; it is still within the court's discretion to adjust the amount upward or downward based on the case-specific factors." *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 2012 WL 4092515, at *1 (D. Conn. 2012) (quotation marks and citation omitted). "Hence, the process is really a four-step one, as the court must: (1) determine the reasonable hourly rate; (2) determine the number of hours reasonably expended; (3) multiply the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award." *Friedman v. SThree PLC.*, 2017 WL 4082677, at *1 (D. Conn. 2017) (citation omitted).

*Reasonable hourly rate*

As noted, plaintiffs' request is based on the hourly rates set forth in this Court's ruling on plaintiffs' pretrial motion for sanctions and attorneys' fees. Doc. #640-1 at 4*; see Bruce Kirby, Inc.*, 2020 WL 502653, at *5. I incorporate my prior analysis as to what constitutes a reasonable hourly rate, and I conclude that the hourly rates that provide the basis for plaintiffs' fee request as previously set forth are reasonable. Doc. #640-1 at 4.

*Hours reasonably expended*

Plaintiffs' legal team billed hundreds of hours in connection with this case since 2013. To support this request, plaintiffs have provided the Court with monthly tables and billing records indicating the dates, hours expended, and nature of the work completed by each attorney and staff member. *See* Docs. #640-4 to #640-11.

"Proffered hours are reasonable if 'at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Perez v. Lasership, Inc.*, 2015 WL 8750965, at *1 (D. Conn. 2015) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)). "Fees should not be awarded for time entries when the corresponding description of work performed is vague and therefore not susceptible to a determination of whether the time [billed] was reasonably expended." *Id.* at *7 (quoting *Conn. Hosp. Ass'n v. O'Neill*, 891 F. Supp. 687, 690 (D. Conn. 1994)). Here, in light of the complexities of this case and its long-running history, as well as on the basis of the detailed billing records submitted by plaintiffs to support its fee request, I conclude that the hours expended, as set forth by plaintiffs, are reasonable.

*Calculating a presumptively reasonable fee*

I must next multiply the two (reasonable hourly rates and hours reasonably expended) to calculate the presumptively reasonable fee. Toward this end, I have reviewed in detail the plaintiffs' yearly summary tables (plaintiffs' "green" and "blue" entries) showing the hours reasonably expended by personnel at the applicable hourly rate along with the billing records, Docs. #640-4 to #640-11, as well as the overall summary table, Doc. #640-12 (summary table), and I accept those figures as an accurate calculation of the presumptively reasonable fee.

*Adjustments to the presumptively reasonable fee*

Having determined the presumptively reasonable fee, the final step in the fee

determination is to inquire whether an upward or downward adjustment is required. The Supreme Court has held that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Valley Hous. Ltd. P'ship v. City of Derby*, 2012 WL 1077848, at *11 (D. Conn. 2012) (quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)).

In recognition of the case's evolution since it was first filed in 2013, plaintiffs ask for 57% of a portion of their fee request, claiming that four out of their original seven claims against defendants went to trial. *See* Doc. #640 at 2-3 (discussing the entries highlighted in blue). Defendants have pointed out, however, that only three of the seven claims (43%) proceeded to trial. Doc. #644 at 2. Plaintiffs in turn furnish calculations to show that the use of a 43% multiple rather than a 57% multiple with respect to the subset of qualifying fees for which a percentage reduction is appropriate would lead to an attorneys' fee calculation of $734,528.30 rather than their initial requested amount of $758,415.15. Doc. #648 at 4-5.

The plaintiffs further exclude from their fee request "all the billing entries between 2013 to the present that either (a) include a redaction, or (b) appear to predominantly relate to a defendant other than Quarter Moon, Inc. or LaserPerformance (Europe) Limited, or predominately relate to a claim other than one concerning Defendants' unauthorized use of Kirby's trademarked name to sell Laser sailboats." Doc. #640 at 3-4 (discussing the entries highlighted in red). Plaintiffs also subtract the amount of fees that I previously awarded them in January 2020. *See* Doc. #640-12 at 2. I conclude that these are all reasonable adjustments.

