UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE KIRBY, INC., *et al.*,<br>    *Plaintiffs*,<br><br>    v.<br><br>LASERPERFORMANCE (EUROPE)<br>LIMITED, *et al.*,<br>    *Defendants*. | No. 3:13-cv-00297 (JAM) |

### ORDER ON REMAND

Before the Court are the parties' memoranda concerning Lanham Act damages following the Second Circuit's limited remand. *See Estate of Kirby v. LaserPerformance (Europe) Ltd.*, 2023 WL 5319216 (2d Cir. 2023). The plaintiffs—the Estate of Bruce Kirby and Bruce Kirby, Inc.—argue that the Court should enter judgment in their favor in the amount of nearly seven million dollars. The defendants—LaserPerformance (Europe) Limited (LPE) and Quarter Moon, Inc. (QMI)—urge the Court to decline to award profits as a measure of damages at all, and they dispute the amount and rate of post-judgment interest that the Court should award.

For the reasons explained below, I will award damages under the Lanham Act in the amount of $451,094.37. I will also award post-judgment interest on this award and on previously granted awards at the appropriate, federally mandated statutory rates. *See* 28 U.S.C. § 1961.

### BACKGROUND

In 1969, Bruce Kirby revolutionized sailboat racing when he designed the "Laser"—a small, compact, and incredibly popular sailboat that could be carried atop a car.[1] He incorporated

---

[1] The Court has provided more detailed accounts of this long running and complex case in its prior rulings. *See, e.g.*, *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2018 WL 3614117, at *1-3 (D. Conn. 2018); *Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2016 WL 4275576, at *1-2 (D. Conn. 2016).

Bruce Kirby, Inc. (BKI) as the company for his boat designs. The plaintiffs then entered into an agreement, called the Head Agreement, with two international sailing organizations—the International Sailing Federation (ISAF, now known as World Sailing) and the International Laser Class Association (ILCA, an association of Laser owners and builders)—to regulate the manufacture, sale, and registration of sailboats that use Kirby's design.

The plaintiffs also entered contracts with defendants LaserPerformance (Europe) Limited (LPE) and Quarter Moon, Inc. (QMI), called the Builder Agreements, to build the sailboats in conformity with the Head Agreement. These latter agreements granted LPE and QMI a license to manufacture, sell, and market the Laser sailboat.[2] In exchange, LPE and QMI agreed to pay the plaintiffs royalties in an amount of 2% of the dealer wholesale price. Under the agreements, a builder's failure to timely pay royalties was a condition for default.[3]

The Builder Agreements also required that Lasers be built according to a Construction Manual, which mandated that each Laser have two small plaques affixed in its cockpit—one known as the "ISAF Plaque" and the other known as the "Builder Plaque."[4] BKI authorized ILCA to issue the ISAF Plaques on its behalf. Importantly, the ISAF Plaque was required for a Laser to compete in certain racing events, and it included the phrase "Authorised by the International Sailing Federation, the International Laser Class Association, Bruce Kirby Inc. & Trade Mark Owner."[5] The Builder Plaque included the phrase "Laser Sailboat Designed by Bruce Kirby."[6]

For many years, the parties enjoyed smooth sailing as LPE and QMI paid the plaintiffs the royalties due from their sales of Lasers affixed with the two plaques. In 2008, however,

---

[2] Docs. # 228-11 at 5 (1983 Agreement), #228-12 at 3 (1989 Agreement).
[3] Doc. #610-3 at 4-5 (¶¶ 15, 18).
[4] *Id.* at 6 (¶ 22); *see also* Doc. #600 at 110-11.
[5] *See* Doc. #600 at 156-57; Doc.#610-3 at 5-6.
[6] Doc. #610-3 at 6.