Because plaintiffs have unquestionably achieved success on their Lanham Act and state law claims against both QMI and LPE, and in recognition of the adjustments that plaintiffs

themselves made, I conclude that a further downward adjustment is not needed.

As a final matter, in their supplementary submission for their fee request, plaintiffs appear to add a request for $32,460 in legal fees incurred in connection with "Defendants' baseless counterclaims." Doc. #640; Doc. #640-12 at 3; *see also* Doc. #610-31 (initial fee declaration). Yet plaintiffs advance no legal argument showing that these additional fees, which are reportedly incurred in connection to certain of defendants' state law counterclaims, may be awarded under the Lanham Act. I therefore decline to award this additional fee request of $32,460.

All in all, I conclude that plaintiffs are entitled to an award of reasonable attorneys' fees under the Lanham Act, and in connection with the inextricably linked state law claims of BKI and Kirby, in the amount of $734,528.30. *See* Doc. #648 at 4. I have considered the additional arguments raised in defendants' supplemental memorandum in opposition, *see* Doc. #644, but do not find them persuasive for substantially the reasons stated by plaintiffs in their reply, *see* Doc. #648.

### *Punitive damages for misappropriation claim*

As noted above, along with their request for attorneys' fees, plaintiffs also seek pursuant to the jury's verdict an award of punitive damages against QMI and LPE in the amount of $885,889.66. Doc. #640 at 1; *see also* Doc. #610-1 at 34-36. "[C]ommon-law punitive damages … are limited under Connecticut law to litigation expenses, such as attorney's fees less taxable costs." *Hylton v. Gunter*, 313 Conn. 472, 484 (2014). As I instructed the jury, punitive damages may be awarded only for conduct that is outrageous because of reckless indifference to the rights of others, or they may be awarded for an intentional and wanton violation of those rights. Doc. #579 at 22.

Consistent with the jury's verdict concluding that the predicate for punitive damages has been proven, I will award punitive damages for the attorneys' fees that I have already calculated for BKI's Lanham Act claim against QMI.[19] Because the jury determined that both QMI and LPE were liable for the misappropriation of Kirby's name and that both should be subject to punitive damages, and also because I have found that the litigation of the misappropriation claim was inextricably linked with the litigation of the Lanham Act claim, it is appropriate to enter an award of punitive damages in joint favor of Kirby and BKI against both QMI and LPE who shall be jointly and severally liable for the full amount.

But in order to avoid the possibility of improper double recovery of an amount that is more than reasonable attorneys' fees expended by plaintiffs' counsel, the total amount that Kirby and BKI are entitled to for attorneys' fees is $734,528.30. Upon payment from the defendants of a total amount of $734,528.30 to Kirby and/or BKI for attorneys' fees (including all amounts paid by QMI to BKI for Lanham Act attorneys' fees), defendants shall not owe any additional sum to either Kirby or BKI for attorneys' fees.

I have considered whether, in light of my award of attorneys' fees under the Lanham Act, I should simply reject as duplicative an award of punitive damages for attorneys' fees for the state law misappropriation claim. I decline to do so for two reasons. First, in the event that any appeal might determine that fees should not have been awarded under the Lanham Act, then plaintiffs should still be entitled to punitive damages for the misappropriation claim. Second, the Lanham Act attorneys' fee award is solely against QMI while the misappropriation punitive damages award lies against both QMI and LPE. Under principles of joint and several liability,

---

[19] Plaintiffs seek a higher amount of attorneys' fees as part of their punitive damages award than for their Lanham Act claim, based on "actual" fees rather than a lodestar calculation. *See* Doc. #640-12 at 4. However, I conclude that $734,528.30 is a reasonable calculation for attorneys' fees for the reasons above and I decline to award an increased amount of attorneys' fees as punitive damages.

plaintiffs should have the opportunity to seek to enforce an award of attorneys' fees against both QMI and LPE rather than only against QMI.