Kirby decided to sell his rights in the Laser boat design, and he and his company entered a sales contract with a New Zealand company called Global Sailing Limited (GSL).[7] BKI did not, however, sell the trademark to GSL, and at some point after the sale to GSL, both LPE and QMI stopped paying royalties.[8]

Once LPE and QMI had stopped paying royalties, Kirby tried to stop them from selling Lasers with his name on them.[9] In March 2010, he sent a letter to the ILCA secretary, requesting that ILCA stop issuing plaques to QMI.[10] In May 2010, the Builder Agreement with LPE was terminated.[11] Then, at the end of January 2011, QMI made its last royalty payment.[12]

But despite these developments, both LPE and QMI continued to sell Lasers with the plaques that bore Kirby's name. Finally, in October and again in November 2012, Kirby sent letters directly to QMI and LPE, respectively, writing that they were "no longer entitled to obtain plaques or in any manner whatsoever take any action regarding the licensed design (Kirby Sailboat)."[13] The companies, undaunted, continued selling Lasers as before.

In March 2013, Kirby and BKI filed this lawsuit against LPE and QMI for breach of contract, for infringement and counterfeiting of Kirby's trademark under the Lanham Act, for unfair trade practices under Connecticut Unfair Trade Practices Act, and for misappropriation of Kirby's name.[14] And on April 23, 2013, an ILCA and ISAF rule change went into effect, which eliminated the requirement for an authorized builder to have a Builder Agreement to build any

---

[7] Doc. #600 at 118, 126-27, 140, 145-46.
[8] *Id.* at 127.
[9] Docs. #228-24, #228-25, #228-26, #228-27; *see also* Doc. #600 at 180:4-5 (explaining that QMI was "building boats . . . with my name and not paying royalties"); *id.* at 180:15-17 (explaining that Kirby wanted to stop LPE from building Lasers "with my name and not paying anybody anything").
[10] Doc. #600 at 129-30.
[11] Doc. #601 at 76.
[12] Doc. #600 at 203 ("[T]he last accrued royalty payment that was paid was from January 31, 2011").
[13] Docs. #610-21, #610-22.
[14] *See* Doc. #1.

Laser.[15] After that rule change, neither LPE nor QMI sold Lasers with plaques that bore the Kirby name.[16]

Following years of pre-trial litigation, I presided over a jury trial in February 2020 on claims for trademark infringement under the Lanham Act and for common law misappropriation of Bruce Kirby's name. The jury returned a verdict in favor of both Kirby and BKI and awarded damages of $4,337,157.49 to BKI for trademark infringement by QMI.[17] The jury also found both LPE and QMI liable to Kirby for misappropriating his name and awarded damages of $2,520,578.81 against LPE and nominal damages against QMI.[18] And it further found that both defendants should be liable for punitive damages for the misappropriation claim in an amount to be determined by the Court.[19]

As relevant here, I awarded judgment in favor of BKI on its Lanham Act claims against QMI in the amount of $2,056,736.33. *See Bruce Kirby, Inc. v. LaserPerformance (Europe) Ltd.*, 2021 WL 328632, at *15 (D. Conn. 2021).[20] I concluded that, "especially on the basis of the evidence showing that QMI engaged in a willful trademark violation—that it is appropriate . . . for the Court to award profits as the measure of damages." *Id.* at *12.[21] I explained that sufficient evidence had been presented for the jury to find that, from the period February 1, 2011 (by which time QMI had ceased paying royalties) to April 23, 2013 (when the

---

[15] Doc. #610-3 at 7; #600 at 199-200.
[16] Doc. #600 at 203-04.
[17] Doc. #573 at 2.
[18] *Id.* at 4.
[19] *Ibid.*
[20] The Court also awarded judgment in favor of Kirby against QMI and LPE for misappropriation of Kirby's name, with a nominal damages award of $1 against QMI and a compensatory damages award of $2,520,578.81 against LPE; an award of attorneys' fees under the Lanham Act in favor of BKI against QMI in the amount of $734,528.30; and an award of punitive damages on Kirby's misappropriation claim in the amount of $804,179.44 against both QMI and LPE, who are jointly and severally liable for that amount. *See Kirby*, 2021 WL 328632, at *22.
[21] *See also* Doc. #600 at 129-30.