In addition, I will award plaintiffs punitive damages in the amount of non-taxable litigation expenses that plaintiffs identify as reasonably necessary to prosecuting this action. For the purpose of a punitive damages award, "[l]itigation expenses may include not only reasonable attorney's fees, but also any other nontaxable disbursements reasonably necessary to prosecuting the action." *Berry v. Loiseau*, 223 Conn. 786, 832 (1992). Plaintiffs seek $76,888.30 in expenses less taxable costs for this action. Doc. #640-12 at 4. I have reviewed plaintiffs' request for litigation expenses and find it to be a reasonable request based on expenses actually billed to plaintiffs in the first instance, and that plaintiffs have properly excluded taxable costs. *See Fraser v. Wyeth, Inc.*, 2013 WL 4012764, at *8 (D. Conn. 2013) ("Connecticut courts do not require specific documentation of costs and fees in order to award punitive damages based on litigation expenses, and the court may consider any evidence Plaintiffs offer for the purpose of calculating the costs related to this litigation") (citing *Berry,* 223 Conn. at 833).

I will again make one adjustment to the expenses request, however. For the same reasons I limited the attorneys' fee award to 43% of fees incurred through 2016, I will also only award 43% of non-taxable litigation expenses incurred through 2016. Plaintiffs represent that this adjustment will reduce non-taxable costs by $7,237.16. Doc. #648 at 5. Accordingly, I will award plaintiffs punitive damages of $69,651.14 for litigation expenses less taxable costs. Together with the attorneys' fees noted above, this results in a full punitive damages award of $804,179.44 in joint favor of plaintiffs against QMI and LPE, who shall be jointly and severally liable for the full amount.[20]

---

[20] Plaintiffs have stated they also intend to file a motion for costs for purposes of their Lanham Act claim under Federal Rule of Civil Procedure 54(d)(1). *See* Doc. #640 at 34 n.5. The Court is prepared to entertain a timely

### *Prejudgment interest*

Finally, plaintiffs seek prejudgment interest on the jury's damages award for federal claims under the Lanham Act as well as the jury's damages award for misappropriation pursuant to Conn. Gen. Stat. § 37-3a. Doc. #610-1 at 47-48.

As to prejudgment interest on the Lanham Act claim, "[a]lthough Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." *Merck Eprova AG*, 760 F.3d at 263–64 (citation omitted). The Second Circuit has explained that, for the determination of whether prejudgment interest is warranted, "exceptional cases" generally involve willfulness and bad faith. *See id.* 264 (affirming a district court's conclusion that the case was "such an exceptional case as to warrant an award of pre-judgment interest pursuant to Section 1117(a)" because the factual record "readily support[ed] the district court's findings of willfulness and bad faith").

As noted earlier, the jury in this case explicitly determined that QMI acted willfully in infringing the BRUCE KIRBY mark. I also conclude that there is some evidence suggestive of bad faith or unreasonable conduct in this case's history, which I also noted in relation to plaintiffs' request for attorney's fees under the Lanham Act. Indeed, I granted the plaintiffs' motion for certain sanctions on QMI and LPE ahead of trial, and I awarded attorneys' fees under Rule 37(b)(2)(C) for failure to comply with a discovery order. *See Bruce Kirby, Inc.*, 2020 WL 502653, at *3-*4.

Notwithstanding these factors, I will exercise my discretion not to award prejudgment interest under the Lanham Act. *See 4 Pillar Dynasty*, 933 F.3d at 216 n.12 (discussing additional

---

motion for costs to the extent that the costs sought are not duplicative of those the Court is awarding as part of the punitive damages award.

equitable factors for a court to consider when deciding to award prejudgment interest for a Lanham Act award beyond whether the case was "exceptional"). "A finding of bad faith does not automatically lead to an award [of prejudgment interest] for the non-infringing party." *Coty Inc. v. Excell Brands*, LLC, 277 F. Supp. 3d 425, 469 (S.D.N.Y. 2017). I think the purposes of the Lanham Act have been amply served by the award against QMI of its profits and also the award of attorneys' fees. *See Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 666 (S.D.N.Y. 2013) (declining to award prejudgment interest under the Lanham Act where "any financial harm to Fresh has been adequately compensated by the jury award" and where "[n]o more is needed").

I also decline to award prejudgment interest on the jury's damages award for misappropriation. Under Connecticut law, prejudgment interest may be recovered and allowed in civil actions at a rate of 10 percent a year. Conn. Gen. Stat. § 37-3a(a). "The decision of whether to grant interest under § 37–3a is primarily an equitable determination and a matter lying within the discretion of the trial court." *Chapman Lumber, Inc. v. Tager*, 288 Conn. 69, 99 (2008) (internal quotations and citations omitted).