4

rule change led the defendants to stop using the protected trademark), QMI had used the Bruce Kirby trademark without BKI's consent. *Id.* at *12-15.[22]

The defendants appealed, arguing that the damages awards were excessive and that the Court had erred in finding that QMI had willfully infringed on Kirby's trademark. *See Estate of Kirby v. LaserPerformance (Europe) Ltd.*, 2023 WL 5319216, at *2 (2d Cir. 2023) (summary order).[23] The plaintiffs cross-appealed, insisting that the Court had erroneously denied their request for an award of prejudgment interest. *Ibid.*

The Second Circuit affirmed the judgment for Kirby in connection with the common law misappropriation claim, but vacated the Lanham Act damages award. It noted that although a finding of willfulness is not required to award profits as a measure of damages under the Lanham Act, this Court had "made it clear that its damage award against QMI rested on its conclusion that QMI engaged in a willful trademark violation." *Id.* at *3; *see also Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 219 (2020). And it explained that the evidence used to support this Court's finding of willful infringement from February 2011 to April 2023—Kirby's 2010 letter to ILCA and QMI's February 2011 nonpayment of royalties—was insufficient to support the finding that the defendants were on notice of their infringement for that entire period.

The Second Circuit elaborated that Kirby's 2010 letter to ILCA was insufficient to put QMI on notice of impermissible trademark infringement because the 2010 letter was addressed to ILCA, not QMI, and it had said "nothing about QMI's use of Kirby's name, or Kirby's objection thereto." *Estate of Kirby*, 2023 WL 5319216 at *4. It also concluded that QMI's February 2011 nonpayment of royalties failed to support the conclusion that QMI was on notice of BKI's non-consent to the use of the trademark. This was because such nonpayment was an

---

[22] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[23] Bruce Kirby died in July 2021, and his estate continued this litigation.

event of default under the Builder Agreement but did not serve to automatically terminate the contract. *Ibid.*

Consequently, the Second Circuit determined that "[t]he earliest a reasonable factfinder could potentially conclude that QMI began willfully infringing on BKI's mark was October 11, 2012, when Kirby sent a letter to QMI stating that its right to build the licensed design was terminated." *Ibid.*[24] The Second Circuit therefore vacated the Lanham Act damages and remanded for reconsideration of the appropriate amount due.

The parties have now filed memoranda addressing the recalculation of damages and the amount of post-judgment interest due.[25]

## DISCUSSION

On remand, the parties advance several arguments related to the Lanham Act award and post-judgment interest. For the reasons explained below, I will award Lanham Act damages in favor of the plaintiffs in the amount of $451,094.37. I will also award post-judgment interest in their favor at the appropriate federally mandated statutory rates per 28 U.S.C. § 1961. This interest shall accrue from the date of this judgment for the Lanham Act damages and from the date of the Court's prior judgment for all other awards.

### *Lanham Act damages*

The parties dispute how much the Second Circuit's ruling should affect the Lanham Act damages award. The plaintiffs urge that, although the Second Circuit held that QMI could not have willfully infringed on Kirby's trademark until Kirby sent QMI his October 2012 letter, this should not affect the total award.[26] For its part, QMI argues that even Kirby's October 2012

---

[24] *See* Doc. #610-21.
[25] Docs #720; #721; #722; #723.
[26] Doc. #720 at 4-5.

6

letter was insufficient to put it on notice of copyright infringement and that the Court should therefore "decline to award profits as a measure of damages."[27] Both parties miss the mark.