"It is well established that '[§] 37–3a provides a substantive right [to prejudgment interest] that applies only to certain claims.'" *DiLieto v. Cty. Obstetrics & Gynecology Grp., P.C.*, 310 Conn. 38, 50 n.11 (2013) (quoting *Foley v. Huntington Co.*, 42 Conn. App. 712, 739, *cert. denied*, 239 Conn. 931 (1996)).  As the Connecticut Supreme Court has explained, prejudgment interest should be awarded only in limited circumstances such as "where there is a written contract for the payment of money on a day certain" or where there is "tortious injury to property when the damages were capable of being ascertained on the date of the injury." *DiLieto*, 310 Conn. at 50 n.11 (internal quotation marks, citations, and brackets omitted).

The tort of misappropriation of name or likeness is not a contract claim or a claim "involving the wrongful detention of money *after* it becomes due and payable." *Goetz v. Hershman*, 423 F. App'x 3, 5 (2d Cir. 2011) (quoting *Foley*, 42 Conn. App. at 740 (emphasis in original)). And although misappropriation of name or likeness is a claim in tort, it does not involve tortious injury to property.

Misappropriation of a name or likeness thus appears not to qualify as the type of claim for which prejudgment interest may be awarded under Connecticut law. *Cf. Nelson v. Tradewind Aviation, LLC*, 155 Conn. App. 519, 548 (2015) (affirming trial court's decision to not charge jury with question about prejudgment interest after finding that the plaintiff's tort claims were akin to personal injury claims unsuited for an award of prejudgment interest). In the absence of plaintiffs' citing authority to the contrary, I therefore conclude that Kirby is not entitled to prejudgment interest on the damages awarded by the jury against QMI and LPE for misappropriation.

## CONCLUSION

For the foregoing reasons, the Court DENIES the defendants' motion to dismiss and for new trial (Doc. #641), and the Court GRANTS in part and DENIES in part plaintiffs' motion for entry of judgment as explained above (Doc. #610). The Clerk of Court shall prepare a separate judgment reflecting the following:

- Judgment in favor of BKI on its Lanham Act claims (Counts One and Two) against QMI, and a Lanham Act damages award of $2,056,736.33 against QMI;

- Judgment in favor of Kirby against QMI and LPE for misappropriation of Kirby's name (Count Three), with a nominal damages award of $1 against QMI and a compensatory damages award of $2,520,578.81 against LPE;

- An award of attorneys' fees under the Lanham Act in favor of BKI against QMI in the amount of $734,528.30; and

- An award of punitive damages on Kirby's misappropriation claim in the amount of $804,179.44 against both QMI and LPE, who shall be jointly and severally

liable for the full amount. Upon payment from the defendants of a total amount of $734,528.30 to Kirby and/or BKI for attorneys' fees (including all amounts paid by QMI to BKI for Lanham Act attorneys' fees), defendants shall not owe any additional sum to either Kirby or BKI for the attorneys' fees component of the punitive damages award.

Upon separate entry of judgment, the Clerk of Court shall close this case. In light of the mathematical complexity of the award calculations in this case, if any party believes that this ruling is based upon a clear computational error, they are encouraged to file a timely motion for reconsideration or motion to re-open the judgment rather than litigating a claimed error of math in the first instance on appeal. It is so ordered.

Dated at New Haven this 1st day of February 2021.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