The Lanham Act does not require willfulness for a finding of liability. *See Romag Fasteners*, 590 U.S. at 218-19. The Second Circuit has explained, however, that willfulness is nonetheless "a highly important consideration in determining whether an award of profits is appropriate." *Estate of Kirby*, 2023 WL 5319216, at *3 (quoting *Ramag Fasteners*, 590 U.S. at 219). But the Second Circuit's analysis focused not on this Court's finding of willfulness *per se*, but on an ancillary matter: When did QMI begin to willfully infringe on the trademark? Furthermore, the Second Circuit pointed to "undisputed evidence" that, under its Builder Agreement, "QMI was licensed to use the Bruce Kirby mark, and was, in fact, *required to do so*." *Estate of Kirby*, 2023 WL 5319216, at *4 (emphasis added).

In other words, the Second Circuit first noted that this Court's award was based on its finding of willful infringement. Second, it considered *when* QMI received adequate notice of its infringement because QMI was, prior to such notice, *required* to use the Kirby mark under the builder agreement. And while in my prior ruling I had determined that QMI received adequate notice in March 2010 (when Kirby mailed a letter to ILCA's secretary), the Second Circuit explained that QMI could not have received adequate notice until October 2012 (when Kirby contacted QMI directly).

The parties both seem to ignore or misunderstand the second step in that analysis. Although the plaintiffs rightly point out that the Lanham Act does not require willfulness for a finding of liability, they take this and run too far with it—overlooking the issue of *when* QMI could have received adequate notice of its infringement.[28] Plaintiffs argue that even if QMI could

---

[27] Doc. #721 at 4-5.
[28] Doc. #720 at 4-5.

7

have been a willful infringer only "from October 11, 2012 to April 23, 2013," it does not matter that QMI might not have been willfully infringing on Kirby's rights from February 2011 to October 2012 because willfulness is not a requirement for damages.[29] Plaintiffs then conclude the award should remain unchanged.[30]

But this ignores that the Court's prior award was largely based on QMI's willful infringement, just as it ignores that the Second Circuit determined that the period of such infringement needs to be narrowed. Because the Second Circuit concluded that the period of willful infringement could not have possibly started until October 11, 2012 (when Kirby contacted QMI directly and insisted that it cease using his mark), there is no merit to the plaintiffs' argument that this Court can simply reinstate its prior award.

QMI's argument similarly misunderstands the Second Circuit's decision. It argues that the Court should decline to award damages because Kirby's 2012 letter was insufficient to provide it with notice of its trademark infringement. But Kirby's letter clearly stated that QMI's "right to build the licensed design (Kirby Sailboat) is hereby terminated," and that QMI was "no longer entitled to obtain plaques or in any manner whatsoever take any action regarding the licensed design (Kirby Sailboat)." *Kirby*, 2021 WL 328632, at *3.[31]

It could hardly be clearer from this letter that Kirby was serving notice that QMI's continued building of the licensed design would infringe the trademark rights. As noted above, the construction of the Laser sailboat required the use of two plaques bearing the Kirby name, and BKI had retained ownership of the trademark when it otherwise sold the building agreements to GSL in 2008. *See id.* at *2-3. Therefore, when Kirby revoked QMI's authority to obtain the required plaques bearing his mark, QMI, having been in receipt of communications revoking that

---

[29] *Ibid.*
[30] *Id.* at 5.
[31] Docs. #610-21, #610-22.

authority, could no longer produce Lasers in accordance with the Builder Agreement without willfully infringing on Kirby's mark.