**APPENDIX - TABLE 1**

QMI'S U.S. SALES REVENUE AND MATERIALS
COST CALCULATIONS FOR OCTOBER 2011-APRIL 23, 2013

| Month | Units sold (1) | Materials cost per unit (2) | Total materials cost (3) | Gross sales (4) | Net sales | Materials cost as % of sales |
|---|---|---|---|---|---|---|
| *Source* | *Def. Ex. 604* | *Def. Ex. 605* | *(1) times (2)* | *BK 219* | *(4) minus (3)* | *(3) divided by (4)* |
| Oct. 2011 | 53 | $2,143.36 | $113,598.08 | $186,967.80 | $73,369.72 | 61% |
| Nov. 2011 | 57 | $2,143.36 | $122,171.52 | $241,705.15 | $119,533.63 | 51% |
| Dec. 2011 | 53 | $2,143.36 | $113,598.08 | $226,839.35 | $113,241.27 | 50% |
| Jan. 2012 | 16 | $2,143.36 | $34,293.76 | $68,007.67 | $33,713.91 | 50% |
| Feb. 2012 | 11 | $2,143.36 | $23,576.96 | $49,110.92 | $25,533.96 | 48% |
| Mar. 2012 | 18 | $2,143.36 | $38,580.48 | $80,024.46 | $41,443.98 | 48% |
| Apr. 2012 | 20 | $2,143.36 | $42,867.20 | $90,566.04 | $47,698.84 | 47% |
| May 2012 | 42 | $2,254.06 | $94,670.52 | $189,816.48 | $95,145.96 | 50% |
| June 2012 | 47 | $2,224.70 | $104,560.90 | $199,377.01 | $94,816.11 | 52% |
| July 2012 | 31 | $2,228.90 | $69,095.90 | $121,743.10 | $52,647.20 | 57% |
| Aug. 2012 | 7 | $2,236.51 | $15,655.57 | $32,356.50 | $16,700.93 | 48% |
| Sept. 2012 | 20 | $2,264.25 | $45,285.00 | $78,572.73 | $33,287.73 | 58% |
| Oct. 2012 | 24 | $2,263.32 | $54,319.68 | $88,306.85 | $33,987.17 | 62% |
| Nov. 2012 | 85 | $2,255.16 | $191,688.60 | $347,409.15 | $155,720.55 | 55% |
| Dec. 2012 | 43 | $2,266.88 | $97,475.84 | $201,286.10 | $103,810.26 | 48% |
| Jan. 2013 | 14 | $2,256.82 | $31,595.48 | $61,163.60 | $29,568.12 | 52% |
| Feb. 2013 | 37 | $2,223.30 | $82,262.10 | $161,253.61 | $78,991.51 | 51% |
| Mar. 2013 | 6 | $2,191.84 | $13,151.04 | $28,985.40 | $15,834.36 | 45% |
| *Apr. 2013 | *29 | $2,207.52 | $64,740.68 | $109,260.44 | $44,519.76 | 59% |
| **Total from Oct. 2011-Apr. 23, 2013** | | | $1,353,187.39 | $2,562,752.36 | $1,209,564.97 | **52%** |

*Notes to Table 1*:

*Only over the period from April 1-April 23, 2013. For the reasons described in the Court's ruling, the estimate of 29 total units sold through April 23 is calculated by dividing the total gross sales from April 1-April 23, 2013 of $109,260.44 (BK 219) by the average gross revenue per unit of $3,725.55 in the month of April (Def. Ex. 604), which equals an estimate of 29 boats sold from April 1-April 23, 2013.

**The 52% figure is the average of the monthly materials cost as a percentage of gross sales estimates, rounded from 52.26%.

**APPENDIX - TABLE 2**

QMI'S U.S. SALES FOR FEBRUARY 2011-SEPTEMBER 2011

| Month | Gross sales (1) | Materials cost (2) | Net sales |
|---|---|---|---|
| *Source* | *BK 219* | *52% of (1)* | *(1) minus (2)* |
| Feb. 2011 | $118,927.50 | $62,146.80 | $56,780.70 |
| Mar. 2011 | $177,838.15 | $92,931.17 | $84,906.98 |
| Apr. 2011 | $120,294.00 | $62,860.88 | $57,433.12 |
| May 2011 | $211,037.05 | $110,279.60 | $100,757.45 |
| June 2011 | $243,051.00 | $127,008.82 | $116,042.18 |
| July 2011 | $219,813.35 | $114,865.74 | $104,947.61 |
| Aug. 2011 | $542,426.50 | $283,450.58 | $258,975.92 |
| Sept. 2011 | $141,017.58 | $73,690.20 | $67,327.38 |
| **Feb-Sept. 2011** | **$1,774,405.13** | **$927,233.77** | **$847,171.36** |