In light of these facts, and especially due to the clear language in Kirby's letter of October 11, 2012, I conclude that QMI's continued use of Kirby's trademark after that date was willful. And as I concluded in my prior ruling, the period of willful infringement on Kirby's mark ended on April 23, 2013. On that date, a rule change went into effect that eliminated the requirement for any authorized builder to affix plaques with Kirby's mark on Lasers that they sold. *See Kirby*, 2021 WL 328632, at *3, *10.[32]

Accordingly, I will award Lanham Act damages from the period beginning October 11, 2012 through April 23, 2013. This is, in fact, what QMI suggests should be done if the Court again concludes that an award of profits is justified.[33] Per QMI's own filings, that amounts to an award of $462,431.73.[34]

But there is one more wrinkle. The amount QMI proffers is derived from exhibits showing that QMI sold 24 units during the entirety of October 2012. An accurate damages award must account for and exclude the days October 1 through 10 before the letter was sent. That is because they fall outside the period of willful infringement and some of the 24 units sold during October 2012 may have been sold during that ten-day period.[35] Such an adjustment would total October net sales of $21,927.21. This leads to a total award amount under the Lanham Act of $451,094.37. The Court's October net sales and its month-by-month calculations are detailed in an appendix to this ruling.

---

[32] *See* Doc. #600 at 199-200; Doc. #610-3 at 7.
[33] Doc. #721 at 5.
[34] *Ibid.*
[35] An amount of 24 units averaged over 31 days amounts to .77 units per day. That amount multiplied by 20 days amounts to 15.48 units. Similar adjustments should be made for material costs and for QMI's gross sales during October 2012. These calculations are reflected in the accompanying appendix.

9

*Attorney fees*

QMI further argues that the Court should revisit its conclusion that this was an "exceptional case" warranting an award of attorneys' fees for the Lanham Act claims—all on the purported basis that the Second Circuit found QMI was *not* a willful infringer.[36] But the Second Circuit made no such finding. Rather, it only narrowed the possible period of willful infringement: "The earliest a reasonable factfinder could potentially conclude that QMI began willfully infringing on BKI's mark," explained the court, "was October 11, 2012." *Estate of Kirby*, 2023 WL 5319216, at *4.

In any event, QMI's willfulness was not the only reason that this Court, in its prior ruling, found the case to be "exceptional." Other reasons included QMI's unreasonable litigation techniques and its violations of discovery orders. *See Kirby*, 2021 WL 328632, at *17 ("Moreover, the manner in which this case was litigated, with its complex history, weighs in favor of qualifying this action as an exceptional case under the totality of the circumstances. For example, certain of the defendants' actions roughly two months before trial, which led to my imposing sanctions for violating discovery orders . . . illustrate the unreasonable manner in which the case was litigated at times."). In light of this, the Court declines to revisit its decision to award attorneys' fees for the Lanham Act claims.

*Post-judgment interest*

There remains the issue of post-judgment interest. Plaintiffs argue that, per Connecticut General Statutes § 37-3a, they are entitled to post-judgment interest on all their claims at a rate of 10%.[37] Defendants counter that 28 U.S.C. § 1961 governs the award of post-judgment interest,

---

[36] Doc. #722 at 3-4.
[37] Doc. #720 at 7-9.

because the provision plaintiffs rely upon applies only to "state court actions."[38] For the following reasons, I will award post-judgment interest on the state claim, the Lanham Act claims, and the attorneys' fees at the appropriate federal statutory rates.

Courts in this Circuit have uniformly determined that post-judgment interest is calculated in accordance with federal law. *See SuperCom Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, 2023 WL 8372271, at *2 (S.D.N.Y. 2023) (collecting cases). What is more, the Second Circuit has squarely held that post-judgment interest "is mandatory on awards in civil cases as of the date judgment is entered." *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996); *accord H.C. v. New York City Dep't of Educ.*, 71 F.4th 120, 129 (2d Cir. 2023). This is in line with the text of 28 U.S.C. § 1961, which states that "*any* money judgment in a civil case recovered in a district court" is entitled to the federal statutory interest rate. 28 U.S.C. § 1961(a) (emphasis added).

Here, however, there is a wrinkle with respect to the Lanham Act award: Because the Second Circuit vacated the Lanham Act damages, interest should not accrue as of the date of this Court's prior judgment. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) ("Where the judgment on damages was not supported by evidence, the damages have not been ascertained in any meaningful way."); *Lewis*, 99 F.3d at 545 ("[W]here [a] judgment is vacated because it lacks a legal basis or requires further factual development, the vacated award should be treated as a nullity and post-judgment interest therefore accrues from the entry of judgment on remand."); *accord Hysell v. Iowa Pub. Serv. Co.*, 559 F.2d 468, 476 (8th Cir. 1977) ("Interest does not accrue on a vacated judgment."). Rather, interest should accrue from the date of entry of the Court's *new* judgment on remand. *See Lewis*, 99 F.3d at 545; *Trs. for the Mason Tenders Dist. Council Welfare Fund v. Hilt Constr.*, 2023 WL 4288358, at *3 (S.D.N.Y. 2023)

---

[38] Doc. #722 at 4.

11

("Petitioners' request for interest at the statutory rate prescribed by § 1961, *accruing from the date judgment is entered* until payment is made, is granted." (emphasis added)).

As regards the common law misappropriation award and attorneys' fees for the Lanham Act claims, however, post-judgment interest should accrue from the date of the Court's *prior* judgment. This is because the post-judgment interest is mandatory and because the Second Circuit affirmed these awards. *See Lewis*, 99 F.3d at 545 ("[W]here the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment."); *Eaves v. Cnty. of Cape May*, 239 F.3d 527 (3d Cir. 2001) ("[W]e already have held . . . that in certain circumstances, post-judgment interest on an attorney's fee award runs from the date of the original judgment even if that judgment was modified on appeal.").

Moreover, the Second Circuit has explained that, with an eye to uniformity, "[a] single rule should govern interest on any [judgment] debt, the nature of the original claim[s] having become irrelevant under the doctrine of merger." *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 269 (2d Cir. 1989) (quoting *Kotsopoulos v. Asturia Shipping Co., S.A.*, 467 F.2d 91, 95 (2d Cir. 1972)). That principle applies here. The judgment debt, exclusive of the vacated Lanham Act damages and despite originally being constituted of (1) the state law claim award and (2) attorneys' fees, should have a uniform date of accrual. *See, e.g.*, *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 250 F.3d 482, 493 (6th Cir. 2001) (deciding to award post-judgment interest on an award of attorneys' fees in a "judgment which is not entirely set aside").

Section 1961 provides that post-judgment interest shall be charged "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment" and

12

further provides that such interest "shall be compounded annually." 28 U.S.C. § 1961(a)-(b). The prior judgment was entered on February 2, 2021.[39] The average rate for the 1-year constant maturity Treasury yield for the week prior was 0.09%.[40] That is the applicable post-judgment interest rate for all of the Court's awards except for the newly calculated Lanham Act award, and such interest should be compounded annually from February 2, 2021, until the date of payment.

The applicable post-judgment interest rate for the Lanham Act damages will also be awarded at the federal statutory rate pursuant to section 1961, to be calculated and commencing from the day the Clerk of Court enters a revised judgment.

## CONCLUSION

For the foregoing reasons, the Court awards Lanham Act damages in the amount of $451,094.37 against QMI. The Court also awards post-judgment interest on this award at a rate to be calculated pursuant to 28 U.S.C. § 1961, accruing from the date judgment is entered. The Court also awards post-judgment interest on all other damages awards at a rate of 0.09%, to accrue from February 2, 2021.

It is so ordered.

Dated at New Haven this 2d day of January 2025.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[39] *See* Doc. #652.
[40] The relevant rate information has been acquired from the publicly available Federal Reserve Economic Data resource.

## APPENDIX – TABLE 1

### QMI'S U.S. SALES REVENUE AND MATERIALS COST CALCULATIONS FOR OCTOBER 2012—ORIGINAL AMOUNTS FROM PRIOR RULING

| Month | Units sold (1) | Materials cost per unit (2) | Total materials cost (3) | Gross sales (4) | Net sales | Materials cost as % of sales |
|---|---|---|---|---|---|---|
| Source | Def. Ex. 604 | Def. Ex. 605 | (1) times (2) | BK 219 | (4) minus (3) | (3) divided by (4) |
| Oct. 2012 | 24 | $2,263.32 | $54,319.68 | $88,306.85 | $33,987.17 | 62% |

*Notes to Table 1*:

These amounts are reflected in the Court's prior ruling and are included here for comparison purposes and for the parties' convenience.

## APPENDIX – TABLE 2

### QMI'S U.S. SALES REVENUE AND MATERIALS COST CALCULATIONS FOR OCTOBER 2012—ADJUSTED AMOUNTS

| Month | Units sold (1) | Materials cost per unit (2) | Total materials cost (3) | Gross sales (4) | Net sales | Materials cost as % of sales |
|---|---|---|---|---|---|---|
| Source | Def. Ex. 604 | Def. Ex. 605 | (1) times (2) | BK 219 | (4) minus (3) | (3) divided by (4) |
| *Oct. 2012 | *15.48387097 | $2,263.32 | $35,044.95 | *$56,972.16 | $21,927.21 | 62% |

*Notes to Table 2*:

*Only over the period from October 11-October 31, 2012. For the reasons described in the Court's ruling, the estimate of 15.48 total units sold in that period is calculated by dividing the 24 units sold during the month of October by the 31 days in that month and multiplying that amount by the 20 (for the 20 days that fell within the period of willful infringement). The gross sales amount of $56,972.16 is similarly calculated by dividing the original gross sales amount of $88,306.85 by 31 and multiplying that amount by 20 (for the 20 days that fell within the period of willful infringement).

APPENDIX – TABLE 3

QMI'S U.S. SALES REVENUE AND MATERIALS
COST CALCULATIONS FOR OCTOBER 2012-APRIL 23, 2013

| Month | Units sold (1) | Materials cost per unit (2) | Total materials cost (3) | Gross sales (4) | Net sales | Materials cost as % of sales |
|---|---|---|---|---|---|---|
| *Source* | *Def. Ex. 604* | *Def. Ex. 605* | *(1) times (2)* | BK 219 | *(4) minus (3)* | *(3) divided by (4)* |
| Oct. 2012 | 15.48387097 | $2,263.32 | $35,044.95 | $56,972.16 | $21,927.21 | 62% |
| Nov. 2012 | 85 | $2,255.16 | $191,688.60 | $347,409.15 | $155,720.55 | 55% |
| Dec. 2012 | 43 | $2,266.88 | $97,475.84 | $201,286.10 | $103,810.26 | 48% |
| Jan. 2013 | 14 | $2,256.82 | $31,595.48 | $61,163.60 | $29,568.12 | 52% |
| Feb. 2013 | 37 | $2,223.30 | $82,262.10 | $161,253.61 | $78,991.51 | 51% |
| Mar. 2013 | 6 | $2,191.84 | $13,151.04 | $28,985.40 | $15,834.36 | 45% |
| *Apr. 2013 | *29 | $2,207.52 | $64,018.08 | $109,260.44 | $45,242.36 | 59% |
| **Total from Oct. 2012-Apr. 23, 2013** | | | **$515,236.09** | **$966,330.46** | **$451,094.37** | ****53%** |

*Notes to Table 3*:

*Only over the period from April 1-April 23, 2013. For the reasons described in the Court's prior ruling, the estimate of 29 total units sold through April 23 is calculated by dividing the total gross sales from April 1-April 23, 2013 of $109,260.44 (BK 219) by the average gross revenue per unit of $3,725.55 in the month of April (Def. Ex. 604), which equals an estimate of 29 boats sold from April 1-April 23, 2013.

**The 53% figure is the average of the monthly materials cost as a percentage of gross sales estimates, rounded from 53.319%.

15